THOMAS B. HARVEY (CA Bar #287198)
**LAW OFFICES OF THOMAS B. HARVEY**
365 E. Avenida De Los Arboles, #226
Thousand Oaks, CA 91360
Telephone: (805) 768-4440
tbhlegal@proton.me

PAUL K. VICKREY
PATRICK F. SOLON
DYLAN M. BROWN
**VITALE, VICKREY, NIRO, SOLON & GASEY LLP**
311 S. Wacker Drive, Suite 2200
Chicago, IL 60606
(312) 236-0733
vickrey@vvnlaw.com
solon@vvnlaw.com
dbrown@vvnlaw.com
(*Applications for Pro Hac Vice Admission Pending*)

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANURADHA MITTAL, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 26-cv-02660 |
| | ) |
| UNILEVER PLC, THE MAGNUM ICE CREAM COMPANY N.V., and JOCHANAN SENF, | ) |
| | ) |
| | ) **AMENDED COMPLAINT** |
| | ) **DEMAND FOR JURY TRIAL** |
| Defendants. | ) |

## AMENDED COMPLAINT

Plaintiff, Anuradha Mittal ("Ms. Mittal"), for her Amended Complaint against Defendants Unilever PLC ("Unilever"), The Magnum Ice Cream Company N.V. ("Magnum"), and Jochanan Senf ("Senf") states as follows:

- 1 -
COMPLAINT

**SUMMARY OF CLAIMS**

1.    Ms. Mittal was a Director of Ben & Jerry's Independent Board since 2008; she served as Board Chair beginning in 2018 through December 15, 2025. The Independent Board was created when Unilever acquired Ben & Jerry's Homemade, Inc. ("Ben & Jerry's) in 2000; a key term of the Merger Agreement was the creation of an Independent Board with legally binding authority over Ben & Jerry's social mission and brand integrity.

2.    In recent years, Ms. Mittal's public support for Palestinian rights and a ceasefire in Gaza rankled Unilever. That acrimony escalated in 2024, when Unilever announced a "spinout," or "demerger" of Ben & Jerry's and the rest of its ice cream businesses into a wholly owned entity, Magnum, shares in which would be sold in a public offering -- a process which would take nearly two years. Thereafter, Defendants crafted and implemented a plan to smear and discredit Ms. Mittal through sham "investigations" and statements about their findings. Defendants engaged in that strategy to (1) coerce Ms. Mittal into "voluntarily" leaving the Board, and if she refused, (2) inform the public that she would be ousted for financial misconduct due to "investigations."

3.    In this suit, Ms. Mittal seeks redress for Defendants' campaign to vilify, denigrate and intimidate her through a drumbeat of defamatory statements, including statements that she had: (1) engaged in "self-dealing"; (2) received "improper benefits"; (3) improperly "diverted Foundation funds"; (4) "violated fiduciary duties"; (5) created a "toxic work environment"; (6) engaged in "material conflicts of interest"; and (7) been deemed unfit to serve after "internal investigations". These and other statements constitute defamation *per se,* and all Defendants participated in publishing them with actual malice; that is, Defendants published them with knowledge of their falsity, or in reckless disregard of their falsity. Ms. Mittal also asserts a claim for false light invasion of privacy and intentional infliction of emotional distress.

**PARTIES**

1.    Plaintiff Ms. Mittal resides in Oakland, California.

- 2 -
COMPLAINT

2. Defendant Unilever is a United Kingdom public limited company headquartered in London, England. Unilever also has offices in Los Angeles and San Francisco, California.

3. Defendant Magnum is a public limited company headquartered in the Netherlands.

4. Defendant Senf is a citizen of the Netherlands who also has a residence in Burlington, Vermont.

## PERSONAL JURISDICTION AND VENUE

5. This Court has personal jurisdiction over Unilever because of its significant contacts with California, and because of its intentional conduct which was specifically directed towards California, which caused harm that Unilever knew would be suffered in California.

6. This Court has personal jurisdiction over Magnum because of its intentional conduct which was specifically directed towards California, which caused harm that Magnum knew would be suffered in California.

7. This Court has personal jurisdiction over Senf because of his intentional conduct which was specifically directed towards California, which caused harm that Senf knew would be suffered in California.

8. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(c)(3).

## SUBJECT MATTER JURISDICTION

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as there is complete diversity between the parties and the matter in controversy exceeds, exclusive of interest and costs, the sum of seventy-five thousand dollars.

## FACTUAL BACKGROUND

10. Ms. Mittal founded The Oakland Institute in 2004 and has been its Executive Director ever since. The Oakland Institute is an independent policy think tank dedicated to advancing the rights and resources of smallholder farmers, pastoralists, forest dwellers, and Indigenous communities

COMPLAINT

worldwide. The Office of United Nations Special Rapporteur on the Right of Food has described Ms. Mittal's work on behalf of the Oakland Institute as "truly inspiring."

11.    Ms. Mittal has authored numerous books, and her articles and opinion pieces have been published in widely circulated newspapers including the *Los Angeles Times*, *The New York Times*, *The Guardian*, *Chicago Tribune*, *Bangkok Post*, among others; and she has been frequently interviewed on mainstream media including the *CNN*, *BBC World*, *CBC*, *ABC*, *Al Jazeera*, and *National Public Radio*.

12.    Ms. Mittal often testifies before the US Congress, the United Nations, and has given several hundred keynote addresses including invitational events from governments and universities. Recognized as the **Most Valuable Thinker** by the *Nation* magazine, Ms. Mittal is the recipient of several awards including the **2025 Swami Agnivesh Memorial Award** (Hindus for Human Rights), **Endow the Future** from Responsible Endowments Coalition, and the **2006 KPFA Peace Prize**. Ms. Mittal serves on the Board of A New Policy, Blue Planet Project, and is a Senior Fellow at the Alternative Policy Solutions at the American University, Cairo.

13.    Ms. Mittal's internationally renowned work with the Oakland Institute resulted in an invitation to join the Independent Board of Ben & Jerry's Homemade, Inc. ("Ben & Jerry's") as a Class I Director in 2008. Ms. Mittal served as the Chair of the Board of Ben & Jerry's from 2018, until her contested removal on December 15, 2025.

14.    Also beginning in 2012, Ms. Mittal has served as one of six (now five) Trustees of the Ben & Jerry's Foundation, the entity responsible for distributing approximately $5 million annually in charitable donations to recipients principally selected by a committee of Ben & Jerry's employees from a cross section of its workforce.

### Ben & Jerry's History of Social Activism

15.    Founded in 1978, Ben & Jerry's has been a leader in weaving social activism into its business model, speaking out on a variety of societal issues, particularly those involving human rights

and social justice. As examples, in 1988, Ben & Jerry's launched the "Peace Pop" to challenge Cold War spending policy, and in 1990, Ben & Jerry's co-sponsored a full-page ad in *The New York Times* challenging the Gulf War as "an unnecessary war" and publicly proclaiming that "[t]he price of gasoline should never be a reason to send our sons and daughters off to die in a foreign war." In 1991, Ben & Jerry's became an outspoken advocate for LGBTQ+ rights and began offering benefits to the same-sex partners of its employees. And, in 1998, the company successfully lobbied the Vermont legislature to pass a law that authorizes corporate directors to consider issues beyond shareholder wealth maximization when making company decisions (often referred to as the "Ben & Jerry's Law").

**Unilever's Unusual Acquisition of Ben & Jerry's,
and the Creation of the Independent Board**

16.     In 1999, several potential buyers became interested in acquiring Ben & Jerry's, including industry rivals Dreyer's Grand Ice Cream and Defendant Unilever. To distinguish its bid, Unilever instructed its Chief Counsel, "to collaborate with" Ben & Jerry's "to create a governance structure that would set [Unilever's] bid apart from any others."

17.     The parties' resulting Merger Agreement contractually preserved Ben & Jerry's authenticity and autonomy via the creation of an Independent Board. Specifically, the majority of Ben & Jerry's Board would be compromised of Class I independent directors. To further cement this autonomy, the Independent Board was entrusted with "primary responsibility" over Ben & Jerry's social mission and brand integrity and was also given veto authority over Ben & Jerry's CEO—a Unilever appointee—for areas in which the Independent Board held such "primary" authority. The Independent Board's oversight authority also included the responsibility for determining a substantial portion of the CEO's bonus.

18.     In 2017, Ms. Mittal was named Vice Chair of Ben & Jerry's Independent Board; she assumed the position of Board Chair in 2018. Under the stewardship of Ms. Mittal and the Independent Board, Ben & Jerry's has been praised as the "gold standard" for corporate activism,

with the brand's authenticity resonating with consumers. Ben & Jerry's is now the leading selling ice cream brand in the United States, and is sold in 42 countries.

