Thomas B. Harvey (CA Bar #287198)
Law Offices Of Thomas B. Harvey
365 E. Avenida De Los Arboles, #226
Thousand Oaks, Ca 91360
Telephone: (805) 768-4440
Tbhlegal@Proton.Me

Paul K. Vickrey
Patrick F. Solon
Dylan M. Brown
Vitale, Vickrey, Niro, Solon & Gasey LLP
311 S. Wacker Drive, Suite 2200
Chicago, Il 60606
(312) 236-0733
Vickrey@Vvnlaw.Com
Solon@Vvnlaw.Com
Dbrown@Vvnlaw.Com

*Attorneys For Plaintiff*

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Steven G. Madison (Bar No. 101006)
  Stevemadison@quinnemanuel.com
Robert M. Schwartz (Bar No. 117166)
  robertschwartz@quinnemanuel.com
Marie M. Hayrapetian (Bar No. 315797)
  mariehayrapetian@quinnemanuel.com
Julian T. Schoen (Bar No. 344202)
  julianschoen@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:     (213) 443-3000

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANURADHA MITTAL, | Case No. 26-cv-02660-WHO |
| Plaintiff, | **JOINT CASE MANAGEMENT STATEMENT** |
| v. | |
| UNILEVER PLC, THE MAGNUM ICE CREAM COMPANY N.V., and JOCHANAN SENF, | Case Management Conference <br> DATE: June 23, 2026 <br> TIME: 2:00 p.m. (Remote) |
| Defendants. | |

JOINT CASE MANAGEMENT STATEMENT

Pursuant to Fed. R. Civ. P. 26, Civil L.R. 16-9, and the Court's May 11, 2026 Case Management Conference Order (Dkt. 30), Plaintiff Anuradha Mittal ("Plaintiff" or "Ms. Mittal") and Defendants Unilever PLC ("Unilever"), The Magnum Ice Cream Company N.V. ("Magnum") and Jochanan Senf ("Mr. Senf"), (collectively, the "Parties") hereby submit the following Joint Case Management Statement for the June 23, 2026 Case Management Conference.

## I.    JURISDICTION AND SERVICE

**Plaintiff's Statement:**

The Court has subject matter jurisdiction over this action based on diversity of citizenship under 28 U.S.C. § 1332 and the amount in controversy exceeds $75,000. Defendants' counsel has represented that all Defendants are contesting personal jurisdiction. All Defendants have been served.

**Defendants' Statement:**

Defendants Unilever, Magnum, and Mr. Senf contest personal jurisdiction and intend to file motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(2). All Defendants have been served. Defendants reserve all rights and defenses available under Fed. R. Civ. P. 12, including without limitation defenses based on lack of personal jurisdiction, improper venue, and failure to state a claim. Defendants reserve all rights with respect to transfer of venue pursuant to 28 U.S.C. § 1404(a).

## II.    FACTS

**Plaintiff's Statement:**

Ms. Mittal, a resident of Oakland, California, founded The Oakland Institute in 2004 and has been its Executive Director ever since. The Oakland Institute is an independent policy think tank dedicated to advancing the rights and resources of small holder farmers, pastoralists, forest dwellers, and Indigenous communities worldwide. Ms. Mittal's work with The Oakland Institute led to her invitation onto the Independent Board of Ben & Jerry's Homemade, Inc. ("Ben & Jerry's) in 2008, where she served as a director through December 15, 2025; she served as Board Chair since 2018. The Independent Board was created when Unilever acquired Ben & Jerry's in 2000; a key term of the Merger Agreement was the creation of an Independent Board with legally binding authority over Ben & Jerry's social mission and brand integrity. (Amended Complaint, Doc #24 at ¶¶1, 10).

In recent years, Ms. Mittal's public support for Palestinian rights and a ceasefire in Gaza rankled Unilever. That acrimony escalated in 2024, when Unilever announced a "spinout," or "demerger" of Ben & Jerry's and the rest of its ice cream businesses into a wholly owned entity, Magnum, shares in which would be sold in a public offering -- a process which would take nearly two years. Thereafter, Defendants implemented a plan to smear and discredit Ms. Mittal through sham "investigations" and statements about their findings. Defendants engaged in that strategy to (1) coerce Ms. Mittal into "voluntarily" leaving the Board, and if she refused, (2) inform fellow directors, Ben & Jerry's employees and eventually the public that she would be ousted for misconduct found in "investigations." (*Id.* at ¶¶2, 23, 59).

Beginning in 2022, Unilever executives warned Ms. Mittal that even mentioning "Palestine" would be problematic. Then, in December 2023, the Independent Board and Ben & Jerry's management informed Unilever that Ben & Jerry's would be issuing a statement calling for a ceasefire in Gaza. In response, Unilever threatened to dismantle the Independent Board and sue the board members individually if Ben & Jerry's issued the statement. (*Id.* at ¶19). During the humanitarian crisis in Gaza, Ben & Jerry's Independent Board attempted to publicly speak out in support of peace and human rights at four different times. Unilever silenced each of those efforts. (*Id.* at ¶22). Accordingly, in November 2024 the Independent Board filed suit to enforce its contractual rights under the Merger Agreement (*Ben & Jerry's Homemade Inc. v. Conopco, Inc.*, 1:24-cv-08641-PKC (S.D.N.Y.) ("the Board litigation"). (*Id.* at ¶23).