19.    Despite that success, over the years, Unilever's leadership increasingly expressed displeasure with Ms. Mittal's public statements, particularly those in support of Palestinians. Beginning in 2022, Unilever executives warned Ms. Mittal that even mentioning "Palestine" would be problematic. Then, in December 2023, the Independent Board and Ben & Jerry's management informed Unilever that Ben & Jerry's would be issuing the following statement: "Ben & Jerry's calls for peace and a permanent and immediate ceasefire in Gaza." By this time, over 140 countries around the world (including England, France, and Canada), Doctors Without Borders, and the Pope had also called for a ceasefire. In response, Unilever threatened to dismantle the Independent Board and sue the board members individually if Ben & Jerry's issued the statement.

20.    Thereafter, the Board issued the statement on its own. On January 16, 2024, the *BBC* reported: "'Promoting peace has been an integral part of Ben & Jerry's DNA for four decades,' said Anuradha Mittal, the head of the board, who also runs the left-leaning think tank the Oakland Institute. 'Today, Ben & Jerry's Board stands steadfast with that principle by calling for peace and a permanent ceasefire.'" (*BBC, Ben & Jerry's Board Calls for Israel Ceasefire* (https://www.bbc.com/news/business-67991822)).

21.    Then, in 2024, Peter ter Kulve was appointed as Unilever's President of Ice Cream. In January 2024, in one of Mr. ter Kulve's first emails to Ms. Mittal, he described her as "manic" and declared: "[y]ou should really consider resigning your chair position…." Mr. ter Kulve is a close ally of Nelson Peltz, who joined Unilever's board in May 2022 and has had significant input in Unilever's decision-making, including the appointment of Unilever's last two CEOs and the censorship of Ben & Jerry's. Just two months after Mr. ter Kulve's email to Ms. Mittal, Mr. Peltz told the *Financial Times* in a March 2024 interview: "Ben & Jerry's job is to sell ice cream, not to make political statements. And these people use anything for a soapbox that they have no right to do."

22.     During the humanitarian crisis in Gaza, Ben & Jerry's Independent Board attempted to publicly speak out in support of peace and human rights at four different times. Unilever silenced each of those efforts.

23.     Accordingly, in November 2024, the Independent Board filed suit to enforce its contractual rights under the Merger Agreement. (*Ben & Jerry's Homemade, Inc. v. Conopco, Inc.*, 1:24-cv-08641-PKC (S.D.N.Y.) (the "Board litigation")).

**Unilever Announces Plans to "Spinout" Ice Cream Business
to Magnum, Escalates Pressure on Ms. Mittal**

24.     On March 19, 2024, Unilever announced plans to "spinout" or "demerge" its ice cream business -- of which Ben & Jerry's was a key component -- to Magnum. In preparation for the demerger, Unilever's ice cream business was legally separated from other parts of the Unilever Group and reorganized as a separate group, of which Magnum would become the holding company on completion of the demerger.

25.     Unilever retained the law firm of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") to assist it, and later Magnum, with the demerger. This would be a very lucrative retention for Skadden, bringing the firm many millions of dollars in fees. A key player on the Skadden team advising Unilever and Magnum on the demerger was Ryan Junck, the global head of Skadden's litigation practice. Skadden's website touts Mr. Junck's experience in "investigations" and "financial fraud."

26.     Though Skadden was assisting Unilever on the demerger plans, Unilever appointed Mr. Junck and Skadden with the investigation of business integrity complaints which the Independent Board had filed against three key Unilever leaders: Messrs. Peltz, ter Kulve and Jeffrey Eglash concerning their actions to silence the Board. Skadden quickly disposed of those complaints under a process which, according to then Unilever General Counsel Maria Varsellona, was "objective and in full compliance with Unilever's established policies and governance protocols." Mr. Eglash was not

only cleared, but also was rewarded with a promotion to Head of Unilever's Business Integrity, and Mr. Junck ostensibly reported to Eglash during his "investigation" of Ms. Mittal at issue in this suit.

27.    As part of the demerger process, Defendants Unilever and Magnum escalated the effort to discredit and oust Ms. Mittal. To quote *Reuters*:

> Unilever and Magnum have been upping the pressure on Ben & Jerry's ahead of the spinout, as the renowned ice cream brand will make up a larger portion of the new company's sales. The brand has been one of the few voices in corporate America speaking out against policies backed by U.S. President Donald Trump and Israel's war in Gaza.

(*Reuters, Exclusive: Unilever-backed audit finds deficiencies in financial controls, governance at Ben & Jerry's Foundation* (https://www.reuters.com/business/finance/unilever-backed-audit-finds-deficiencies-financial-controls-governance-ben-2025-12-02/ )).

28.    Those efforts included Unilever executive Jostein Solheim's December 2024 warning to then Ben & Jerry's CEO, Dave Stever, "if the founders keep supporting Anuradha [Mittal], Unilever will start taking it out on the management team."

**Defendants Target Ms. Mittal with an Audit and an Investigation**

29.    By early 2025, Defendants Unilever and Magnum had crafted a plan to deal with Ms. Mittal. First, an "outside" firm -- guided by Skadden -- would audit the Ben & Jerry's Foundation, focusing on Ms. Mittal and contributions to the Oakland Institute. The audit findings would then be used to justify an "investigation" into Ms. Mittal, which would be conducted by Skadden's Mr. Junck. Then, if the threat to release ensuing pretextual findings of misconduct were not enough to coerce Ms. Mittal to "voluntarily" resign before the demerger, Defendants would publish news about the findings of the "investigations" to signal to potential investors in Magnum that Ms. Mittal's days as Board Chair were numbered, due to her "misconduct." Defendants also choreographed their conduct so as to maximize Ms. Mittal's humiliation, anxiety and distress.

30.    On April 9, 2025, after Unilever removed Dave Stever as Ben & Jerry's CEO, Abhijit Bhattacharya (Unilever's Chief Financial Officer for Ice Cream) sent a letter demanding an

COMPLAINT

"expeditious" audit of the Ben & Jerry's Foundation for the first time since Unilever acquired Ben & Jerry's in 2000, stating that the audit would focus on "internal procedures and controls, disbursements, accuracy of books and records, and governance." This statement was false; the audit was focused on Ms. Mittal, pursuant to the strategy crafted by Defendants Unilever and Magnum.

31.     According to plan, on April 22, 2025, Unilever leaked Mr. Bhattacharya's letter to the media, with an article appearing in *Semafor* referencing the letter and "off the record" statements by "Unilever executives" that the target of the audit was Ms. Mittal, who had allegedly improperly benefitted from Foundation grants:

> ***Unilever is probing the finances of Ben & Jerry's charitable foundation with a focus on its grants to progressive and pro-Palestinian groups, including to an organization with ties to two of the foundation's trustees, people familiar with the matter said.***
>
> It's the latest escalation of long-running tensions between Ben & Jerry's and its corporate parent over the creamery's progressive bent. Unilever is spinning off its ice cream division, which includes Ben & Jerry's, into a standalone company.
>
> As part of that process, Unilever plans to audit the Ben & Jerry's Foundation, according to a letter sent earlier this month to the foundation's president, Jeff Furman, and seen by Semafor.

(Ex. A, *Semafor, Unilever probes Ben & Jerry's Foundation's donations* (https://www.sema for.com/article/04/21/2025/unilever-probes-ben-jerrys-foundations-donations); emphasis added). The article later identifies the two trustees as Ms. Mittal and Jeff Furman, and repeats Unilever's message that Ms. Mittal had improperly benefited from grants by the Ben & Jerry's Foundation:

> ***Unilever executives have privately identified a series of grants to the Oakland Institute, a nonprofit that promotes global aid and is critical of the World Bank and Israel, the people said. One Ben & Jerry's Foundation trustee, Anuradha Mittal, is a salaried employee and founder of the Oakland Institute, which has received more than $200,000 from the foundation since 2016, according to tax filings.***

- 9 -

COMPLAINT

(*Id.*; emphasis added). The leak and statements by "Unilever executives" were scripted and planned in advance by Defendants Unilever and Magnum, and conveyed the intended false message that Ms. Mittal had engaged in financial misconduct.