Unilever hired the law firm of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") to assist it, and later Magnum, with the demerger. A key player on the Skadden team advising Unilever and Magnum on the demerger was Ryan Junck, the global head of Skadden's litigation practice. (*Id.* at ¶25). Unilever retained Mr. Junck and Skadden to investigate business integrity complaints which the Independent Board had filed against three key Unilever executives concerning their actions to silence the Board. Skadden quickly disposed of those complaints under a process which, according to then Unilever General Counsel Maria Varsellona, was "objective and in full compliance with Unilever's established policies and governance protocols." (*Id.* at ¶26).

By early 2025, Defendants Unilever and Magnum had crafted a plan to deal with Ms. Mittal. First, an accounting firm -- guided by Skadden -- would audit the Ben & Jerry's Foundation, focusing on Ms. Mittal and contributions to the Oakland Institute. The audit findings would then be used to justify an "investigation" into Ms. Mittal, which would be conducted by Skadden's Mr. Junck. Then, if the threat to release ensuing pretextual findings of misconduct were not enough to coerce Ms. Mittal to "voluntarily" resign before the demerger, Defendants would publish news about the findings of the "investigations." (*Id.* at ¶29).

On April 9, 2025, Abhijit Bhattacharya (Unilever's Chief Financial Officer for Ice Cream) sent a letter demanding an "expeditious" audit of the Ben & Jerry's Foundation, stating that the audit would focus on "internal procedures and controls, disbursements, accuracy of books and records, and governance." This statement was false; the audit was focused on Ms. Mittal, pursuant to the strategy crafted by Defendants Unilever and Magnum. (*Id.* at ¶30). In April, 2025, Unilever leaked Mr. Bhattacharya's letter to the media, with an article appearing in *Semafor* referencing the letter and "off the record" statements by "Unilever executives" that the target of the audit was Ms. Mittal, who had allegedly improperly benefitted from Foundation grants:

> ***Unilever is probing the finances of Ben & Jerry's charitable foundation with a focus on its grants to progressive and pro-Palestinian groups, including to an organization with ties to two of the foundation's trustees, people familiar with the matter said.***

* * *

> ***As part of that process, Unilever plans to audit the Ben & Jerry's Foundation, according to a letter sent earlier this month to the foundation's president, Jeff Furman, and seen by Semafor.***

(emphasis added). The article later identifies the two trustees as Ms. Mittal and Jeff Furman, and repeats Unilever's message that Ms. Mittal had improperly benefited from grants by the Ben & Jerry's Foundation:

> ***Unilever executives have privately identified a series of grants to the Oakland Institute, a nonprofit that promotes global aid and is critical of the World Bank and Israel, the people said. One Ben & Jerry's Foundation trustee, Anuradha Mittal, is a salaried employee and founder of the Oakland Institute, which has received more than $200,000 from the foundation since 2016, according to tax filings.***

(emphasis added). The leak and statements by "Unilever executives" were scripted and planned in advance by Defendants Unilever and Magnum, and conveyed the intended false message that Ms. Mittal had engaged in financial misconduct. (*Id.* at ¶31).

In a letter dated May 6, 2025, Unilever again claimed that it sought to conduct a "routine audit" and promised "that the results of the audit would be made available privately to the Trustees." The letter also stated that the audit was merely part of a pre-demerger process conducted company-wide: "we are conducting audits across the entirety of the Magnum organization." This statement was also false: Defendants had already signaled to Ms. Mittal and the rest of the world that she was the target. (*Id.* at ¶32). What ensued was an "audit" conducted by Ernst & Young ("EY"), guided by Skadden, and aimed at Ms. Mittal. (*Id.* at ¶33). Consistent with the plan, Skadden, and Unilever's counsel in the Board litigation, Weil, Gotshal & Manges LLP ("Weil") met with EY in advance of the "audit" and gave them a road map (a document which EY labeled "attorney work product") as to what they were trying to accomplish, and specifically identified the grants on which EY was to focus. (*Id.* at ¶¶34, 35).

When EY completed its report on September 2, 2025, Unilever reneged on its promise to share it with the Foundation, claiming that the "audit" was now "privileged." The "audit" did not, and could not, have revealed any evidence of malfeasance by Ms. Mittal. Public reporting later confirmed this, noting that while the audit purportedly criticized certain controls and processes, knowledgeable sources stated the audit did not find "wrongdoing, ethical malpractice, or violations." (*Id.* at ¶38). Despite claiming that the audit was "privileged," Defendants Unilever and Magnum began feeding selective findings to the press. For example, Magnum told *Reuters* in an "exclusive" that its audit found "deficiencies" in Ben & Jerry's "financial controls and governance." (*Id.* at ¶39). Then, on cue, on September 11, 2025, Mr. Junck informed Ms. Mittal by email that Unilever had retained Skadden "to conduct a review on Unilever's behalf into certain matters relating to your role as a director on Ben & Jerry's Independent Board." (*Id.* at ¶40).