32.     In a letter dated May 6, 2025, Unilever again claimed that it sought to conduct a "routine audit" and threatened to withhold $3.5 million in grants if the Foundation did not cooperate. In that letter, Unilever promised "that the results of the audit would be made available privately to the Trustees. This is a customary practice…. [and] an effort toward transparency for all involved." The letter also stated that the audit was merely part of a pre-demerger process conducted company-wide: "we are conducting audits across the entirety of the Magnum organization." This statement was also false: Defendants had already signaled to Ms. Mittal and the rest of the world that she was the target. The "audit" was timed to allow public messaging of the "results" prior to the December 8, 2025 demerger.

33.     Following Unilever's threats, the Ben & Jerry's Foundation agreed to the audit on the condition that the report of the purportedly "routine," "independent" audit would be shared with the Foundation as Unilever unequivocally promised. What ensued was an "audit" conducted by Ernst & Young ("EY"), guided by Skadden, and aimed at Ms. Mittal.

34.     Consistent with the plan, Skadden, and Unilever's counsel in the Board litigation, Weil, Gotshal & Manges LLP ("Weil") met with EY in advance of the "audit" and gave them a road map as to what they were trying to accomplish, and specifically identified the grants on which EY was to focus. EY was instructed to keep Skadden and Weil's involvement in the audit secret from Ms. Mittal and the Foundation.

35.     However, EY made a mistake. On July 21, 2025, EY sent the Foundation's Director of Finance, its "Document Inventory List" of all documents provided to EY as of June 20, 2025. The very first document on that list is identified as follows:

COMPLAINT

| ID | Sub-Folder | Document File Name | Document Title Name | Comments |
|---|---|---|---|---|
| 1 | Attorney Work Product | Background for EY_Privileged & Confidential_Attorney Work Product.pd | Background Overview | Background overview of the situation, similar to our meeting notes with Skadden and Weil but have more depth on the grants in question. |

36.     This document shows that Skadden (and Unilever's Board litigation counsel, Weil), gave EY its marching orders, and the underlying reasons for the audit. That the document was labeled "attorney work product" also confirms the falsity of Unilever's statements that the "audit" of the Foundation was a "routine" exercise in preparation for the demerger.

37.     EY then attempted to "claw back" the document through an email "recalling" the document, but the list had already been forwarded to others within the Foundation.

38.     When EY completed its report on September 2, 2025, Unilever reneged on its unequivocal promise to share it with the Foundation, claiming that the "audit" was now "privileged." The "audit" did not, and could not, have revealed any evidence of malfeasance by Ms. Mittal. Public reporting later confirmed this, noting that while the audit purportedly criticized certain controls and processes, knowledgeable sources stated the audit did not find "wrongdoing, ethical malpractice, or violations." (Ex. B, *Reuters*, *Unilever-backed audit finds deficiencies in financial controls, governance at Ben & Jerry's Foundation* (https://www.reuters.com/business/finance/unilever-backed-audit-finds-deficiencies-financial-controls-governance-ben-2025-12-02/)). Nonetheless, for reasons which would soon be clear, all Defendants wanted to keep Ms. Mittal in the dark about the actual findings.

39.     Despite claiming that the audit was "privileged," Defendants Unilever and Magnum began feeding selective findings to the press. For example, Magnum told *Reuters* in an "exclusive" that its audit found "deficiencies" in Ben & Jerry's "financial controls and governance." (*Id.*).

40.     Then, on cue, on September 11, 2025, Mr. Junck of Skadden informed Ms. Mittal by email that Unilever had retained Skadden "to conduct a review on Unilever's behalf into certain matters relating to your role as a director on Ben & Jerry's Independent Board." That letter instructed

Ms. Mittal to not "share information regarding this review with others whether inside or outside Ben & Jerry's or Unilever." That admonition stands in stark contrast with Defendants' own plan to publish the "investigation's" purported findings "both inside and outside Ben & Jerry's."

41. At no time during the "investigation" was Ms. Mittal told what "certain matters" were being investigated, and Mr. Junck simply ignored several written requests for information about the purported charges against Ms. Mittal. The timing of Skadden's "investigation" would allow the results to be used in advance of the demerger, scheduled for December 8, 2025. Given that Skadden and Mr. Junck were assisting Unilever and Magnum with the demerger, and had already worked with Defendants to craft a plan to oust Ms. Mittal, this "investigation" could not meet any of the criteria of an "objective" investigation supposedly required by Unilever.  Mr. Junck also refused to answer straightforward questions regarding Skadden's independence and conflict of interest.

42. Meanwhile, as per Defendants' plan, Ms. Mittal was placed in the untenable, Kafkaesque position of having to defend herself against charges which Defendants intentionally kept secret from her.

**The October San Francisco Meeting and Threat**

43. Less than a month later, on October 10, 2025, Ms. Mittal attended a meeting in San Francisco with then Unilever's General Counsel, Maria Varsellona, and others to discuss the possible settlement of the Board litigation, a meeting which Unilever CEO Fernando Fernandez arranged and choreographed. In the course of those discussions, Ms. Varsellona made a startling threat: if Ms. Mittal did not resign from the Board, Unilever would publish damaging claims about her in the upcoming Magnum prospectus.

44. Ms. Varsellona also said that if Ms. Mittal resigned, the statements about Ms. Mittal would not be made. Instead, the investigation would result in a finding of no wrongdoing, and Ms. Mittal could head a new multi-million-dollar charitable organization that Unilever would fund. Ms. Varsellona's statements provided blunt confirmation that the investigation was fraudulently

conceived. The threat and proposal conveyed by Ms. Varsellona were carefully scripted in advance by Defendants Unilever and Magnum. Ms. Mittal was so shocked and upset by them that she immediately left the meeting.

45.     After Ms. Mittal refused to leave the Board, all Defendants crafted their strategy to force the Independent Board to remove her by telling the Board (all Directors except Ms. Mittal) of their "findings" and threatening that a failure to act would "breach [the Directors'] fiduciary duties." In the interim, Defendants would signal to potential investors that Ms. Mittal would be removed due to misconduct.

<strong>Defendants' October 23, 2025 Letter</strong>

46.     After Ms. Mittal rejected Unilever's coercive proposal, all Defendants escalated their efforts to isolate, humiliate and denigrate her. On October 14, 2025, Ms. Mittal sent an email to Unilever CEO Fernandez stating, among other things, "I was informed last week that should I not resign as a Chair of the Independent Board. Unilever's next prospectus would include allegations against me…. I would also note that in the same conversation that this threat was made, Unilever offered to allow me to head a multi-million-dollar non-profit should I capitulate." On October 16, 2025, Fernandez instructed Ms. Mittal that Defendant Senf was to be her "point of contact" with Unilever and Magnum. Unilever had just appointed Senf, a long time Unilever executive, as Ben & Jerry's new CEO.

47.     On October 23, 2025, Magnum sent a letter to Ben & Jerry's Independent Board members (except for Ms. Mittal), two of whom reside in California, a letter signed by Magnum's Chief Legal Officer Vanessa Vilar (who previously held the title of General Counsel of Unilever Ice Cream), but which all Defendants took a responsible part in preparing and publishing. That letter disclosed the findings of Skadden's "investigation," and demanded that the Board remove her "immediately":

*The investigation's findings are extremely troubling and raise clear concerns of self-dealing by Ms. Mittal* that directly conflict with the principles of transparency, accountability and good governance to which we are all bound. *The investigation also uncovered a pattern of inappropriate behavior, poor conduct, and waste of resources that have created a toxic and unprofessional environment for B&J's management and its employees.* Our concerns are further exacerbated by Ms. Mittal's failure to cooperate in the investigation or the audit of the B&J Foundation (the "Foundation").