At no time during the "investigation" was Ms. Mittal told what "certain matters" were being investigated, and Mr. Junck ignored several written requests for information about the purported charges against Ms. Mittal. The timing of Skadden's "investigation" would allow the results to be

used in advance of the demerger. Given that Skadden was assisting Unilever and Magnum with the demerger, and had already worked with Defendants to craft a plan to oust Ms. Mittal, this "investigation" was not an "objective" investigation supposedly required by Unilever. (*Id.* at ¶41).

On October 10, 2025, Ms. Mittal attended a meeting in San Francisco with then Unilever's General Counsel, Maria Varsellona, and others to discuss the possible settlement of the Board litigation. In the course of those discussions, Ms. Varsellona made a startling threat: if Ms. Mittal did not resign from the Board, Unilever would publish damaging claims about her in the upcoming Magnum prospectus. (*Id.* at ¶43). Ms. Varsellona also said that if Ms. Mittal resigned, the statements about Ms. Mittal would not be made. Instead, the investigation would result in a finding of no wrongdoing, and Ms. Mittal could head a new multi-million-dollar charitable organization that Unilever would fund. The threat and proposal conveyed by Ms. Varsellona were carefully scripted in advance by Defendants Unilever and Magnum. Ms. Mittal was so shocked and upset by them that she immediately left the meeting. (*Id.* at ¶44).

On October 14, 2025, Ms. Mittal sent an email to Unilever CEO Fernandez stating, among other things, "I was informed last week that should I not resign as a Chair of the Independent Board. Unilever's next prospectus would include allegations against me…. I would also note that in the same conversation that this threat was made, Unilever offered to allow me to head a multi-million-dollar non-profit should I capitulate." On October 16, 2025, Fernandez instructed Ms. Mittal that Defendant Senf was to be her "point of contact" with Unilever and Magnum. Unilever had just appointed Senf, a long time Unilever executive, as Ben & Jerry's new CEO. (*Id.* at ¶46).

On October 23, 2025, Magnum sent a letter to Ben & Jerry's Independent Board members (except for Ms. Mittal), two of whom reside in California, a letter signed by Magnum's Chief Legal Officer Vanessa Vilar (who previously held the title of General Counsel of Unilever Ice Cream), but which all Defendants took a responsible part in preparing and publishing. That letter disclosed the findings of Skadden's "investigation," and demanded that the Board remove her "immediately." The accusations against Ms. Mittal included: (1) "improperly benefit[ting] from Ben & Jerry's Foundation Funds"; (2) "diverting Foundation funds"; (3) "violating… her fiduciary duties and the Avoiding Conflicts of Interest Policy"; (4) "create[ing] a toxic work environment"; (5) "allow[ing] the

disclosure of confidential business information"; and (6) "fail[ing] to cooperate in the investigation and the Foundation audit." (*Id.* at ¶47).

The Independent Board held its October meeting in Burlington, Vermont on October 28 and 29, 2025. During that meeting, Defendant Senf loudly read a summary of the same charges against Ms. Mittal identified in the October 23, 2025 letter, including "improperly benefitting from Ben & Jerry's Foundation funds," "diverting funds," and "creating a toxic working environment." Defendant Senf also shouted threats at Ms. Mittal. (*Id.* at ¶51).

On November 11, 2025, Defendant Senf and Magnum's Chief Integrity Officer and Head of Litigation Palmina Fava assembled the entire Ben & Jerry's leadership team (at least ten people) for a video conference during which Fava read aloud each of the charges of misconduct in the October 23, 2025. (*Id.* at ¶59). All Defendants took a responsible part in the November 11, 2025 recitation of charges in an effort to demonize Ms. Mittal to Ben & Jerry's employees and eliminate dissent about her upcoming ouster. (*Id.* at ¶60).

On November 4, 2025, Magnum filed its Form 20-F Registration Statement with the SEC in anticipation of the demerger. At that time, Magnum's entire share capital was held by a wholly owned subsidiary of Unilever; that document states that Unilever will be "interested in 3 per cent of [Magnum's] share capital with a 19.9% share of "total voting rights." (*Id.* at ¶62). That Registration Statement contains the following statement:

> The Group has taken a pro-active approach to finding common ground with the Ben & Jerry's Board and its members to avoid future conflicts of the type that have arisen in the past. However, ***following investigations commissioned by the Group and conducted by external advisers, in the opinion of the Group the current chair of the Ben & Jerry's Board no longer meets the criteria to serve as a member of the Ben & Jerry's Board. The Group has informed the Ben & Jerry's Board about the results of the internal investigations. The Group will consider its options depending on the response it receives from the Ben & Jerry's Board.***

(emphasis added). Defendants Unilever and Magnum took a responsible part in drafting that statement for publication. (*Id.* at ¶63). Reporting on that filing, *Reuters* repeated the very message which Defendants intentionally crafted in its filing; "investigations" revealed that she was unfit to serve on the Board: "Magnum Ice Cream Says Ben & Jerry's Board Chair Not Fit to Serve." (*Id.* at ¶64). On

December 3, 2025, Magnum published its Prospectus containing the identical statement. Defendants Unilever and Magnum took a responsible part in drafting that statement for publication. (*Id.* at ¶66).