We are bringing these findings directly to your attention because *Ms. Mittal's actions raise serious concerns about her adherence to her fiduciary duties, specifically the duties of care and loyalty. Her actions also constitute serious violations of the Code and its attendant policies. We strongly believe that these violations render Ms. Mittal ineligible to serve on the B&J Board, effective immediately.*

*A. Ms. Mittal Improperly Benefits from B&J Foundation Funds*

*The investigation found evidence suggesting that Ms. Mittal has personally benefitted from Foundation funds directed to her own organization [the Oakland Institute] in violation of her fiduciary duties, and that Ms. Mittal further failed to disclose those conflicts in violation of the Avoiding Conflicts of Interest policy, which requires directors to disclose an actual, perceived, or potential conflict of interest to Business Integrity.*
* * *
*At the same time, Ms. Mittal received approximately $1.3 million in compensation from the Oakland Institute, including $249,000 in rent between 2018 and 2023 for the use of an Oakland, CA home zoned as "family residential." The Oakland Institute also purchased a residential home in a California wine region with an on-site vineyard in 2019, which was not disclosed in any of the Oakland Institute's annual reports or other public statements. In other words, Foundation funds have been directed or funneled to the Oakland Institute, without appropriate conflict-of-interest disclosures or considerations, and Ms. Mittal has personally benefited by receiving compensation through the Oakland Institute.*

*Ms. Mittal's personal benefit of Foundation funds raises serious concerns about her adherence to her fiduciary duties to B&J and Unilever. Further, Ms. Mittal's presence on both sides of numerous transactions gives an appearance of a conflict of interest that is harmful to the B&J brand, particularly where she failed to disclose her conflict as required under the Avoiding Conflicts of Interest policy.*

*B. Ms. Mittal Circumvented Unilever's Refusal To Donate To Certain Organizations*

- 14 -
COMPLAINT

*The investigation also found evidence of Ms. Mittal diverting Foundation funds to organizations that Unilever has previously rejected as donation recipients.*

\* \* \*

Notwithstanding, Ms. Mittal permitted the Foundation (which is funded by Unilever) to provide donations to several previously rejected organizations, either unilaterally through her trustee discretionary grants or through "U-Fund" grants approved by the other trustees, including: The Institute for Middle Eastern Understanding, Jewish Voice for Peace, Council on American-Islamic Relations, Tikkun Olam Productions, and MPower Change.

\* \* \*

By permitting the Foundation to provide donations to these organizations, *Ms. Mittal allowed her personal values and political beliefs to take precedence over her responsibilities to B&J and Unilever, in violation of her fiduciary duties and the Avoiding Conflicts of Interest policy.*

### C. Ms. Mittal's Behavior Towards Employees and Fellow Board Members Created a Toxic Working Environment

*The investigation found that, over the course of the last several years, Ms. Mittal exhibited a pattern of disrespectful, offensive, and inappropriate workplace behavior to both B&J and Unilever employees, as well as fellow Board members,* in violation of the Respect, Dignity and Fair Treatment policy, which prohibits any behavior that is offensive, intimidating, malicious or insulting. The investigation found that Ms. Mittal has made remarks that are disrespectful and offensive and that, among other things, demonstrated racial or ethnic bias, or an intent to exclude fellow Board members or employees whom she may have perceived as holding different beliefs than she. *The investigation found that several individuals resigned, at least in part, due to Ms. Mittal's workplace conduct and that Ms. Mittal's overall conduct had created a dysfunctional work environment.*

\* \* \*

### E. Ms. Mittal Allowed the Disclosure of Confidential Business Information

As Chair of the Board, Mittal is entrusted with certain confidential business information necessary to make informed decisions about B&J's social mission and brand integrity. Ms. Mittal, like all directors, has a fiduciary duty to protect the confidentiality of such information and to adhere to Protecting Unilever's Information Policy. Notwithstanding, *the Board, under Ms. Mittal's leadership, disclosed confidential details of former B&J CEO David Stever's January 2025 annual performance review in the pending litigation*, and subsequently to the media. *Ms. Mittal's disclosure of this confidential information not only violated her fiduciary duties and Protecting Unilever's Information Policy*, but also thrusted a long time, hardworking employee and his family into the public eye before he had the chance to make his own arrangements.

- 15 -

COMPLAINT

***F. Ms. Mittal Failed to Cooperate in the Investigation and the Foundation Audit***

Despite numerous opportunities to do so, Ms. Mittal refused to cooperate in the investigation or the Foundation audit. Ms. Mittal, through her counsel, made clear that neither she nor any Class I Directors or Foundation Trustees would agree to be interviewed for the investigation despite several follow-up attempts. ***Ms. Mittal further declined to participate in an interview with the auditors as part of the Foundation audit. Her failure to cooperate in the investigation and the Foundation audit violates her fiduciary duties and the Living the Code Policy.***

\* \* \*

Ms. Mittal's continued involvement with B&J is inconsistent with [the Independent Board's fiduciary] duties. Further, by refusing to engage with B&J, [Magnum] and Unilever on issues concerning the integrity of Ms. Mittal, the Class I Directors have failed to fulfill their own fiduciary duties…. Please let us know what you intend to do about these findings against Ms. Mittal so we can determine how best to proceed.

(Ex. C; subtitle emphasis in original; other emphasis added).

48. These statements -- Skadden's purported findings of its investigation -- were false.

49. At Defendants' directive, the Independent Board members who received the October 23, 2025 letter were told that they could not disclose it to Ms. Mittal. Defendants had yet to notify Ms. Mittal of the investigation charges, much less its findings.

**The October Meeting of the Independent Board**

50. The Independent Board held its October meeting in Burlington, Vermont on October 28 and 29, 2025. During that meeting, Defendant Senf repeatedly deviated from the agenda, and, shouting at times, talked over Ms. Mittal. He also sought to use the time allotted for the "CEO update" to instruct the Board that it could not be conducting business as usual in light of the serious charges of financial misconduct against Ms. Mittal.

51. Also during that meeting, Defendant Senf loudly read a summary of the same charges against Ms. Mittal identified in the October 23, 2025 letter, including "improperly benefitting from Ben & Jerry's Foundation funds," "diverting funds," "creating a toxic working environment." Given

that Defendants had refused to tell Ms. Mittal what the "serious charges" against her were, much less the purported basis for them, Defendants deliberately placed Ms. Mittal in the humiliating position of being unable to defend herself from Defendant Senf's attacks. Defendant Senf also shouted threats at Ms. Mittal, including "I am warning you" and "be careful."

52.    Also during that meeting, Michiel Kruyt, a Class U Director appointed by Unilever, took at least one of the Independent Directors aside and told him that in light of the pending charges against Ms. Mittal, it was time to replace her.

53.    All Defendants took a responsible part in planning Defendant Senf's attacks on Ms. Mittal, and Mr. Kruyt's statements, in an effort to embarrass and humiliate Ms. Mittal and shame her into resigning if the Board did not vote her out.

**The Independent Board Confirms the Falsity of the "Findings"**

54.    The Independent Board suspected that the "investigation" was a sham effort to smear Ms. Mittal and force her ouster. Nonetheless, the Board sought to evaluate the charges and respond. Accordingly, Independent Board Members questioned Ms. Mittal about whether she had engaged in self-dealing with Oakland Institute funds, a very awkward process because Defendants had prohibited the Board from disclosing the actual "findings" to Ms. Mittal.

55.    While Ms. Mittal recognized that the Board's questions were necessary, the process was embarrassing and humiliating. She also realized from the Independent Directors' questions that Defendants were claiming that she had bilked a non-profit to live a luxurious lifestyle. This revelation shook Ms. Mittal to her core, as it was the antithesis of her values and lifetime of work. Defendants were well aware of the character and integrity of the person it was now smearing. Among other actions during her tenure, in 2020 Ms. Mittal directed that the entirety of her fourth quarter Board salary be paid to Ben & Jerry's franchisees who were struggling because of COVID.

56.    Through their questioning, the Directors learned that all of Defendants' accusations that Ms. Mittal had engaged in financial self-dealing were false or deliberately misleading. For

example, Defendants' statement that "Miss Mittal received approximately $1.3 million in compensation from the Oakland Institute, including $249,000 in rent between 2018 and 2023," was intentionally phrased in a way to suggest that her total compensation of roughly $1 million from the Institute -- *over a thirteen-year period* -- was for five years.

57.    They also learned the facts surrounding the Oakland Institute's ownership of two properties, one in Oakland and another in "wine country." Regarding the former, in 2016, the landlord of the Oakland Institute's offices forced the Institute to vacate its space. In response, Ms. Mittal used a significant portion of her own retirement savings to fund the down payment on the property the Institute now uses as office space. The rent Defendants referenced was below market, approved annually by the Oakland Institute's Board, and went directly to pay the property's mortgage. Ms. Mittal has never been reimbursed for her down payment. In other words, Ms. Mittal's conduct was the opposite of "self-dealing." While Defendants implied that the property is Ms. Mittal's home, Defendants knew that she didn't live there, given that Unilever had planned to provide Ms. Mittal security at her actual home after she received threats.

58.    The second property -- which Defendants described as a "vineyard" -- is, in fact, a retreat for human rights activists seeking to flee persecution, a property purchased through a single gift from a well-respected institution. The Independent Board addressed these and the other false charges and accusations in a December 3, 2025 letter sent to, among other people, Unilever CEO Fernando Fernandez, Ben & Jerry's CEO Senf, Magnum CEO ter Kulve, and Magnum Chief Legal Officer Vilar (Ex. D).