The Amended Complaint alleges that both statements are false in several respects. To begin with, both "investigations" were pretextual, and, their "findings" were false. Furthermore, contrary to the December 3, 2025 statement, Defendants already knew that the Ben & Jerry's Board had declined to remove Ms. Mittal. And, the Group had already decided what it would do: it planned to create a new term limit for Independent Board members, and use that limit to remove Ms. Mittal and two other Board members on December 15, 2025, a week after the demerger. Given those circumstances, the gratuitous, false statements in Defendants Unilever and Magnum's filings were intended to get the word out in the international press that these "investigations" had discovered misconduct which would lead to Ms. Mittal's ouster. (*Id.* at ¶68). Per their plan, on December 12, 2025, Defendants Unilever and Magnum engineered the amendment of the Ben & Jerry's Bylaws which retroactively limited the terms of Independent Board members to nine years. This move, if lawful, meant that Ms. Mittal and two other members were no longer eligible to serve on the Board. (*Id.* at ¶71).

On December 15, 2025, Defendants Unilever and Magnum ousted Ms. Mittal as Board Chair via letter signed by Vanessa Vilar, "Vice President of Ben & Jerry's HoldCo. LLC." That letter, nearly identical to the prior October 23, 2025 letter, restated all of Ms. Mittal's purported misconduct quoted above and the directive that she was being removed. At the end of the letter, Defendants also stated that she was also no longer eligible to serve due to a change in the bylaws imposing a new term limit of nine years. (*Id.* at ¶72).

Almost simultaneously, according to plan, Unilever and Magnum reached out to their media contacts, and took a responsible part in publishing the message that Ms. Mittal was ousted after "investigations" found improprieties. (*Id.* at ¶73). Though Unilever and Magnum could have simply said that Ms. Mittal and two other members of the Board had to leave because of the new term limit, they publicly emphasized that Ms. Mittal was removed immediately, while the other two term-impacted members were allowed to remain until the end of the year. (*Id.* at ¶74).

That same day, the Financial *Times* reported about Ms. Mittal's ouster:

> ***The Magnum Ice Cream Company has moved to oust the chair of Ben & Jerry's board over alleged conflicts of interest***, as the ice cream business spun out of Unilever intensifies its grip on one of its key subsidiaries, ***according to people familiar with the matter.***
>
> \* \* \*
>
> ***Magnum informed Ben & Jerry's chair Anuradha Mittal on Monday that she was no longer eligible to serve on the board with immediate effect, after an external investigation and an audit of the brand's charitable arm, of which she is a trustee, uncovered conflicts of interest***, according to people briefed on the matter. They declined to outline the alleged conflicts.

(*Id.* at ¶75; emphasis added).

Also on December 15, 2025, Magnum sent a statement to the BBC (and likely others), resulting in a report stating: "The BBC understands that Ms. Mittal will leave the company immediately, while Board members Daryn Dodson and Jennifer Henderson will go at the end of this year…. Ben & Jerry's said the move is aimed to preserve and enhance the brand's historical mission and safeguard its essential integrity". (*Id.* at ¶76). On or about December 17, 2025, Magnum emailed the same or a similar statement to *CNBC* and perhaps others, which *CNBC* described and quoted. (*Id.* at ¶77)

The Amended Complaint contains detailed allegations as to why Defendants knew that each of their statements were false or made them in reckless disregard of their falsity. (*Id.* at ¶¶82-105).

After its own investigation, on December 3, 2025, the Independent Board (minus Ms. Mittal) sent a detailed response refuting all of the charges against Ms. Mittal in a letter to, among other people, Unilever CEO Fernando Fernandez, Ben & Jerry's CEO Senf, Magnum CEO ter Kulve, and Magnum Chief Legal Officer Vilar (*Id.* at ¶58). Nonetheless, Defendants restated the exact same allegations in their December 15, 2025 letter to Ms. Mittal outlining the purported reasons for her ouster. They also published statements that Ms. Mittal had been ousted following "investigations" which found serious problems, including "conflicts of interest." (*Id.* at ¶93).

Defendants achieved their goal of thoroughly humiliating and discrediting Ms. Mittal. As a result, Ms. Mittal suffered injury to her personal and professional reputations, as well as severe humiliation, embarrassment, depression, and emotional distress. (*Id.* at ¶106).

**Defendants' Statement:**

Plaintiff's Statement, which runs over seven pages, is inaccurate and argumentative and exceeds the appropriate standards for a concise chronology of relevant facts and statement of the salient issues. *See Standing Order for All Judges of the N.D. Cal.* ¶ 2 (Nov. 30, 2023) (Statement of the Case should be "a brief chronology of the facts and a statement of the principal factual issues in dispute."). Simply put, it was Plaintiff's own persistent, unseemly, and unprofessional conduct towards others, her lack of integrity in the discharge of her duties, and her truculent refusal to be subject to the same company-wide Code of Business Principles to which thousands of others at Unilever and Magnum have committed themselves, that resulted in her removal and the resulting media coverage.