**Defendants' Blast of the Charges to the Entire Ben & Jerry's Leadership Team**

59.    On November 11, 2025, Defendant Senf and Magnum's Chief Integrity Officer and Head of Litigation Palmina Fava assembled the entire Ben & Jerry's leadership team for a video conference during which Fava read aloud each of the charges of misconduct in the October 23, 2025 (Ex. C). The assembled team included: (1) Melissa Bland, Leadership Coordinator; (2) Rebecca

- 18 -

COMPLAINT

Robinson, Chief Operating Officer; (3) Jay Curley, Chief Marketing Officer; (4) Michael Graning, Finance Director; (5) Lilian Geijsen, Managing Director, Europe; (6) Briana Bennett, Global Head of Research and Development; (7) Solymar Baez, Head of People; (8) Carleen Pickard, Social Misson Director; (9) David Ellis, Head of Factories; and (10) Marina Campbell, Global Strategy Manager. Ms. Mittal had interacted with many of these individuals over the years (some of them for over fifteen years) and had enjoyed a positive relationship with them. None of these people had any possible control over Ms. Mittal's future on the Independent Board. Defendants simply sought to get the word out among Ben & Jerry's rank and file that Ms. Mittal had engaged in serious misconduct.

60.     All Defendants took a responsible part in the November 11, 2025 recitation of charges in an effort to demonize Ms. Mittal to Ben & Jerry's employees and eliminate dissent about her upcoming ouster.

61.     Defendants had yet to disclose any of the charges to Ms. Mittal. As Defendants intended, news of the November 11, 2025 "misconduct briefing" made it back to Ms. Mittal, intensifying the embarrassment, humiliation and anxiety she already was experiencing on a daily basis.

### The Magnum Demerger Statements

62.     On November 4, 2025, Magnum filed its Form 20-F Registration Statement with the SEC in anticipation of the demerger. At that time, Magnum's entire share capital was held by a wholly owned subsidiary of Unilever; that document states that Unilever will be "interested in 3 per cent of [Magnum's] share capital with a 19.9% share of "total voting rights."

63.     That Registration Statement contains the following statement:

> The Group has taken a pro-active approach to finding common ground with the Ben & Jerry's Board and its members to avoid future conflicts of the type that have arisen in the past. However, *following investigations commissioned by the Group and conducted by external advisers, in the opinion of the Group the current chair of the Ben & Jerry's Board no longer meets the criteria to serve as a member of the Ben & Jerry's Board. The Group has informed the Ben & Jerry's Board about the results of the*

*internal investigations. The Group will consider its options depending on the response it receives from the Ben & Jerry's Board.*

(Ex. E, *U.S. SEC Form 20-F Registration Statement for the Magnum Ice Cream Company, Nov. 4, 2025* (https://www.sec.gov/Archives/edgar/data/2071668/000110465925106340/tm2515841-10_20fr12b.htm) at p. 136; emphasis added). Defendants Unilever and Magnum took a responsible part in drafting that statement for publication.

64.     Reporting on that filing, *Reuters* repeated the very message which Defendants intentionally crafted in its filing; "investigations" revealed that she was unfit to serve on the Board: "Magnum Ice Cream Says Ben & Jerry's Board Chair Not Fit to Serve." In the text of the article, *Reuters* stated: "The Magnum Ice Cream Company has concluded that the chair [later identified in the article as Ms. Mittal] of its Ben & Jerry's independent board 'no longer meets the criteria' to serve after internal investigations, according to a security filing late on Tuesday…." (Ex. F, *Reuters, Magnum Ice Cream says Ben & Jerry's board chair not fit to serve* (https://www.reuters.com/business/magnum-ice-cream-says-ben-jerrys-board-chair-no-longer-fit-serve-2025-11-05/)).

65.     Ms. Mittal was contacted by several news organizations about Defendants' statement, but Defendants still had not informed her of the "results" of the "investigations."

66.     On December 3, 2025, Magnum published its Prospectus containing the identical statement:

> The Group has taken a pro-active approach to finding common ground with the Ben & Jerry's Board and its members to avoid future conflicts of the type that have arisen in the past. However, *following investigations commissioned by the Group and conducted by external advisers, in the opinion of the Group the current chair of the Ben & Jerry's Board no longer meets the criteria to serve as a member of the Ben & Jerry's Board. The Group has informed the Ben & Jerry's Board about the results of the internal investigations. The Group will consider its options depending on the response it receives from the Ben & Jerry's Board.*

(Ex. G, Magnum TIMCC Prospectus 3 December 2025 (chrome-extension://efaidnbmnnnibpca

COMPLAINT

jpcglclefindmkaj/https://assets.unileversolutions.com/v1/144026406.pdf?disposition=inline) at 278; emphasis added). Defendants Unilever and Magnum took a responsible part in drafting that statement for publication.

67. Defendants still had not informed Ms. Mittal of the "results of the internal investigations."

68. Both statements are false in several respects. To begin with, both "investigations" were pretextual, and, as addressed above, their "findings" were false. Furthermore, contrary to the December 3, 2025 statement, Defendants already knew that the Ben & Jerry's Board had declined to remove Ms. Mittal. And, the Group had already decided what it would do: it planned to create a new term limit for Independent Board members, and use that limit to remove Ms. Mittal and two other Board members on December 15, 2025, a week after the demerger. Given those circumstances, the gratuitous, false statements in Defendants Unilever and Magnum's filings were intended to get the word out in the international press that these "investigations" had discovered misconduct which would lead to Ms. Mittal's ouster.

**The Demerger and Skadden's Announcement**

69. On December 8, 2025, Magnum became listed on the London, New York and Amsterdam stock exchanges, with its Dutch listing valued at $9.2 billion.

70. On December 9, 2025, Skadden boasted about its role in the demerger, specifically naming Junck and four other partners among a larger Skadden team of attorneys who were involved:

> Skadden advised The Magnum Ice Cream Company N.V. (TMICC) on its demerger from Unilever PLC. Trading in the shares of TMICC commenced on December 8, 2025, on Euronext Amsterdam, the London Stock Exchange and the New York Stock Exchange. The Skadden team included Denis Klimentchenko, Danny Tricot, Jisun Choi, Victor Hollender and Ryan Junck.

(Ex. H, *Skadden Website*, *The Magnum Ice Cream Company and Unilever Complete Demerger* (https://www.skadden.com/about/news-and-rankings/news/2025/12/the-magnum-ice-cream-

company-and-unilever-complete-demerger)). The other four partners on the team handled mergers and acquisitions, as well as tax matters. Mr. Junck's role on the "demerger team" was not transaction related: he was brought in to assist Defendants in their efforts to coerce and vilify Ms. Mittal, by engineering the "audit," and then "finding" misconduct through the "investigation."

**Defendants Create New Bylaws, Retroactively Limiting Board Terms to Nine Years**

71.     Per their plan, on December 12, 2025, Defendants Unilever and Magnum engineered the amendment of the Ben & Jerry's Bylaws which retroactively limited the terms of Independent Board members to nine years. This move, if lawful, meant that Ms. Mittal and two other members were no longer eligible to serve on the Board. Defendants kept this move under wraps.

**Magnum Ousts Ms. Mittal as Board Chair; Immediately Alerts the News Media that Investigations Had Revealed Misconduct**

72.     On December 15, 2025, Defendants Unilever and Magnum ousted Ms. Mittal as Board Chair via letter signed by Vanessa Vilar, "Vice President of Ben & Jerry's HoldCo. LLC." That letter, nearly identical to the prior October 23, 2025 letter (Ex. C), restated all of Ms. Mittal's purported misconduct quoted above (¶47). This was the first time Defendants disclosed the results of the "investigation" to Ms. Mittal, and it came with the directive that she was being removed. At the end of the letter, Defendants also stated that she was also no longer eligible to serve due to a change in the bylaws imposing a new term limit of nine years.

73.     Almost simultaneously, according to plan, Defendants Unilever and Magnum reached out to their media contacts, and took a responsible part in publishing the message that Ms. Mittal was ousted after "investigations" found improprieties. Ms. Mittal received the letter via email on December 15, 2025 at 6:38 a.m. PST; five minutes later, a reporter from *The Wall Street Journal* emailed her for comment about being removed.

74.     Though Defendants Unilever and Magnum could have simply said that Ms. Mittal and two other members of the Board had to leave because of the new term limit, they sought to ensure

that the ouster of Ms. Mittal was publicly linked to misconduct. Indeed, they publicly emphasized that Ms. Mittal was removed immediately, while the other two term-impacted members were allowed to remain until the end of the year.