As Plaintiff's Statement acknowledges, her claims arise from facts and circumstances that are the subject of a corporate governance and breach of contract dispute that has been ongoing in the Southern District of New York since November 2024, captioned as *Ben & Jerry's Homemade, Inc. v. Conopco, Inc.*, S.D.N.Y. Case No. 1:24-cv-08641-PKC (the "S.D.N.Y. Case"). In that case, several members of the Ben & Jerry's Homemade, Inc. ("Ben & Jerry's") Board—purportedly on behalf of themselves and Ben & Jerry's—and the Ben & Jerry's Foundation, Inc., sued Unilever and Magnum to enforce what they contend are their contractual rights under a Merger Agreement and a Settlement Agreement, and to seek reinstatement and declaratory relief regarding the governance of the Board. Under the agreements, a Board comprised largely of independent directors was established to advise Ben & Jerry's management on matters concerning the company's social mission and on essential brand integrity, as defined in the agreements. Plaintiff Mittal is a former member of that Board and was the Chair when the S.D.N.Y. Case was filed. Ms. Mittal is also a trustee of the Ben & Jerry's Foundation, Inc., which later intervened as a party plaintiff in the S.D.N.Y. Case.

The plaintiffs' claims in the S.D.N.Y. Case include, among other things, the propriety of Unilever's and Magnum's governance determinations that Ms. Mittal is ineligible to serve on the Board, and they seek her reinstatement. Also at issue in the S.D.N.Y. Case is whether Ms. Mittal was rendered ineligible based on investigations by an independent accounting firm and a law firm that conducted reviews pursuant to best practices principles. The Fourth Amended Complaint in the

S.D.N.Y. Case mentions Plaintiff Mittal more than 60 times, removing any doubt about the substantial overlap between the cases. Here, Plaintiff Mittal alleges that the same investigations, as well as internal discussions of the underlying facts and results including in meetings with the Board, SEC filings that mentioned them, and media coverage about these corporate developments, defamed her.

The following is a brief chronology of the saliant facts and summary of the principal issues in dispute.

In 2000, a wholly owned subsidiary of Unilever acquired Ben & Jerry's. The parties entered into a series of governing agreements, including a Merger Agreement, Shareholders Agreement, Articles of Incorporation, and Bylaws, all of which establish the governance framework for Ben & Jerry's and the Board.  Certain provisions of these documents also addressed the governance of the Ben & Jerry's Foundation, a private charitable foundation established in 1985 under the laws of Vermont, that uses contributions from Ben & Jerry's to make grants to nonprofits focused on social justice causes.

For 20 years this business arrangement worked.  That all changed in July 2021, when the Board—influenced by Ms. Mittal and without consultation with Unilever—announced that B&J would stop selling ice cream in the West Bank.  That decision generated immediate and substantial controversy.  It resulted in several states placing Unilever and Ben & Jerry's on their blacklists of companies that engage in the movement to boycott, divest from, and sanction Israel ("BDS"), leading to the divestment of hundreds of millions of dollars in Unilever's stock, sanctions, and accusations of antisemitism.  Unilever received letters of condemnation from a dozen State Attorneys General and faced investigations from both the U.S. Congress and Israeli regulators.  Supermarkets across the U.S. and the world announced and/or threatened that they would reduce the number of Ben and Jerry's products they sell—or stop selling Ben & Jerry's products altogether.  Unilever was also subject to mounting threats of violence and forced to implement security measures to protect the safety of its employees, stores, and franchisees.  Such actions harmed the companies' financial and operational areas that were Unilever's sole responsibility, per the operative agreements.

In 2024, Unilever announced that it was spinning off its ice cream brands and businesses, including Ben & Jerry's, to a new publicly traded company, The Magnum Ice Cream Company N.V.

During this period, Unilever engaged Ernst & Young ("EY") to conduct an audit of the Ben & Jerry's Foundation that included interviews with several trustees. Plaintiff Mittal refused to sit for an interview with the EY auditors unless they consented to special rules and procedures that were inconsistent with standard auditing practices. The EY audit found Ben & Jerry's Foundation's governance, oversight, and financial protocols to be deficient due, in part, to their failure to require trustees to disclose potential conflicts of interest and to ensure funds were used as intended and granted pursuant to the Foundation's policies.

Unilever also engaged the Skadden Arps law firm to conduct a business integrity review of Plaintiff's conduct as a director. The business integrity review issued findings concerning Plaintiff's lack of compliance with the Unilever Code of Business Principles and other concerns pertaining to whether she was eligible to serve on the Board.

On December 6, 2025, the merger transaction with Magnum closed. At that point, Ben & Jerry's HoldCo, LLC ("HoldCo"), as Ben & Jerry's sole shareholder, amended Ben & Jerry's Articles of Incorporation and Bylaws—as expressly permitted by the operative agreements—to update the eligibility requirements for service on the Board. Further to those amendments and the findings of the business integrity investigation and audit, on December 15, 2025, Plaintiff was notified that she was no longer eligible to serve.

On March 26, 2026, Plaintiff filed this lawsuit. She alleges defamation and related claims for relief arising from statements made in connection with the audit, the business integrity review, and her ineligibility to continue to serve on the Board. Defendants deny Plaintiff's allegations.