75.    That same day -- December 15, 2025 -- the *Financial Times* reported from London about Ms. Mittal's ouster:

> **The Magnum Ice Cream Company has moved to oust the chair of Ben & Jerry's board over alleged conflicts of interest**, as the ice cream business spun out of Unilever intensifies its grip on one of its key subsidiaries, ***according to people familiar with the matter.***
> * * *
> ***Magnum informed Ben & Jerry's chair Anuradha Mittal on Monday that she was no longer eligible to serve on the board with immediate effect, after an external investigation and an audit of the brand's charitable arm, of which she is a trustee, uncovered conflicts of interest***, according to people briefed on the matter. They declined to outline the alleged conflicts.

(Ex. I, *Financial Times*, *Magnum moves to oust chair of Ben & Jerry's*

(https://www.ft.com/content/7513da03-ac49-4d2e-9718-2af2b7fd8188); emphasis added).

76.    Also on December 15, 2025, Magnum reported Ms. Mittal's ouster in a statement to the *BBC*, which stated, "***The*** BBC ***understands that Ms. Mittal will leave the company immediately, while Board members Daryn Dodson and Jennifer Henderson will go at the end of this year***…. ***Ben & Jerry's said the move is aimed to*** preserve an enhance the brand's historical mission and ***safeguard its essential integrity***". (Ex. J, *BBC*, *Ben & Jerry's row deepens as three board members removed* (bbc.com/news/articles/c5y9glg2076o); emphasis added).

77.    On or about December 17, 2025, Magnum emailed a statement to *CNBC* and perhaps others. *CNBC* described and quoted from that statement as follows:

> ***The changes to Ben & Jerry's corporate governance*** "***aim to*** preserve and enhance the brand's historical social mission and ***safeguard its essential integrity***," a spokesperson told CNBC in an emailed statement. "Since 2000, the Board has worked with the company to ensure Ben & Jerry's is a vital voice for social change and to amplify movements that shape a more just and equitable world," they added.

COMPLAINT

> ***Magnum said Chair Anuradha Mittal — one of the board members notified of their ineligibility — no longer meets the criteria to serve as a member of the board following "internal investigations," the company said, declining to give further details.***

(Ex. J (https://www.cnbc.com/2025/12/17/ben-jerrys-founder-lashes-out-against-parent-magnums-board-changes.html)); emphasis added). All Defendants participated in scripting those statements.

78.    On December 19, 2025, the *BBC* reported on a statement from Magnum announcing Ms. Mittal's removal, stating: **"**It [Magnum's statement] also said that an audit of the Ben & Jerry's Foundation, a charitable organization, had ***identified a series of material deficiencies in financial controls, governance, and other compliance policies, including conflicts of interest.***" (Ex. L (https://www.bbc.com/news/articles/cn98pzr8x79o); emphasis added).

79.    These articles represent just a fraction of the worldwide articles published in multiple languages which carried Defendants' messaging.

80.    Defendants Unilever and Magnum took a responsible part in the publication of those statements, and they crafted the content and timing of their messaging to maximize Ms. Mittal's humiliation and distress.

**The Defamatory Per Se Statements**

81.    The statements quoted above were statements of purported fact of and concerning Ms. Mittal, false, and defamatory *per se*. Specifically, those statements are:

    a.    Defendant Unilever's statements published in the April 22, 2025 *Semafor* article (italicized in ¶31) announcing a "probe"/"audit" into the Ben & Jerry's Foundation's contributions to the Oakland Institute, suggesting that Foundation trustee Ms. Mittal had improperly received a benefit of more than $200,000. At a minimum, Defendants intended to convey the defamatory impression that Unilever had discovered improper funding of the Oakland Institute by Ben & Jerry's Foundation when Ms. Mittal was on both sides of the transactions, justifying a "probe" so serious that it was being leaked to the press.

    b.    Defendant Unilever and Magnum's statements published in the October 23, 2025 letter to Independent Board members other than Ms. Mittal, read aloud at the October 28 and 29, 2025 Board Meeting by Defendant Senf, and read again to the entire Ben & Jerry's leadership team by Magnum's Head of Litigation, Fava, accompanied by Defendant Senf on November 11, 2025 (italicized in ¶47). Those statements included charges that Ms. Mittal: (1) engaged in "self-dealing"; (2) received "improper benefits"; (3) improperly "diverting

Foundation funds"; (4) "violated fiduciary duties"; (5) created a "toxic work environment"; (6) "allowed the disclosure of confidential information"; and (7) "failed to cooperate" in the "audit" and "investigation." These statements were false. The "audit" and "investigation" were contrived to create these demonstrably false accusations of misconduct.

c.     Defendants Unilever and Magnum's demerger statements published in the November 4, 2025 and December 3, 2025 filings (italicized in ¶¶63 and 66). Both statements are false in several respects. To begin with, both "investigations" were pretextual and they found no misconduct by Ms. Mittal. Furthermore, contrary to the statements, "the Group" had already decided what it would do: it planned to create new term limits for Independent Board members, and use that limit to remove Ms. Mittal and two other Board members on December 15, 2025, a week after the demerger. Given those circumstances, the gratuitous, false statements in Defendants' filings were intended to get the word out in the international press that these "investigations" had discovered misconduct which would lead to Ms. Mittal's ouster. At a minimum, Defendants had intended to convey the defamatory impression that neutral, objective investigations had discovered financial misconduct by Ms. Mittal, misconduct serious enough to warrant action by the Ben & Jerry's Board. Unilever General Counsel Varsellona's warning that the statements would be harmful to Ms. Mittal was accurate.

d.     All Defendants' statements made in the December 15, 2025 letter (¶72) restating the same accusations made in ¶47, above, to the extent that Defendants sent that letter or orally published any portion of that letter to persons other than but Ms. Mittal. Those statements included: (1) engaged in "self-dealing"; (2) received "improper benefits"; (3) improperly "diverting Foundation funds"; (4) "violated fiduciary duties"; (5) created a "toxic work environment"; (6) "allowed the disclosure of confidential information"; and (7) "failed to cooperate" in the "audit" and "investigation." These statements were false. The "audit" and "investigation" were contrived to create these demonstrably false accusations of misconduct.

e.     Defendants Unilever and Magnum's statements published to the *Financial Times* and perhaps others on December 15, 2025 (italicized in ¶75). The statements indicated that Ms. Mittal was ousted "after an external investigation and an audit of the brand's charitable arm, of which she is a trustee, uncovered conflicts of interest." This statement is false in several respects. To begin with, both the "audit" and the "external investigation" were pretextual and neither "uncovered" any conflict of interest. Ms. Mittal engaged in no conflict of interest, and the fact that the Foundation had made contributions to the Oakland Institute was well known to Unilever by at least 2017.

f.     Defendants Unilever and Magnum's December 15, 2025 statements to the *BBC* that Ms. Mittal was immediately removed, while two other members remained until the end of the year, in a "move to… safeguard [the brand's] essential integrity" (italicized in ¶76). By messaging the urgency of Ms. Mittal's removal in a move to safeguard "integrity," Defendants intended to convey the defamatory impression that her urgent removal was due to misconduct.

g.     Defendants Unilever and Magnum's statement published to *CNBC* and perhaps others on December 17, 2025 (italicized in ¶77). That statement announced the removal Ms. Mittal was to "safeguard [Ben & Jerry's] essential integrity" and came after "internal investigations." This statement is false in several respects: the "investigations" were pretextual and they found no evidence of misconduct or dishonesty by Ms. Mittal, much less, conduct

warranting her removal by the Board. At a minimum, Defendants Unilever and Magnum intended to convey the defamatory impression that two objective investigations discovered misconduct by Ms. Mittal justifying her removal from the Board for cause.

h.      Defendants Unilever and Magnum's statement published to the *BBC* and perhaps others on December 19, 2025 (italicized in ¶78). That statement announced the removal of Ms. Mittal and that an audit had "identified… material… conflicts of interest." This statement is false in several respects; the "audit" was contrived to justify Defendants' pretextual "investigation." Ms. Mittal engaged in no conflict of interest, and the fact that the Foundation had made contributions to the Oakland Institute was well known to Unilever by at least 2017.

**All Defendants Made the Statements with Actual and Common Law Malice**

82.      Defendants made those defamatory statements with actual malice. Prior to and at the time Defendants made their defamatory statements, they knew they were false, had a high degree of awareness of the statements' probable falsity, and/or entertained serious doubts as to the truth of the statements, and proceeded to publish the statements with reckless disregard for their falsity. Defendants also published the statements with common law malice, in that they acted from a state of mind rising from hatred or ill will, evidencing a willingness to vex, annoy or injure Ms. Mittal.