Plaintiff's lawsuit paints herself as a victim, but Defendants are the ones who have paid the price of Plaintiff Mittal's pride, ego, and greed. For example, Plaintiff Mittal helped orchestrate Ben & Jerry's payments to the Oakland Institute, a non-profit Ms. Mittal founded and from which she has received over $1.3 million in compensation and rental payments since 2011, including $249,000 in rent between 2018 and 2023. When not misappropriating funds, Plaintiff squandered Ben & Jerry's resources, creating inefficiencies and confusion that caused disharmony between the company's economic mission and social mission. Plaintiff, for example, rejected a proposal to change ice cream formulations that would have helped reduce carbon emissions—a key social mission issue for Ben &

Jerry's—without any clear reasoning. She also impeded the company's transition from almond-based to oat-based dairy, despite clear consumer preferences supporting the change. Plaintiff further fostered a toxic workplace environment. She exhibited a pattern of extremely disrespectful, offensive, and inappropriate workplace behavior to Unilever and Ben & Jerry's employees and other Board members, including remarks that illuminated her racial and ethnic biases.

Plaintiff's pattern of misstating the facts appears even in her summary above. She claims that she left a meeting with Ms. Varsellona because she "was so shocked and upset." Discovery will show, however, that the real reason Plaintiff left was because she did not get her settlement demands. Plaintiff also claims Mr. Senf "loudly read a summary of the same charges" against her, but witness testimony from those present at the meeting will show that the Board refused to let Mr. Senf address them. And Plaintiff's claim that Ms. Fava "read aloud each of the charges of misconduct" against her is demonstrably false: the timeline of events belies Plaintiff's mischaracterization.

For purposes of case management, the principal factual issues in dispute include: (1) the findings of the EY audit and Skadden Arps' independent business integrity review, (2) whether any of the challenged statements are non-actionable opinions, (3) whether the challenged statements are true, assuming they are statements of fact and not opinions, (4) whether any of the challenged statements are privileged or otherwise non-actionable, (5) whether any Defendant acted with actual malice, (6) whether Plaintiff is a limited-purpose public figure, and (6) whether Plaintiff suffered legally cognizable damages. Defendants Unilever, Magnum, and Mr. Senf submit that each issue should be resolved against Plaintiff and in their favor.

## III.   LEGAL ISSUES

**Plaintiff's Statement:**

Whether personal jurisdiction exists over all Defendants.

Whether Section 425.16 of the California Code of Civil Procedure applies to the alleged conduct of Defendants.

Whether Plaintiff has adequately pled her claims for defamation *per se*, false light and intentional infliction of emotional distress.

**Defendants' Statement:**

1. Whether this Court has personal jurisdiction over any defendant.

2. Whether Plaintiff's claims are subject to California's Anti-Slapp statute, Cal. Code Civ. Proc. § 425.16.

3. Whether the Amended Complaint states a claim upon which relief can be granted, including whether the challenged statements are privileged under Cal. Civ. Code § 47(b) or otherwise, constitute protected opinion, or satisfy the pleading standard for actual malice as to each Defendant.

4. Whether Plaintiff is a limited-purpose public figure required to plead and prove actual malice.

## IV.    MOTIONS

**Plaintiff's Statement:**

Defendants' counsel has represented that all Defendants may be filing: (1) a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction; (2) a Rule 12(b)(6) motion to dismiss all claims; and (3) a motion to strike all claims pursuant to Section 425.16 of the California Code of Civil Procedure.

The Parties acknowledge Judge Orrick's Standing Order linking each Party to one summary judgment motion absent leave of Court.

**Defendants' Statement:**

The last day to respond to the First Amended Complaint is August 12, 2026.  Unilever, Magnum and Mr. Senf presently intend to timely file simultaneous motions: (1) to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), (2) to dismiss all claims for relief under Fed. R. Civ. P. 12(b)(6) and (3) to strike under Cal. Code Civ. Proc. § 425.16.  Defendants are considering other motions, as well.  If the case proceeds past the pleadings stage, Defendants may bring counterclaims against Plaintiff.

## V.    AMENDMENT OF PLEADINGS

**Plaintiff's Statement:**

Plaintiff does not anticipate further amendment of her Amended Complaint at this time. Plaintiff reserves the right to file a motion for leave to amend in the event it is necessary to do so.

**<u>Defendants' Statement:</u>**

As noted above, responsive pleadings have not yet been filed.

## VI. EVIDENCE PRESERVATION

The Parties certify that they have read the ESI Guidelines and have met and conferred pursuant to Fed. R. Civ. P. 26(f) regarding reasonable and proportionate steps taken to preserve evidence relevant to the issues and reasonably evident in this action.

## VII. DISCLOSURES

The Parties have agreed to exchange initial disclosures on or before July 23, 2026.

## VIII. DISCOVERY

No discovery has been conducted to date, although discovery is proceeding in the S.D.N.Y. Case.

**Timing/Scope of Anticipated Discovery:**

**Plaintiff's Statement:**

The Parties conducted their Rule 26(f) conference on June 2, 2026. Discovery is now open for all purposes. *Castaline v. Aaron Mueller Arts*, No. C 09-2543 CRB (JL), 2010 WL 11583447, at *3 (N.D. Cal. Jan. 28, 2010) ("Once the Rule 26(f) conference [is] completed, the parties [are] free to serve discovery.").