**The Statements That Ms. Mittal Engaged in "Self-Dealing," "Conflicts of Interest," "Breaches of Fiduciary Duties," and "Improperly Benefited from Ben & Jerry's Funds"**

83.      Defendants knew their statements that Ms. Mittal engaged in "self-dealing," "conflicts of interest," "breaches of fiduciary duties," and "improperly benefited from Ben & Jerry's funds" were false or published them in reckless disregard of their falsity. To begin with, Defendants' audit revealed no malfeasance on the part of Ms. Mittal. While Defendants have reneged on their pledge to declare the results of such audit with the Foundation trustees, people who had access to the audit results were quoted as stating that the audit found no "wrongdoing, ethical malpractice, or violations."

84.      All Defendants knew that the investigation failed to discover any instances in which Ms. Mittal requested or decided that Foundation funds be directed to the benefit of the Oakland Institute. They also were presented with evidence affirmatively showing that she had no authority to make decisions to fund the Oakland Institute, and that she never attempted to do so.

85.     All Defendants knew that Unilever had already rejected the very same allegations of self-dealing Defendants now made against Ms. Mittal. In 2021, the *Washington Beacon* -- a right wing, conservative website -- accused Ms. Mittal of the same "self-dealing" accusation at the heart of Defendants' report of the "investigation." On August 13, 2021, the remaining trustees of the Foundation, including Ben & Jerry's co-founder, Jerry Greenfield, wrote a letter to Unilever's CEO thoroughly rejecting the accusation, confirming that "[a]ll grants made to the Oakland Institute were used to support human rights/land rights [of] Indigenous defenders and their struggles," confirming that the "work of the Oakland Institute is in sync with the social and environmental justice work the Foundation and the company support," and "affirm[ing]" the trustees' "unequivocal support for our colleague and friend, Anuradha Mittal." The trustees further commended Ms. Mittal's "bravery" and expressed that they were "very concerned about the threats and attacks being leveled" against her. Rejecting the very "self-dealing" and "conflicts of interest" accusations stated in Skadden's investigation "findings," a Unilever executive unequivocally stated that smear tactics "must and will be denounced," that the allegations constituted "extreme personal slander and threats," and that "unprecedented measures" had been taken to keep Ms. Mittal safe.

86.     The Ben & Jerry's Foundation donations to the Oakland Institute -- ***none of which were solicited or decided by Ms. Mittal*** -- have funded the institute's non-profit human rights work, rather than Ms. Mittal personally. As an example, the Foundation's grants to the Institute have funded projects protecting the human rights of Indigenous Anuak facing forced displacement. All Defendants knew that the "audit" found no evidence that Ms. Mittal personally benefited from any Foundation funding.

87.     Defendants also deliberately distorted Ms. Mittal's compensation from the Oakland Institute, and they either knew the truth about the "rent" and the "wine country" house, or they purposefully instructed EY to not send Ms. Mittal written questions about those items, though EY had sent the Foundation hundreds of written questions relating to the audit. Defendants wanted to

COMPLAINT

convey the defamatory impression in Skadden's "findings" that Ms. Mittal was living in luxury due to ill-gotten gains.

88.    As for failing to disclose a potential conflict, at all times since 2008, Unilever has known that Ms. Mittal's full-time, paid position is Executive Director of the Oakland Institute. While Ms. Mittal never requested or solicited funding for the Oakland Institute from the Foundation; she expressly invited Unilever executives to advise her of any reservations about the receipt of contributions. All Defendants knew this.

89.    As an example, in 2017, the Foundation trustees approved a grant to the Oakland Institute without Ms. Mittal's solicitation or request from the U fund (an independent funding pool). Rather than accept the funds, Ms. Mittal made clear that she was "very glad to have the check returned" if Unilever executives had "any reservations AT ALL":

> Dear Jostein
>
> So I have asked our finance dept to not deposit the check. We will wait for Jeff's return and for Jerry, as the Chair of the board of the fdn. to write the process followed---this was coming from U fund, it was unsolicited and I was not even aware of when and how the conversation happened.
>
> Also pls know that if you have any reservations AT ALL, the Institute is very glad to have the check returned. This is important both for me personally and to the organization. I am sorry if you were not aware of this. But since the check arrived today—I had to tell you. Thanks for your udnerstanding.
>
> Sincerely
>
> Anuradha

90.    Hence, even if Defendants contended that the Foundation's contributions to the Oakland Institute -- unsolicited by Ms. Mittal -- constituted a "conflict of interest" by Ms. Mittal, they knew that their statements that the "investigation and the audit uncovered conflicts of interest" were false, as such contributions were well known by Unilever since at least 2017.

91.    All Defendants also knew that their statements that Ms. Mittal had violated a "conflict of interest policy" or "code" were false as well. Ben & Jerry's Foundation never had a formal conflict of interest policy until October 27, 2025, when all of the Foundation Trustees -- including Ms. Mittal -- signed and adopted a code of ethics and conflict of interest policy. However, as Defendants were

COMPLAINT

informed in August 2025, even before the adoption of that formal policy, the "trustees disclose[d] any relationship with a non-profit they select for funding."

92.     Further evidence of Defendants' knowledge of the falsity of these serious accusations can be found in their proposal to install Ms. Mittal as head of a new multi-million-dollar charitable organization with funding coming from Unilever. Had Defendants actually believed their accusations of serious misconduct, their implementation of such an arrangement would have breached their own fiduciary duties.

93.     On December 3, 2025, the Independent Board (minus Ms. Mittal) sent a detailed response refuting all of the statements made in the October 23, 2025 letter (Ex. D). Nonetheless, Defendants restated the exact same allegations in their December 15, 2025 letter to Ms. Mittal outlining the purported reasons for her ouster. They also published statements that Ms. Mittal had been ousted following "investigations" which found serious problems, including "conflicts of interest."

94.     Defendants' December 15, 2025 letter also stated that Ms. Mittal was being removed because her tenure had exceeded Magnum's new nine-year term limit. Given that fact, Defendants' inclusion of the "investigation's" findings of misconduct were gratuitous, but necessary to Defendants' messaging that Ms. Mittal had been removed for misconduct discovered by "investigations."

**"Failure to Cooperate in the Investigation and Foundation Audit"**

95.     All Defendants knew that their statement that Ms. Mittal failed to cooperate in the investigation and Foundation audit was false, or, at a minimum, published it with reckless disregard for its falsity for several reasons. First, Defendants deliberately misrepresented the purpose of the "audit," calling it "routine," though it was crafted and guided by Skadden and Unilever's Board litigation counsel, Weil, as a pretext to launch the Skadden "investigation" into Ms. Mittal. Realizing

that Unilever had misrepresented the basis for the "audit," and that she was its target, Ms. Mittal offered to respond to written questions, a proposal which EY rejected at Defendants' behest.

96.     In fact, in August 2025, Ms. Mittal offered to respond to written questions sent by EY. That offer likewise was rejected, even though EY had sent hundreds of written questions to the Foundation for response. On August 13, 2025, counsel for the Independent Board wrote to EY, requesting:

> Please provide your scope of work. It is very concerning you are intentionally deflecting this simple request.
>
> Please provide the questions in writing as you have the hundreds to the Foundation. Why do these specific questions require an interview while the others you asked did not?

At Defendants' instruction, EY did not answer the questions.

97.     Moreover, the "investigation" was not a legitimate, "objective" investigation required under Unilever policy, but a pretextual investigation conducted for the purpose of ousting Ms. Mittal and defaming her. Worse, Defendants deliberately refused to inform Ms. Mittal of the allegations against her so that she could adequately respond.

98.     Under the circumstances, counsel for the Independent Board wrote Skadden's Mr. Junck on September 23, 2025:

> To evaluate your request below [for an interview of Ms. Mittal], could you please clearly state whether Skadden played any role in advising on the Foundation's audit? The response to this straightforward question will inform our position on your request. Also, please specify the allegation you are asking us to respond to? This is our second request for the same.

99.     Skadden refused to provide the requested information.

100.     Under these circumstances, Defendants' accusation that Ms. Mittal "refused to participate" in the "investigation" and hence breached fiduciary duties was a deliberate distortion of what occurred.