Defendants' counsel has stated that no discovery is appropriate pending decision of their anticipated motions because such motions will be limited to questions of law. Plaintiff anticipates serving discovery promptly to seek documents and information about, among others things: (1) the audit and the investigation of Plaintiff; (2) the threat and proposal made to Plaintiff during the October 10, 2025 meeting in San Francisco; (3) the October 23, 2025 letter containing the accusations against Plaintiff; (4) the October 28 and 29, 2025 Independent Board meeting; (5) the November 11, 2025 publication of the charges against Plaintiff to approximately ten Ben & Jerry's employees; and (6) Defendants' communications to the news media about Plaintiff.

**Defendants' Statement:**

Defendants contend that discovery should await resolution of their anticipated pleading, jurisdiction, and venue motions. Those motions raise threshold legal questions that do not require

factual development and that, if granted, would narrow or eliminate the claims at issue.  Proceeding with discovery prior to their resolution would risk redundant and inconsistent rulings on discovery and would impose substantial burden and cost without commensurate benefit, particularly given that much of the discovery in which Plaintiff is interested will be exchanged in the S.D.N.Y. Case.

Discovery will involve documents and witnesses located in multiple countries, close coordination with the parallel proceedings in the S.D.N.Y. Case, and significant privilege and confidentiality issues, including with respect to materials related to the EY audit and the business integrity review.  Defendants will seek appropriate limitations on discovery proportionate to the needs of the case.  To the greatest extent possible, discovery in this case should be coordinated with discovery in the S.D.N.Y. Case to minimize duplicative activity, particularly the need for witnesses to sit for depositions more than once.

Subject to the outcome of the pleading motions, Defendants anticipate that discovery will address, among other things: (1) the factual basis for each challenged statement, (2) the truth or substantial truth of those statements, (3) Plaintiff's public figure status, (4) Plaintiff's alleged damages and any failure to mitigate, and (5) the lack of a causal link between each specific statement and any claimed harm.

**Protective Order:**

The Parties will attempt to agree upon a stipulated protective order within 30 days of the CMC.

**Electronic Discovery:**

The Parties will attempt to agree upon a stipulated order within 30 days of the CMC.

**Limitations or Modifications:**

The Parties consent and agree, pursuant to Fed. R. Civ. P. 5(b)(2)(E), that service may be made by electronic mail, with copies sent to all attorneys of record for the party served.

The Parties currently do not anticipate that any changes should be made in the limitations on discovery imposed under the Federal Rules of Civil Procedure or the Local Rules, and currently do not request that other limitations be imposed. Each party reserves the right to seek the other's consent and, as necessary, to seek leave for such modifications.

**IX.    CLASS ACTION**

Not applicable.

**X.    RELATED CASES**

**Plaintiff's Statement:**

*Ben & Jerry's Homemade, Inc. v. Conopco, Inc.*, 1:24-cv-08641-PKC (S.D.N.Y.), in which the Independent Board claims that Unilever and Magnum breached the Merger Agreement.

**Defendants' Statement:**

*Ben & Jerry's Homemade, Inc. v. Conopco, Inc.*, S.D.N.Y. Case No. 1:24-cv-08641-PKC, in which the former directors of the Board—on their behalf and on behalf of Ben & Jerry's Homemade, Inc.—and the Ben & Jerry's Foundation, Inc. allege breach of the Merger Agreement and the Settlement Agreement by Conopco, Inc. and Magnum. Unilever and Magnum are parties to the S.D.N.Y. Case.  As noted in § VIII (Discovery) above, Defendants anticipate that written and deposition discovery in the two cases will overlap substantially, and Defendants intend to seek coordination across the two cases to avoid duplication and unnecessary cost, where practicable.

**XI.    RELIEF**

**Plaintiff's Statement:**

Plaintiff seeks monetary damages and any other relief the Court deems appropriate.

**Defendants' Statement:**

Defendants deny that Plaintiff is entitled to any relief and deny that Plaintiff has suffered any damages as a result of any conduct by Unilever, Magnum, or Mr. Senf.  If the case proceeds past the pleadings, Defendants may file counter-claims and seek appropriate relief, including monetary damages.

**XII.    SETTLEMENT AND ADR**

The Parties believe it is premature to engage in ADR or settlement discussions at this time. Per ADR L.R. 3-5., the Parties have read the handbook entitled "Dispute Resolution Procedures in the Northern District of California," available at www.adr.cand.uscourts.gov.

**Defendants' Statement:**

Defendants' preferred ADR process is private mediation before a mutually agreed mediator, after resolution of Defendants' anticipated pleadings motions.

The Parties agree that this case is not presently suitable for reference to binding arbitration, a special master, or referral to the Judicial Panel on Multidistrict Litigation. . Defendants reserve the right to seek appointment of a discovery special master if warranted.

## XIII.   NARROWING OF ISSUES

**Plaintiff's Position:**

Plaintiff is not presently aware of any issues that can be narrowed by agreement. Plaintiff does not believe this case is not appropriate for the Expedited Trial Procedure of General Order No. 64 Attachment A.