**"Diversion of Funds"**

101.    All Defendants knew that their statement that Ms. Mittal had "diverted funds" was false, or at a minimum, published it with reckless disregard of its falsity for several reasons. The March 27, 2024 confidential arbitration addressed the disposition of two amounts to be distributed in the settlement of prior litigation. Unilever never criticized or objected to Ms. Mittal's discretionary contributions as a Foundation trustee, though all were publicly disclosed in annual disclosures. *The very first time* Ms. Mittal was ever informed of an objection to her own discretionary contributions in previous years came in the December 15, 2025 announcement of her ouster.

### "Creation of a Toxic Working Environment"

102.    All Defendants knew that their statement that Ms. Mittal created a "toxic working environment" was false, or at a minimum, published it with reckless disregard for its falsity. Nowhere in their report did Defendants identify a single instance or example supporting that accusation, and they ignored repeated requests by the Board for such examples, even with names redacted.

103.    As Chair of the Independent Board, no Ben & Jerry's employees reported to Ms. Mittal. The rank and file Ben & Jerry's employees with whom Ms. Mittal interacted pushed back against the notion that she was a source of "conflict," stating in an email to Magnum's management on November 5, 2025:

> We've watched her [Ms. Mittal] fight for our mission when it would have been so much easier to compromise. We've seen her hold the line on our values in meetings where others wanted to water them down. We've witnessed her spend countless hours ensuring we don't lose sight of who we're supposed to serve. Her integrity, strategic vision, and tireless advocacy have preserved our credibility in the social impact space during a period of immense internal and external pressure. And we've heard, again and again, from our NGO partners that the board's integrity is the only reason they still trust us.
>
> That's why we're so deeply concerned by what appears to be a narrative framing Anuradha Mittal and the board as sources of conflict, rather than recognizing them as defenders of our core values. **The tension hasn't been caused by their leadership -- it's been caused by attempts to dilute the very commitments that define us.**

(emphasis in original). Defendants knew that Ms. Mittal had enjoyed an excellent relationship with

- 31 -
COMPLAINT

Ben & Jerry's employees. Indeed, that is why they arranged the November 11, 2025 assembly to smear Ms. Mittal's reputation.

104.    Ms. Mittal interacted with fellow Board members at meetings, and they unanimously elected her Board Chair twice, including the Class U Directors appointed by Unilever. To the extent that this accusation came from Unilever and Magnum executives, they are the same people who called Ms. Mittal "manic," sought her removal, and engaged in intimidating, insulting, and bullying behavior which was itself prohibited by the Unilever code.

**"Ms. Mittal Allowed the Disclosure of Confidential Business Information"**

105.    All Defendants knew that their statement that "Ms. Mittal allowed the disclosure of confidential business information" was false, or at a minimum, published it with reckless disregard for its falsity. To begin with, Ms. Mittal did not disclose anything. Information disclosed in the pending litigation was made by counsel for the Independent Board on behalf of Independent Board. Mr. Stever never reported to the Board that Unilever's threats were "confidential business information," and Unilever's policies do not support such a characterization. Moreover, in light of Defendants' own concerted effort to disclose "confidential" information about their "investigations" of Ms. Mittal, this accusation epitomizes the extent to which Defendants' "external," "objective" "investigation" went in their effort to falsely tag Ms. Mittal with a litany of misconduct.

**Defendants Achieved Their Goal**

106.    Defendants achieved their goal of thoroughly humiliating and discrediting Ms. Mittal. As a result, Ms. Mittal suffered injury to her personal and professional reputations, as well as severe humiliation, embarrassment, depression, and emotional distress. Her symptoms included and still include:

> a.    Extreme and intense emotional swings. Ms. Mittal prided herself in her ability to exude a confident mien at all times, even in high pressure situations, such as testifying before Congress or the United Nations. As the direct result of Defendants' conduct, Ms. Mittal has publicly and privately broken down, often crying uncontrollably, when discussing, reading

COMPLAINT

or thinking about her supposed misconduct -- reflex reactions which bring Ms. Mittal even more humiliation.

b.      Intense anxiety resulting in chronic insomnia: Ms. Mittal frequently cannot sleep at all, often because she obsesses about how badly her life's work has been altered, tarnished, undermined and stopped, and how different her life would have been had she succumbed to Defendants' demands. She has agonized over these false accusations and the concentrated effort to break her with no regard for her dedicated contribution to the success of the company. This cycle has resulted in Ms. Mittal experiencing daily distress, fatigue and a loss of appetite.

c.      Inability to meet or cancel social and familial obligations: Ms. Mittal's distraught state has caused her to miss social and familial obligations; as one example, she recently had to cancel a family vacation due to her emotional state.

d.      Changes in daily routine: those issues have caused dramatic changes to Ms. Mittal's daily routine, including self-care and meeting pre-scheduled appointments and other work obligations at the Oakland Institute.

e.      Physical manifestations: Ms. Mittal has suffered physical ailments as the direct result of the constant stress under which Defendants deliberately placed her.

f.      Depression: Ms. Mittal has suffered depression which has deprived her of the ability to look forward to another day; instead, sadness and anxiety prevails over all aspects of her life.

## COUNT I

### Defamation *Per Se* Against All Defendants

107.    Plaintiff incorporates by reference Paragraphs 1-106 as if fully set forth herein.

108.    Each of the statements published by Defendants imputed an unfitness to perform or lack of integrity in Ms. Mittal's performance of her job.

109.    Each of the statements published by Defendants necessarily prejudiced Ms. Mittal in her profession.

110.    Defendants made those defamatory statements with actual malice. Prior to and at the time Defendants made their defamatory statements, they knew they were false, had a high degree of awareness of the statements' probable falsity, and/or entertained serious doubts as to the truth of the statements, and proceeded to publish the statements with reckless disregard for their falsity.

Defendants also published the statements with common law malice, in that they acted from a state of mind arising from hatred or ill will, evidencing a willingness to vex, annoy or injure Ms. Mittal.

111.    Regarding the statements quoted in Paragraphs 63 and 66, above, the purpose of the Form 20-F Registration Statement and the Prospectus was to register and sell shares and obtain authorization for such sale, not to trigger an investigation. In other words, neither statement was intended to prompt the SEC to investigate Ms. Mittal or initiate formal proceedings against her.

112.    As a result of Defendants' acts, Ms. Mittal is entitled to compensation for the injuries she suffered to her business and personal reputation, for her humiliation, emotional and mental anguish, embarrassment, pecuniary losses, and punitive damages.

## COUNT II

### False Light Against All Defendants

113.    Plaintiff incorporates by reference Paragraphs 1-112 as if fully set forth herein.

114.    Defendants publicly disclosed information which showed Ms. Mittal in a false light.

115.    The false light created by the disclosures would be highly offensive to a reasonable person in Ms. Mittal's position.

116.    Defendants knew that their disclosures would create a false impression about Ms. Mittal or acted with reckless disregard for the truth.

117.    Ms. Mittal was harmed by Defendants' conduct.

## Count III

### Intentional Infliction of Emotional Distress Against All Defendants

118.    Plaintiff incorporates by reference Paragraphs 1-117 as if fully set forth herein.

119.    Defendants engaged in extreme and outrageous conduct toward Ms. Mittal with the intention of causing, or reckless disregard of the probability of causing, emotional distress.

120.    Ms. Mittal suffered severe or extreme emotional distress as the actual or proximate cause of Defendants' outrageous conduct.

- 34 -

121.   Ms. Mittal has suffered damage as the result of such conduct.

## PRAYER FOR RELIEF

Wherefore, Ms. Mittal seeks the entry of judgment against Defendants, Unilever PLC, The Magnum Ice Cream Company N.V., and Jochanan Senf, for compensatory and punitive damages in amounts to be determined at trial, plus costs of suit.

DATE: May 8, 2026

**Jury Demanded**

Respectfully submitted
Plaintiff, Anuradha Mittal

By: */s/ Thomas B. Harvey*
     Thomas B. Harvey

THOMAS B. HARVEY (CA Bar #287198)
**LAW OFFICES OF THOMAS B. HARVEY**
365 E. Avenida De Los Arboles, #226
Thousand Oaks, CA 91360
Telephone: (805) 768-4440
tbhlegal@proton.me

PAUL K. VICKREY     (*Pro Hac Vice*)
PATRICK F. SOLON    (*Pro Hac Vice*)
DYLAN M. BROWN    (*Pro Hac Vice*)
**VITALE, VICKREY, NIRO, SOLON & GASEY LLP**
311 S. Wacker Drive, Suite 2200
Chicago, IL 60606
(312) 236-0733
vickrey@vvnlaw.com
solon@vvnlaw.com
dbrown@vvnlaw.com

*Attorneys for Plaintiff*

COMPLAINT