**Defendants' Statement:**

Defendants submit that the most consequential issues in this case are: (1) **personal jurisdiction over each Defendant**, and (2) **the legal sufficiency of Plaintiff's claims under Fed. R. Civ. P. 12(b)(6) and Cal. Code Civ. Proc. § 425.16**. Resolution of Defendants' anticipated motions on these issues will determine the scope, and potentially the entirety, of any further proceedings. Defendants are not presently aware of any issues that can be narrowed by agreement and do not request bifurcation at this time, but reserve the right to do so following resolution of the pleading motions.

Defendants do not believe this case is appropriate for the Expedited Trial Procedure of General Order No. 64 Attachment A.

## XIV.   SCHEDULING

Plaintiff proposes the following case schedule: In light of the anticipated motions, Plaintiff is not proposing a schedule at this time.

**Defendants' Statement:**

Defendants submit that scheduling should be deferred pending resolution of their anticipated motions. If the Court sets dates at the CMC, Unilever, Magnum, and Mr. Senf propose that all deadlines be set following the Court's ruling on the anticipated pleading motions, and respectfully request that the Court set a scheduling conference for that purpose at the appropriate time. In the

alternative, if the Court wishes to set dates now, Unilever, Magnum, and Mr. Senf propose the following schedule, which assumes a ruling on the pleading motions, including a second round, if necessary, by December 31, 2026:

- Fact discovery cutoff: 6 months after ruling on pleading motions
- Expert designation: 7 months after ruling on pleadings motions
- Expert discovery cutoff: one month after designations.
- Last day for hearing dispositive motions: two months after close of expert discovery.
- Pretrial conference: one month after ruling on pleading motions.
- Trial: one month later (same as 12 months after ruling on pleadings motions).

## XV.   TRIAL

Plaintiff has requested a trial by jury. Unilever, Magnum, and Mr. Senf reserve all rights with respect to the scope of any jury trial.

Plaintiff does not believe it is possible to estimate the length of the trial at this time. Defendants believe that a jury trial of this case can be completed in eight court days.

## XVI.   DISCLOSURE OF NON-PARTY INTERESTED ENTITIES OR PERSONS

**Plaintiff's Statement:**

Plaintiff filed her Certification of Interested Entities or Persons on 03/26/2026 (*see* ECF No. 4) which stated that, other than the named party, there is no such interest to report.

**Defendants' Statement:**

Each Defendant has also filed their Certification of Interested Entities or Persons required by Civil Local Rule 3-15. The substance of those certifications is as follows:

Unilever PLC (Dkt. 42): There is no publicly held corporation that owns 10% or more of Unilever PLC's stock and Unilever PLC has no parent corporation. Unilever PLC is the indirect parent of Conopco, Inc., a New York corporation, and Unilever United States, Inc., a Delaware corporation. There is no conflict of interest other than the named parties to report.

The Magnum Ice Cream Company N.V. (Dkt. 43): Unilever PLC owns approximately 121,533,558, or 19.85%, of TMICC's ordinary shares. TMICC has no parent corporation. TMICC is

a direct parent of The Magnum Ice Cream Company HoldCo Netherlands B.V. There is no conflict of interest other than the named parties to report.

Jochanan Senf (Dkt. 44): Mr. Senf is a citizen of the Netherlands. There is no conflict of interest other than the named parties to report.

## XVII.  PROFESSIONAL CONDUCT

All attorneys of record for the Parties have reviewed the Guidelines for Professional Conduct for the Northern District of California.

## XVIII. OTHER

The parties are discussing a potential agreement as to the date(s) on which the parties should begin logging attorney-client and work product communications.

DATE: June 16, 2026

By: /s/ *Steven G. Madison*
    Steven G. Madison

Steven Geoffrey Madison
Robert M. Schwartz
Marie M. Hayrapetian
Julian Toca Schoen
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Fax: (213) 443-3096
robertschwartz@quinnemanuel.com
stevemadison@quinnemanuel.com
mariehayrapetian@quinnemanuel.com
julianschoen@quinnemanuel.com

*Attorneys for Defendants Unilever PLC, The Magnum Ice Cream Company N.V., and Jochanan Senf*

Respectfully submitted

By: /s/ *Thomas B. Harvey*
    Thomas B. Harvey

THOMAS B. HARVEY (CA Bar #287198)
**LAW OFFICES OF THOMAS B. HARVEY**
365 E. Avenida De Los Arboles, #226
Thousand Oaks, CA 91360
Telephone: (805) 768-4440
tbhlegal@proton.me

PAUL K. VICKREY     (*Pro Hac Vice*)
PATRICK F. SOLON    (*Pro Hac Vice*)
DYLAN M. BROWN    (*Pro Hac Vice*)
**VITALE, VICKREY, NIRO, SOLON & GASEY LLP**
311 S. Wacker Drive, Suite 2200
Chicago, IL 60606
Telephone: (312) 236-0733
vickrey@vvnlaw.com
solon@vvnlaw.com
dbrown@vvnlaw.com

*Attorneys for Plaintiff*

**ATTESTATION**

I, Steven G. Madison, am the ECF User whose ID and password are being used to file this Stipulation.  In compliance with L.R. 5-1(i)(3), I hereby attest that Thomas B. Harvey has concurred in this filing.


Dated: June 16, 2026                           /s/ Steven G. Madison

                                               Steven G. Madison