QUINN EMANUEL URQUHART
& SULLIVAN, LLP
Steven G. Madison (SBN: 101006)
stevemadison@quinnemanuel.com
Robert M. Schwartz (SBN: 117166)
robertschwartz@quinnemanuel.com
Marie M. Hayrapetian (SBN: 315797)
mariehayrapetian@quinnemanuel.com
Julian T. Schoen (SBN: 344202)
julianschoen@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000

*Attorneys for Defendants Unilever PLC, The Magnum Ice Cream Company N.V., and Jochanan Senf*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

ANURADHA MITTAL,

Plaintiff,

vs.

UNILEVER PLC, THE MAGNUM ICE CREAM COMPANY N.V., and JOCHANAN SENF,

Defendants.

Case No. 26-cv-02660-WHO

**DEFENDANTS' SPECIAL MOTION TO STRIKE (CALIFORNIA CODE OF CIVIL PROCEDURE § 425.16) AND MOTION TO DISMISS (FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6))**

Judge: Hon. William H. Orrick
Hearing Date: September 30, 2026
Hearing Time: 2:00 p.m.
Courtroom: 2

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| SUMMARY OF ARGUMENT | | 1 |
| RELEVANT ALLEGATIONS | | 4 |
| A. | Unilever Acquired Ben & Jerry's; Mittal Joined the Board. | 4 |
| B. | Mittal and Mittal-Affiliated Organizations Received Substantial Cash Payments During Her Tenure on the Board and as a Foundation Trustee. | 5 |
| C. | When Unilever Spun Off Ben & Jerry's, a Governance Audit of the Foundation Revealed Mittal's Improper Conduct. | 5 |
| D. | In October 2025, TMICC Told Board Members that the Investigation Had Found that Mittal Had Breached Her Duties and Violated Company Policies. | 6 |
| E. | TMICC Mentioned the BI Investigation Outcome in its SEC Filings. | 8 |
| F. | Mittal Exited the Board and the Media Reported On Her Departure. | 8 |
| LEGAL STANDARD | | 9 |
| A. | Anti-SLAPP Special Motion To Strike. | 9 |
| B. | Motion To Dismiss. | 10 |
| ARGUMENT | | 10 |
| I. | PLAINTIFF'S CLAIMS ARISE FROM DEFENDANTS' PROTECTED ACTIVITY | 10 |
| II. | MITTAL CANNOT SHOW A PROBABILITY OF PREVAILING | 12 |
| A. | The Statements in the *Semafor* Article are Not Actionable. | 12 |
| B. | The Statements in the October 23 Letter Are Not Actionable. | 14 |
| C. | The Statements in the SEC Form 20-F and Prospectus Are Not Actionable. | 21 |
| D. | The Statements in the *Financial Times*, *BBC*, and *CNBC* Are Not Actionable. | 22 |
| E. | Mittal's False Light And IIED Claims Fail As A Matter Of Law. | 24 |
| F. | Defendants Are Entitled to An Award of Attorneys' Fees and Costs. | 24 |
| III. | ALTERNATIVELY, THE COURT SHOULD GRANT THE MOTION TO DISMISS | 24 |
| CONCLUSION | | 25 |

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 10

*Campanelli v. Regents of University of California*,
44 Cal. App. 4th 572 (1996) .......... 19, 22, 24

*Charney v. Standard Gen., L.P.*,
10 Cal. App. 5th 149 (2017) .......... 17, 18, 19, 22, 23

*ComputerXpress, Inc. v. Jackson*,
93 Cal. App. 4th 993 (2001) .......... 11, 23

*Conservation Force v. Salazar*,
646 F.3d 1240 (9th Cir. 2011) .......... 10

*Corales v. Bennett*,
567 F.3d 554 (9th Cir. 2009) .......... 24

*CoreCivic, Inc. v. Candide Grp., LLC*,
46 F.4th 1136 (9th Cir. 2022) .......... 10, 12, 14, 16, 23, 25

*Duronslet v. Cnty. of Los Angeles*,
266 F. Supp. 3d 1213 (C.D. Cal. 2017) .......... 24

*Galanski v. Wal-Mart Assocs., Inc.*,
2024 WL 2701084 (E.D. Cal. May 24, 2024) .......... 21

*Global Telemedia, Int'l, Inc. v. Doe 1*,
132 F. Supp. 2d 1261 (C.D. Cal. 2001) .......... 11

*Hoang v. Tran*,
60 Cal. App. 5th 513 (2021) .......... 11

*Hogan v. Weymouth*,
2019 WL 11055032 (C.D. Cal. Aug. 19, 2019) .......... 18

*Hughes v. Pair*,
46 Cal. 4th 1035 (2009) .......... 24

*Jackson v. Mayweather*,
10 Cal. App. 5th 1240 (2017) .......... 12, 24

*John Doe 2 v. Superior Ct.*,
1 Cal. App. 5th 1300 (2016) ... 17

*Ketchum v. Moses*,
24 Cal. 4th 1122 (2001) ... 24

*Kiehn v. Stein*,
2013 WL 1789718 (N.D. Cal. Apr. 26, 2013) ... 18

*Knievel v. ESPN*,
393 F.3d 1068 (9th Cir. 2005) ... 15

*Koch v. Goldway*,
817 F.2d 507 (9th Cir. 1987) ... 24

*McGarry v. Univ. of San Diego*,
154 Cal. App. 4th 97 (2007) ... 14, 18, 20, 23

*Mindys Cosms., Inc. v. Dakar*,
611 F.3d 590 (9th Cir. 2010) ... 10

*Montandon v. Cox Broad. Corp.*,
45 Cal. App. 3d 932 (1975) ... 17

*Newton v. Nat'l Broad. Co.*,
930 F.2d 662 (9th Cir. 1990) ... 13, 19, 22

*Ojjeh v. Brown*,
43 Cal. App. 5th 1027 (2019) ... 11

*Okun v. Superior Ct.*,
29 Cal. 3d 442 (1981) ... 17

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd.*,
507 U.S. 380 (1993) ... 16

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) ... 23

*Resolute Forest Prods., Inc. v. Greenpeace Int'l*,
302 F. Supp. 3d 1005 (N.D. Cal. 2017) ... 14, 24

*Savage v. Pac. Gas & Elec. Co.*,
21 Cal. App. 4th 434 (1993) ... 18, 23

*Smith v. Maldonado*,
72 Cal. App. 4th 637 (1999) ... 12, 13, 15

*Song Fi Inc. v. Google, Inc.*,
108 F. Supp. 3d 876 (N.D. Cal. 2015) ... 13

*Sprewell v. Golden State Warriors*,
266 F.3d 979 (9th Cir. 2001) .......... 10

*Troy Grp., Inc. v. Tilson*,
364 F. Supp. 2d 1149 (C.D. Cal. 2005) .......... 11

*UCP Int'l Co. Ltd. v. Balsam Brands Inc.*,
420 F. Supp. 3d 966 (N.D. Cal. 2019) .......... 10, 12

*Van Buskirk v. Cable News Network, Inc.*,
284 F.3d 977 (9th Cir. 2002) .......... 10

*Vogel v. Felice*,
127 Cal. App. 4th 1006 (2005) .......... 12, 15, 16, 23

*Wilson v. Cable News Network, Inc.*,
7 Cal. 5th 871 (2019) .......... 9, 10

*Wynn v. Chanos*,
75 F. Supp. 3d 1228 (N.D. Cal. 2014) .......... 12, 16, 19

**Statutes**

Cal. Civ. Code § 45a .......... 13

Cal. Code Civ. Proc. 425.16 .......... 1, 9, 11, 12, 24

**Other Authorities**

Fed. R. Civ. Proc. 5(b) .......... 26

Fed. R. Civ. Proc. 12(b)(6) .......... 1, 10, 25

PLEASE TAKE NOTICE THAT, on September 30, 2026, at 2 p.m., or as soon thereafter as it may be heard, Defendants Unilever PLC ("Unilever"), The Magnum Ice Cream Company N.V. ("TMICC"), and Jochanan Senf will hereby move the Court to: (1) strike the First Amended Complaint (Dkt. 24, "FAC") pursuant to California Code of Civil Procedure § 425.16, or (2) dismiss it pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. By filing this motion, Defendants neither consent to personal jurisdiction nor waive that defense.

**STATEMENT OF ISSUES TO BE DECIDED**

Whether the Court should strike or dismiss Mittal's defamation, false light, and emotional distress claims because she cannot allege that any of Defendants' statements was: (1) false, (2) defamatory on its face, (3) a statement of fact, not opinion, and (4) made with actual malice.

**SUMMARY OF ARGUMENT**

The Court should dismiss the FAC with prejudice because none of Defendants' allegedly defamatory statements is actionable. The statements lack falsity, require unstated facts to convey a defamatory meaning, are matters of opinion, or lack actual malice. Accordingly, none of Mittal's claims survives scrutiny under California's anti-SLAPP statute or Rule 12(b)(6).

Mittal admits three facts fatal to her claims. First, Mittal describes herself as an internationally renowned person, thus requiring her to allege that Defendants acted with actual malice—a burden that she has not and cannot satisfy. Second, Mittal admits—and her tax filings confirm—that she received the benefits described in the audit report on which Defendants' alleged defamatory statements are premised. Given that those matters are true, the statements cannot be defamatory. Third, the only publication of allegedly defamatory statements occurred in TMICC's SEC 20-F filing and Prospectus, expressly framed as an opinion and published to comply with legal obligations and to serve the public interest of informing potential investors ahead of the initial public offering. All other "publications" either were internal at Unilever or TMICC to a limited group of individuals with a need to know, or were not attributed to Defendants, as Mittal admits. Moreover, all were non-actionable statements of opinion.

As in any defamation case, the context of the challenged statements is critical. The first statements were published in April 2025 in an online site called *Semafor*. It reported on

Unilever's "demerger" of its ice cream business, including Ben & Jerry's, into newly-formed TMICC. Claiming to draw from sources within Unilever, it noted the existence of a governance audit of the Foundation. *See* Ex. A to FAC. The article mentioned that Mittal's wholly-owned organization, the Oakland Institute ("OI"), had received over $200,000 from the Ben & Jerry's Foundation. Mittal does not and cannot allege that those statements were false. The payments are documented in tax filings that Defendants ask this Court to judicially notice. *See* Exs. 19-27 to Defendants' Request for Judicial Notice ("RJN").

EY performed the audit. It found serious irregularities in the operation of the Foundation, particularly in light of Mittal's dual role as the Ben & Jerry's board chair and as a Foundation trustee. During the same period, Unilever and TMICC conducted a business integrity ("BI") investigation of Mittal based on concerns raised about her conduct. That investigation, for which Mittal belligerently refused to be interviewed, examined not only issues related to the Foundation's donations to OI, but a litany of Mittal's offensive and inappropriate behavior, her disruption of Ben & Jerry's business, her circumvention of Unilever instructions about charitable recipients, and her weaponization of Unilever's BI process to further her personal interests by pursuing others in bad faith.

Under the Merger Agreement that created the Ben & Jerry's Board, the Class I Directors may remove another Class I Director at any time for ineligibility. The Merger Agreement requires every Director to acknowledge and abide by Unilever's Code of Business Principles to remain eligible, and the investigation revealed violations of the Code. In October 2025, TMICC attempted to share the investigation results with the disinterested Class I Ben & Jerry's Directors. But they refused to hear the results without their litigation lawyer's attendance. And they demanded to record the meeting despite the confidential nature of the investigation.

To avoid confrontation, TMICC summarized the investigators' opinions in a letter to those Ben & Jerry's directors. TMICC limited its disclosure of Mittal's misconduct to them and to a few executives on the BI Committee who had a need to know to discharge their duties.

Most of the statements at issue consist of accurately reporting the opinions of the auditors and investigators. It was not defamatory for Defendants to have restated those opinions. To avoid

the opinion safe harbor, Mittal alleges that the investigation was pretextual. But the California Court of Appeal has rejected that theory. Statements about a company investigation are non-actionable opinions, even where the target claims the investigation was tainted. And if the revelations about Mittal's misconduct have harmed her public reputation, it is only because ***she*** publicly disclosed them by including them in her complaint.

The FAC paints Mittal as a selfless warrior for righteous causes that Defendants sought to silence. The truth is less flattering. In reality, Mittal used her position to enrich herself and her family. During her tenure, the Foundation issued grants in excess of $200,000 to OI. An additional $400,000 flowed to OI from other organizations that received Foundation grants—circuitous funding akin to "donation laundering." This enabled her to draw over $1 million in salary from OI plus $249,000 in "rent" for the use of her house as OI's "headquarters." Between 2018 and 2023, 23-27% of OI's budget went to Mittal in one form or another. That percentage is a donor "red flag" for any charity. The Foundation was not her only victim. Every dollar Mittal lavished on herself was one dollar less that the Foundation could give to deserving causes.

In summary, Mittal's claims fail on numerous legal grounds that cannot be cured:

***Lack of Falsity***: Many of the statements do no more than state amounts of money that flowed from the Foundation to Mittal. To ensure an accurate record, Defendants have asked the Court to take judicial notice of IRS filings that confirm the truth of what Defendants said. Other statements accurately reflected what the audit and the BI investigation conveyed to Defendants. For all such statements, Mittal cannot allege the prima facie element of falsity.

***Non-Actionable Opinions***: Defendants' other statements concerned whether, as chair of Ben & Jerry's board or a Foundation trustee, Mittal's conduct was "improper" or "toxic" or if she were "eligible" to remain. Those are quintessential, non-actionable matters of opinion.

***Statements are not defamatory per se***: To convey a defamatory meaning, many of the alleged statements require additional information that the speaker did not say, or only imply a defamatory meaning, or are no more than innuendo. By law, those are not defamatory *per se*.

***Absence of Malice***: Mittal must plead actual malice. But she failed to sufficiently allege that any Defendant knew or should have known that any allegedly defamatory statement was false.

Mittal's false light and emotional distress claims likewise fail as a matter of law. A false light claim paired with a defamation claim is "superfluous"; the two rise and fall together. A plaintiff alleging intentional infliction of emotion distress ("IIED") based on a publication must prove falsity and actual malice. These tacked-on claims fail for the same reasons that her defamation claim fails. Accordingly, the Court should strike the FAC and award Defendants their attorneys' fees under California's anti-SLAPP statute. Alternatively, the Court should grant Defendants' motion to dismiss without leave to amend.

## **RELEVANT ALLEGATIONS**

### **A. Unilever Acquired Ben & Jerry's; Mittal Joined the Board.**

In 2000, Unilever acquired the "renowned ice cream brand" Ben & Jerry's Homemade, Inc. ("Ben & Jerry's"). FAC ¶¶ 16-17, 27. As part of the acquisition, Unilever agreed to establish a special purpose board of directors, comprised of a majority of "Class I" "independent directors," plus the CEO and a Class "U" Director, appointed by Unilever (the "Board"). Importantly, the Board is not a traditional company board that has oversight for everything the business does. Here, the Board's remit is limited to primary responsibility for Ben & Jerry's "social mission and brand integrity." *Id.* ¶ 17. Mittal refused to abide by that limitation.

As part of its acquisition, Unilever agreed to fund the Foundation, an entity separate from Ben & Jerry's run by its own board of trustees. FAC ¶ 14. Unilever was the Foundation's sole source of funding. Unilever agreed to annually donate a percentage of Ben & Jerry's profits, and a minimum of $5 million for the first 10 years. *Id.* Unilever has contributed well over $60 million through the Foundation to grassroots organizations. It has a legitimate interest in ensuring the Foundation's proper management.

Mittal is a public figure known for her activism on social causes. FAC ¶¶ 2, 11-12, 19. In 2004, she founded OI, an "independent policy think tank" and serves as the executive director and a salaried employee. *Id.* ¶ 10. In 2008, Mittal became a Class I director of the Ben & Jerry's Board. *Id.* ¶ 13. In 2012, she became a trustee of the Foundation. *Id.* ¶ 14. In 2018, Mittal became the Ben & Jerry's Board chair. *Id.* ¶ 18.

**B. Mittal and Mittal-Affiliated Organizations Received Substantial Cash Payments During Her Tenure on the Board and as a Foundation Trustee.**

From 2011 to 2023, as Mittal served on the Board and as a Foundation trustee, organizations with which Mittal was affiliated received over $1 million from the Foundation. This includes $345,600 in grants the Foundation made to OI plus another $488,125 OI received from organizations to which the Foundation had issued grants. Ex. C at 3; RJN Exs. 14-26. An additional $300,000 in Foundation funds went to other non-profit organizations where Mittal sat on the board. Ex. C at 3.

Where did that $833,725 that the Foundation directly or indirectly paid to Mittal's OI go? Mostly to Mittal. During this period, Mittal pulled out $1.3 million from OI, mostly in a salary that generously escalated each year. Ex. C at 3; RJN Exs. 1-13 It also included $249,000 in "rent" (at a rate of about $4,000 per month) that she drew from OI from 2018 to 2023 for its use of her house. Ex. C at 3; RJN Exs. 8-13. Between 2018 and 2023, OI lavished 23-27% of its expenses on Mittal and her house. RJN Exs. 8-13.

**C. When Unilever Spun Off Ben & Jerry's, a Governance Audit of the Foundation Revealed Mittal's Improper Conduct.**

In March 2024, Unilever announced plans to spin-off its ice cream companies (including Ben & Jerry's) into TMICC. FAC ¶ 24. In preparation for the transaction, so that TMICC could report to its shareholders (and the SEC) about its business, risk factors and governance practices, Unilever initiated audits "across the entirety of the [TMICC] organization." *Id.* ¶ 32. EY was retained to audit the Foundation.

On April 22, 2025, the financial news website *Semafor* posted an article about the Foundation audit. FAC ¶ 31, Ex A. It wrote that "Unilever is probing the finances of Ben & Jerry's charitable foundation with a focus on its grants to progressive and pro-Palestinian groups, including to an organization with ties to two of the foundation's trustees, people familiar with the matter said." *Id.* It added that "Unilever executives have privately identified a series of grants to OI, a nonprofit that promotes global aid and is critical of the World Bank and Israel, the people said." *Id.* "One Ben & Jerry's Foundation trustee, Anuradha Mittal, is a salaried employee and

founder of the Oakland Institute, which has received more than $200,000 from the foundation since 2016, according to tax filings." *Id.*; *see* RJN Exs. 19-27. In addition to tax filings, *Semafor* wrote that it sourced the article from an internal letter written by TMICC's chief financial officer, Abhijit Bhattacharya, and unnamed "Unilever executives." FAC ¶¶ 30-31.

During the period at issue, several Foundation trustees, including Mittal, directed donations to organizations with which they were affiliated, including to Mittal's OI. Mittal also issued trustee-directed grants to controversial organizations that Unilever had rejected, as Unilever had the right to do under the governing agreements. Ex. C at 3-4. Mittal did so even after she and the other independent directors on the Ben & Jerry's board had lost an arbitration that challenged Unilever's discretionary right to veto grants to at least two of those organizations.

Mittal refused to cooperate with the audit. The auditors gave her multiple opportunities to participate in interviews related to the discretionary grant making process and respond to questions about discretionary grants made at her request. But Mittal sought special treatment as a condition to her involvement. Unlike other Trustees who cooperated in the audit, she said that she would answer questions only if put to her in writing. FAC ¶¶ 95-96. But by then she had retained an attorney—the same attorney who was representing her and the other former Class I directors in the pending governance lawsuit against Unilever and Magnum in the Southern District of New York. *Id.* The auditors wanted her unprompted answers, not answers written by her litigators.

In September 2025, Unilever notified Mittal, through Skadden Arps that Skadden had been retained to conduct a BI investigation "into certain matters relating to [her] role as director on Ben & Jerry's Independent Board." FAC ¶ 40. Skadden asked Mittal to sit for an interview. Again, she refused. *See* FAC ¶¶ 95-96. Even worse, she prevented others from complying: "Mittal, through her counsel, made clear that neither she nor any Class I Directors or Foundation Trustees would agree to be interviewed for the investigation." Ex. C at 5.

### D. <u>In October 2025, TMICC Told Board Members that the Investigation Had Found that Mittal Had Breached Her Duties and Violated Company Policies.</u>

Under the Ben & Jerry's governing agreements, disinterested Class I directors sit in judgment of, and may remove, one another. At the conclusion of the BI investigation, TMICC

attempted to share the findings with the Ben & Jerry's Board at an October 23, 2025 meeting. But they "refused to engage without their outside litigation counsel present," while their lawyer "insisted on recording the meeting where confidential and sensitive information was to be shared." Ex. C at 6. Given that, TMICC sent the findings to them in a letter, which concluded by asking them to tell TMICC how they planned to address the issues raised. *See* FAC ¶ 47 & Ex. C (the "October 23 Letter"). No Defendant shared the October 23 Letter or the investigation's details with the public or with anyone outside of Unilever or TMICC, other than the directors with a need to know. Mittal first made the October 23 Letter's content public when she pasted its text into her complaint (*id.* ¶ 47) and attached it as an exhibit. Per the FAC, the gist of each statement regarding Mittal is as follows:

1. "Ms. Mittal improperly benefits from B&J Foundation funds." This concerned the direct and indirect payments from the Foundation to her organization, which is evident in the Foundation's and OI's IRS filings. Ex. C at 2.

2. "Ms. Mittal circumvented Unilever's refusal to donate to certain organizations." This concerned donations the Foundation made to organizations that Unilever had properly rejected as donees, after Mittal and the Board had lost a legal challenge to Unilever's decisions. Mittal's conduct "placed Unilever and B&J at legal risk of state anti-boycott laws," which breached Mittal's fiduciary duties. *Id.* at 3-4.

3. "Ms. Mittal's behavior towards employees and fellow Board members created a toxic working environment." This concerned Mittal's offensive and inappropriate workplace behavior to both employees and Board members in violation of the company's "Respect, Dignity and Fair Treatment" policy, including comments that demonstrated bias and that caused some to resign. *Id.* at 4.

4. "Ms. Mittal's actions have substantially interfered with both Unilever and B&J businesses." This concerned her refusal to stay within the limited areas of responsibility contractually delegated to the Board. She inserted herself in product development, overruled justified decisions, and wasted resources. *Id.* at 4-5.

5. "Ms. Mittal allowed the disclosure of confidential business information." This concerned her wrongful public disclosure of a confidential performance review of the former CEO without his or the company's consent. *Id.* at 5.

6. "Ms. Mittal failed to cooperate in the Investigation and the Foundation Audit." This concerned her refusal to be interviewed and her demand that she be given any questions in writing so that she could draft her responses with the aid of her lawyer.

7. "Ms. Mittal initiated a Business Integrity complaint to further her own personal interests at the expense of the Foundation, Unilever, and B&J." This concerned her retaliation against members of the legal department involved in the audit and BI investigation by commencing a BI investigation against them. *Id.* at 5-6.

The B&J Board met on October 28 and 29. The FAC alleges that, at the meeting, CEO Jochanan Senf read a "summary" of the "charges" in the October 23 Letter to the Board members, including Mittal. FAC ¶¶ 50-51. The FAC alleges further that on November 11, 2025, TMICC's chief integrity officer and head of litigation and Ben & Jerry's General Counsel, Palmina Fava, shared the Letter's content with Ben & Jerry's leadership team. *Id.* ¶ 59.

**E. <u>TMICC Mentioned the BI Investigation Outcome in its SEC Filings.</u>**

In November 2025, in connection with registering its securities with the SEC, TMICC filed an SEC Form 20-F Registration Statement. FAC ¶¶ 62-66. In relevant part, the 359-page document stated that, "following investigations commissioned by the Group and conducted by external advisers, in the opinion of the Group the current chair of the Ben & Jerry's Board no longer meets the criteria to serve as a member of the Ben & Jerry's Board." *Id.* ¶ 63; Ex. E. A December 2025 shareholder prospectus related to the transaction included the same statement. FAC ¶ 66; Ex. G.

**F. <u>Mittal Exited the Board and the Media Reported On Her Departure.</u>**

On December 15, 2025, TMICC sent Mittal a letter reiterating the opinions stated in the October 23 Letter and wrote that she was no longer eligible to serve on the Board, including because her tenure exceeded the amended by-laws' nine-year term limit. FAC ¶ 72. Mittal's exit followed. *Id.* ¶¶ 72, 74. The media covered her exit. TMICC responded to their inquiries.

On December 15, the *Financial Times* published an article stating that TMICC had "uncovered conflicts of interest" through "an external investigation and audit" and informed Mittal "that she was no longer eligible to serve on the board with immediate effect." FAC ¶ 75; Ex. I.

On December 15 and December 17, the *BBC* and *CNBC* respectively published articles stating—without any reference to any statements by any of the Defendants—that TMICC's decision to find Mittal ineligible was "aimed to preserve and enhance the brand's historical social mission and safeguard its essential integrity." FAC ¶¶ 76-77; Exs. J-K.

On December 19, the *BBC* published an article on Mittal that included a TMICC statement that "an audit of the Ben & Jerry's Foundation, a charitable organization, had identified a series of material deficiencies in financial controls, governance, and other compliance policies, including conflicts of interest." FAC ¶ 78; Ex. L.

Mittal sued Unilever and TMICC on March 26, 2026. *See* ECF No. 1. She filed the FAC on May 8, 2026, which added Mr. Senf as a defendant. She alleges claims for defamation *per se*, false light, and intentional infliction of emotional distress ("IIED") based on: (1) the *Semafor* article, (2) the October 23 Letter and its internal republication, (3) the SEC Form 20-F Registration Statement and December 2025 Prospectus, and (4) the December 2025 news articles.

## **LEGAL STANDARD**

### **A. Anti-SLAPP Special Motion To Strike.**

"Enacted by the Legislature in 1992, the anti-SLAPP statute is designed to protect defendants from meritless lawsuits that might chill the exercise of their rights to speak and petition on matters of public concern." *Wilson v. Cable News Network, Inc.*, 7 Cal. 5th 871, 883–84 (2019). The statute requires dismissal of a claim "arising from any act … in furtherance of [a] person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue …, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Cal. Code Civ. Proc. § 425.16(b)(1). The statute "shall be construed broadly." *Id.* § 425.16(a).

An anti-SLAPP motion involves two steps. "First, the defendant must make a prima facie showing that the plaintiff's suit arises from an act in furtherance of the defendant's rights of

petition or free speech." *UCP Int'l Co. Ltd. v. Balsam Brands Inc.*, 420 F. Supp. 3d 966, 974 (N.D. Cal. 2019) (Orrick, J). Once the defendant makes that showing, "the burden shifts to the plaintiff to demonstrate a probability of prevailing on the challenged claims." *Id.* at 974. An anti-SLAPP challenges to the legal sufficiency of a defamation claim is analyzed under the Rule 12(b)(6) standard. *CoreCivic, Inc. v. Candide Grp., LLC*, 46 F.4th 1136, 1143 (9th Cir. 2022).

### B. Motion To Dismiss.

Courts grant a Rule 12(b)(6) motion where there is a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (citation omitted). To survive a motion to dismiss, Mittal "must allege 'enough facts to state a claim to relief that is plausible on its face.'" *UCP Int'l Co. Ltd.*, 420 F. Supp. 3d at 975 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Courts must accept well-pleaded facts as true, but may disregard conclusory legal or factual allegations and formulaic recitations of the elements of a claim. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). Courts also need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). Here, many of the pleading's allegations are flatly contradicted by the attached and incorporated exhibits. The Court may dismiss defamation claims in part where some defamatory statements fail as a matter of law and others survive a pleading challenge. *See Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 978-80, 985 (9th Cir. 2002).

## ARGUMENT

## I. PLAINTIFF'S CLAIMS ARISE FROM DEFENDANTS' PROTECTED ACTIVITY

At anti-SLAPP Step One, "the question is only whether a defendant has made out a prima facie case that activity underlying a plaintiff's claims is statutorily protected, not whether it has shown its acts are ultimately lawful." *Wilson*, 7 Cal. 5th at 888. A defendant meets its burden by demonstrating the "alleged actions f[a]ll into one of the categories listed in section 425.16, subdivision (e)." Under § 425.16(e)(3)-(4), protected activity includes "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest," and "any other conduct in furtherance of the exercise of the constitutional

right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." "An 'issue of public interest' is *any issue in which the public is interested*." *Hoang v. Tran*, 60 Cal. App. 5th 513, 528 (2021) (emphasis in original).

Defendants' statements about Mittal concerned issues of public interest. The FAC admits as much. Ben & Jerry's is a "renowned ice cream brand" owned by Unilever and then TMICC, which are public companies. FAC ¶¶ 2-3, 24, 27, 69. "[T]he conduct of a publicly traded corporation, including the legitimacy of corporate actions," constitutes issues of public interest. *Troy Grp., Inc. v. Tilson*, 364 F. Supp. 2d 1149, 1153 (C.D. Cal. 2005); *see Global Telemedia, Int'l, Inc. v. Doe 1*, 132 F. Supp. 2d 1261, 1265 (C.D. Cal. 2001) (allegedly defamatory statements about company involved issue of public interest because company was publicly traded); *see also ComputerXpress, Inc. v. Jackson*, 93 Cal. App. 4th 993, 1007-08 (2001) (media statements by publicly traded company are "issues of public interest" under the anti-SLAPP statute).

Mittal's public statements about the conflict between Palestinians and Israel, made as Ben & Jerry's board chair, including her outspokenness in cancelling sales of Ben & Jerry's products in Gaza and the West Bank to show solidarity with those living there, are also issues of public interest. FAC ¶¶ 2, 19-23, 27 & 31. *See Ojjeh v. Brown*, 43 Cal. App. 5th 1027, 1036 (2019) (reversing anti-SLAPP denial because "[t]here is no question that the Syrian refugee crisis is an issue of public interest"). Mittal's claim that Unilever and TMICC's "plan" was to "publish news about the findings of the 'investigations' to signal to potential investors in [TMICC] that Ms. Mittal's days as Board Chair were numbered" concedes the public interest element. FAC ¶ 29.

Similarly, the SEC filing and Prospectus regarding TMICC's demerger from Unilever are communications "directed at existing or potential shareholders" and thus qualify as issues of public interest. *ComputerXpress, Inc.*, 93 Cal. App. 4th at 1008; FAC ¶¶ 62-66. And because the press statements, SEC filing, and Prospectus all appear in public documents made available on the internet, they satisfy Section 425.16(e)(3). *See Jackson v. Mayweather*, 10 Cal. App. 5th 1240, 1252 (2017) (public web sites "are 'public forums' for purposes of the anti-SLAPP statute.").

That takes the Court to Step Two of the analysis, where Mittal bears the burden of establishing that her claims have legal merit. *See UCP Int'l Co.*, 420 F. Supp. 3d at 979.

## II. MITTAL CANNOT SHOW A PROBABILITY OF PREVAILING

### A. The Statements in the *Semafor* Article are Not Actionable.

Defamation requires "the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or which causes special damage." *Smith v. Maldonado*, 72 Cal. App. 4th 637, 645 (1999). As a limited purpose public figure, *see* FAC ¶ 11-12, Mittal must also demonstrate actual malice, *i.e.* that each Defendant made the alleged defamatory statement "with knowledge of or serious subjective doubts as to [their] truth." *Wynn v. Chanos*, 75 F. Supp. 3d 1228, 1238 (N.D. Cal. 2014) (Orrick, J.).

The *Semafor* article states that: (1) Unilever is "probing the finances of Ben & Jerry's charitable foundation"; (2) Mittal "is a salaried employee and founder of the Oakland Institute"; and (3) the OI "has received more than $200,000 from the foundation since 2016, according to tax filings." FAC ¶ 31; Ex. A. Mittal alleges that *Semafor* sourced the article from a letter by Unilever's Group Ice Cream chief financial officer Abhijit Bhattacharya and "'off the record' statements by 'Unilever executives.'" FAC ¶¶ 30-31. Because she does not allege that TMICC or Senf made the statements, she cannot maintain a defamation claim against them for the article. Nor can she maintain the claim against Unilever.

***First***, the FAC fails to deny the truth of the *Semafor* statements. "To plead falsity, a plaintiff must deny the 'substance' of the charge." *CoreCivic, Inc.*, 46 F.4th at 1144 (citing *Vogel v. Felice*, 127 Cal. App. 4th 1006, 1022 (2005)). Mittal concedes that Unilever "probe[d]" the Foundation's finances by conducting an audit and investigation. FAC ¶¶ 29-41. And she affirms on OI's website that she founded OI and served as its executive director. *Id*. ¶ 10. The Foundation's tax filings, which *Semafor* cites, confirm that it donated more than $200,000 to OI from 2016 through 2024. *See* RJN, Exs. 19-27; *see Wynn*, 75 F. Supp. 3d at 1235 (financial filings submitted to government agencies are public records subject to judicial notice). A true statement is incapable of being defamatory even if the speaker acts in "bad faith or with a malicious purpose." *Smith*, 72 Cal. App. 4th at 646. Mittal cannot cure these defects through amendment. To do so, she would have to allege that she filed false tax returns.

***Second***, the article's statements are not defamatory *per se*. A statement is defamatory *per se* only if it is "libel on its face" "without the necessity of explanatory matter, such as an inducement, innuendo, or other extrinsic fact." Cal. Civ. Code § 45a. None of the *Semafor* statements is defamatory on its face: It is not defamatory to say that Mittal drew a salary from OI or that OI received more than $200,000 from the Foundation while she was trustee.

Mittal alleges nonetheless that the article "conveyed the intended false message that Ms. Mittal had engaged in financial misconduct." FAC ¶ 31. But the article says no such thing. To get there, Mittal relies on innuendo, i.e., indirect, hidden, or implied meanings, to construe the statements as defamatory. Her allegations confirm this. *See* FAC ¶ 81(a) (alleging *Semafor* article "suggest[s]" and "convey[s]" a defamatory "impression"). Mittal relies on other facts extrinsic to the *Semafor* statements, such as Unilever and TMICC's purportedly threatening Mittal with a "pretextual" audit and investigation. FAC ¶ 29. These additional "facts," not found in the article, cannot convert a factual statement about the existence of an investigation into a statement that is defamatory *per se*. The facts surrounding the investigation were not "matters of common knowledge rationally attributable to all reasonable persons[.]" *Song Fi Inc. v. Google, Inc.*, 108 F. Supp. 3d 876, 889 (N.D. Cal. 2015). They remained undisclosed to the public until Mittal filed this lawsuit. As a result, the *Semafor* article cannot be defamatory *per se*.

***Third***, Mittal failed to plead actual malice. Actual malice is "subjective in nature, provable only by evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." *Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 668 (9th Cir. 1990). Without any basis, Mittal alleges that *Semafor* used Mr. Bhattacharya's letter as a source for the article, but she did not and cannot allege that Mr. Bhattacharya wrote it with actual malice. She does not allege even what the letter said. Assuming the *Semafor* statements reflect Mr. Bhattacharya's letter, the veracity of the statements means that Mittal cannot allege that he wrote it with actual malice. *See Smith*, 72 Cal. App. 4th at 646. Mittal also fails to identify the unnamed "Unilever executives" who purportedly provided the "off the record" statements. FAC ¶ 31. "When there are multiple actors involved in an organizational defendant's publication of a defamatory statement, the plaintiff must identify the individual responsible for

publication of a statement, and it is that individual the plaintiff must prove acted with actual malice." *Resolute Forest Prods., Inc. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005, 1018 (N.D. Cal. 2017). Her failure to identify "the precise individual who spoke the defamatory statements, and therefore whose 'state of mind' is at issue," precludes an actual malice finding as a matter of law. *McGarry v. Univ. of San Diego*, 154 Cal. App. 4th 97, 124 (2007) (granting anti-SLAPP motion).

The *Semafor* article contains the only statements the FAC attributes to Unilever. If the Court holds that they are not actionable, it should dismiss Unilever from the case regardless of how it rules on the other allegedly defamatory statements the FAC has put at issue.

**B. <u>The Statements in the October 23 Letter Are Not Actionable.</u>**

Mittal alleges that the October 23 Letter and its republication by Mr. Senf, Ms. Fava, and Ms. Vilar are defamatory *per se*. FAC ¶¶ 47, 51, 72, & 81(b) & (d). The allegations fail.

***Mittal fails to deny the October 23 Letter's statements*.** As with the *Semafor* article, Mittal fails to "deny the 'substance' of the charge[s]" made in the October 23 Letter. *CoreCivic, Inc.*, 46 F.4th at 1144. Nor can she because the statements are true. As a threshold matter, the FAC does not allege that the October 23 Letter inaccurately summarizes what the BI investigation found. This is not a case where an investigation exonerated the employee, but the employer stated that the investigation found the employee to have engaged in misconduct. Here, there is no allegation that the October 23 Letter misstates the investigation outcome.

Moreover, the FAC does not deny that: (1) from 2011 through 2023, Mittal was the executive director of OI and received "$1.3 million in compensation … including $249,000 in rent between 2018 and 2023" for OI's "use" of her house (Ex. C at 3); (2) during that period, she served as a Foundation trustee and oversaw the Foundation's donation of "at least $345,600 to the Oakland Institute through 59 grants" and OI received "at least $488,125" more from organizations to which the Foundation also donated (*id.*); and (3) the Foundation donated "more than $300,000" in funds to other non-profits where Mittal held board positions. *Id.*

Instead, Mittal tries to explain away her compensation, claiming that Defendants "intentionally phrased" the statement "in a way to suggest that her total compensation of roughly $1 million from the Institute—over a thirteen-year period—was for five years." FAC ¶ 56. But

courts must "judg[e] the statement not in isolation, but within the context in which it was made." *Knievel v. ESPN*, 393 F.3d 1068, 1074 (9th Cir. 2005). The October 23 Letter's plain language belies Mittal's spin. It states that she received her compensation "[a]t the same time" she served on the Foundation's board, *i.e.* "[f]rom 2011 to 2023." Ex. C at 3. The five year reference relates to the $249,000 amount Mittal received in rent from 2018 to 2023. *Id.* (receiving "$1.3 million in compensation from the Oakland Institute, including $249,000 in rent between 2018 and 2023"). The OI's tax filings confirm that these amounts are correct. *See* RJN Exs. 8-13. Thus, any "ill intent" Defendants allegedly had in making these statements is irrelevant. *See Smith*, 72 Cal. App. 4th at 646 ("[T]he truth of the offensive statements or communication is a complete defense against civil liability, regardless of bad faith or malicious purpose.").

The FAC does not deny the substance of the other statements in the October 23 Letter. The FAC outright ignores the Letter's statements that Mittal "substantially interfered with both Unilever and B&J Businesses" and "initiated a business integrity complaint to further her own personal interests at the expense of the Foundation, Unilever, and B&J." Ex. C at 4-6; *see* FAC ¶ 47 (failing to mention Letter subsections D and G). Nor does the FAC deny that Mittal caused the Foundation to donate to organizations that Unilever had rejected as donation recipients, which "placed Unilever and B&J at legal risk of state anti-boycott laws" and "threaten[ed] the reputation and financial health of B&J and Unilever, as well as the safety of employees." Ex. C at 3-4.

The FAC makes only a conclusory allegation that the October 23 Letter's "statements—Skadden's purported findings of its investigation—were false." FAC ¶ 48; 81(d). That is not sufficient. She "never state[s] the true facts to which the statement would have to be compared in order to establish its *substantial* falsity." *Vogel*, 127 Cal. App. 4th at 1022 (emphasis in original).

Her denials—to the extent there are any—amount to "negative pregnants" that fail as a matter of law. A negative pregnant is "a denial of the literal truth of the total statement, but not of its substance." *Vogel*, 127 Cal. App. 4th at 1021. That is how Mittal has attempted to allege falsity. She alleges that the October 23 Letter's charge that she disclosed "confidential business information" in the S.D.N.Y. case is false because she ***herself*** did not disclose the information; instead, "counsel for the Independent Board" did. FAC ¶ 105, Ex. C at 5. Her evasion makes no

legal difference. She was chair of the Board and a plaintiff in the case. These were disclosures by her lawyers. Mittal may "be held accountable for the acts and omissions of [her] chosen counsel." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd.*, 507 U.S. 380, 397 (1993).

Similarly, Mittal alleges that the letter's claim that she "failed to cooperate in the Investigation and Foundation Audit" is false because she "offered to respond to written questions." Ex. C at 5; FAC ¶ 96. That's an evasion, not a denial. The allegation avers only that Defendants did not accept her offer to impose conditions that would have neutered her responses. The FAC does not deny that she refused to be interviewed. Ex. C at 5. Evasive allegations are not sufficient denials of the allegedly defamatory statements. *See Vogel*, 127 Cal. App. 4th at 1021-22 (husband's denial that he "do[es] not owe my wife and kids thousands" "leaves open the possibility of a debt in some other, perhaps substantially equivalent, amount"); *see also CoreCivic, Inc.*, 46 F.4th at 1144 (organization's denial that it "does not, nor has it ever, operated any immigration detention facilities for children separated from their parents pursuant to the government's family separation policy" failed to refute substance of actual charge—that it "was involved in the business of family separation and incarceration at the border").

As to the October 23 Letter's statement that Mittal fostered a "toxic work environment," her allegation of "falsity" consists of her assertion that unidentified "rank and file Ben & Jerry's employees with whom Ms. Mittal interacted" emailed TMICC and "pushed back against the notion that she was a source of 'conflict.'" Ex. C at 4, FAC ¶ 103. That does her no good. That *some* employees may have held different opinions about her does not dispute that *others* found her behavior inappropriate. *See, e.g., Wynn*, 75 F. Supp. 3d at 1239 ("[T]he fact that the SEC ultimately did not find Wynn in violation of the FCPA does not mean that Wynn committed no FCPA violations whatsoever.") (Orrick, J.). Similarly, her allegation that, as the Board's chair, "no Ben & Jerry's employees reported" to her and thus could not have complained (FAC ¶ 103) elides that employees who may not have "reported" to Mittal—but nonetheless interacted with her —told investigators about her toxic workplace behavior.

***The October 23 Letter's conclusions are non-actionable opinions***. Mittal alleges that the October 23 Letter's statements that she "engaged in 'self-dealing,' 'conflicts of interest,' 'breaches

of fiduciary duties,' and 'improperly benefited from Ben & Jerry's funds,'" rendering her "ineligible to serve on the B&J Board," are defamatory. Ex. C; FAC ¶¶ 47, 83. She is wrong. Those were statements of opinion reflecting TMICC's judgments following the audit and investigation. Defendants' alleged republications of them are entitled to the same protection for opinion. *Montandon v. Cox Broad. Corp.*, 45 Cal. App. 3d 932, 935 (1975) (republication of a non-defamatory statement creates no liability).

"Because the [allegedly defamatory] statement must contain a provable falsehood, courts distinguish between statements of fact and statements of opinion for purposes of defamation liability. Although statements of fact may be actionable as libel, statements of opinion are constitutionally protected." *McGarry*, 154 Cal. App. 4th at 112; *see Okun v. Superior Ct.*, 29 Cal. 3d 442, 450 (1981) ("mere opinion" is "not libelous"). Whether a statement is an opinion is for the Court to decide as a matter of law. *See John Doe 2 v. Superior Ct.*, 1 Cal. App. 5th 1300, 1312 (2016) ("It is the province of the court to determine whether a statement is actionable as a statement of fact susceptible of a defamatory meaning, versus a nonactionable statement of opinion privileged under the First Amendment.").

The California Court of Appeal has held that, as a matter of law, a company's statements about its decision to terminate an executive, based on findings of an investigation, are non-actionable opinions. *See Charney v. Standard Gen., L.P.*, 10 Cal. App. 5th 149 (2017). In *Charney*, the defendant was a private equity firm that owned a clothing company that had fired its CEO after an investigation found that the CEO had acted improperly, including by fostering a toxic work environment and diverting corporate assets for his personal use. *Id.* at 153-55. The defendant sent the CEO a "suspension letter" documenting the reasons for his removal and issued a press release stating that it "supported" the investigation's findings and the board's decision to fire the CEO. *Id.* at 152, 155. The CEO sued for defamation, alleging that the investigation was not impartial and that the press release was therefore defamatory. The trial court granted the anti-SLAPP motion and the Court of Appeal affirmed. *Id.* at 152, 158-59. "Even if the press release could be interpreted as somehow stating Charney was terminated for unidentified improper conduct, the fact that there may be some dispute over whether there was 'improper' conduct that

justified termination ***is a matter of opinion***." *Id*. at 158 & n.10 (emphasis added). Importantly, the allegation "that the investigation was not 'independent' or 'impartial' is a matter of opinion or subjective judgment and therefore cannot support an action for defamation." *Id*. at 158.

*Charney* forecloses Mittal's claims. As in *Charney*, Mittal bases her claims on statements that she engaged in improper conduct, including conflicts of interest, self-dealing, and breaches of fiduciary duty. Those statements—based on the audit and investigation's findings—are matters of opinion shielded from defamation liability. *Id.* at 158 & n.10. Many other courts have reached the same conclusion. *Hogan v. Weymouth*, 2019 WL 11055032, at *4 (C.D. Cal. Aug. 19, 2019) ("To the extent that Defendants' statements implied that Plaintiff was unprofessional, insensitive, and aggressive, those implications are statements of opinions and non-actionable.") (citing *Kiehn v. Stein*, 2013 WL 1789718, at *3 (N.D. Cal. Apr. 26, 2013) (dismissing defamation claim and concluding that the plaintiff's allegations describing the defendants' statements as "'extremely inappropriate and unprofessional' are expressions of opinion, and thus not actionable")); *Savage v. Pac. Gas & Elec. Co.*, 21 Cal. App. 4th 434, 445 (1993) ("The determination of a conflict of interest involves instead an application of an ethical standard to facts, reflecting the exercise of judgment. The judgment may, of course, be reasonable or unreasonable; but whatever quality may be attributed to it, the expressed belief in the existence of a conflict of interest does not imply an objective fact that can be proved to be true or false."); *McGarry*, 154 Cal. App. 4th at 117 ("[C]oncepts [of morality] are infinitely debatable, and their precise meaning is extremely elusive … the principle of right and wrong, or morality or immorality, is impossible as an element of proof … Indeed, the Court could not instruct the jury on how to evaluate the truth of a charge of immorality without entering an age old debate better left to philosophers.").

Mittal's allegations that the investigation "was not a legitimate 'objective' investigation" but rather "pretextual" (FAC ¶¶ 29, 32, 68, 81, 95, 97) make no difference. The ex-CEO in *Charney* made the same allegation; yet the Court of Appeal said that it did not affect the legal conclusion that the defendant was expressing an opinion. *See Charney*, 10 Cal. App. 5th at 158.

***Mittal cannot allege actual malice***. The statements about her OI compensation cannot have been made with malice. She alleges that Defendants "either knew the truth about the 'rent'

and the 'wine country' house, or they purposefully instructed EY to not send Ms. Mittal written questions about those items." FAC ¶ 87. But Mittal *did* receive $249,000 in rent from OI between 2018 and 2023, as reflected in publicly-available IRS forms. *See* RJN 8-13. The October 23 Letter states that (Ex. C at 3) and the FAC does not deny it. There is thus no basis to allege that Defendants "realized that [their] statement was false or that [they] subjectively entertained serious doubt as to the truth of [the] statement." *Newton*, 930 F.2d at 668; *see Wynn*, 75 F. Supp. 3d at 1238. That Defendants concluded Mittal's rent earnings "give[] an appearance of a conflict of interest" is an opinion that cannot be made with malice. *See Charney*, 10 Cal. App. 5th at 158 & n.10; *e.g.*, *Campanelli v. Regents of University of California,* 44 Cal. App. 4th 572, 578 (1996).

Mittal's other allegations about her compensation and role at OI likewise fail to aver actual malice. She claims that "[a]ll Defendants knew" that the investigation "failed to discover any instance" where Mittal "requested or decided" the direction of Foundation funds to OI. FAC ¶ 84. That is a strawman argument: The October 23 Letter does not accuse Mittal of "requesting or deciding" how to distribute Foundation funds. *See* Ex. C. It states truthfully that Mittal received $1.3 million in compensation from OI at the same time non-profit organizations where she served on the board received more than $1 million in Foundation funds while she served as a Foundation trustee. *Id.* at 3; *see* RJN Exs. 1-27.

The FAC notes that a 2021 *Washington Beacon* article made "the very same allegations of self-dealing" about Mittal but also wrote that Unilever "had rejected" the allegation. FAC ¶ 85. Mittal cannot use that unattributed statement to allege that, four years later, Unilever did not believe that she had engaged in potential "self-dealing." Not only is an assertion of "self-dealing" a matter of opinion for which malice is not relevant, even if the statement were one of fact, the FAC fails to identify, as it must to establish actual malice, the "Unilever executive" that had purportedly "rejected" the assertion or that the facts had not changed in the ensuing years. *McGarry*, 154 Cal. App. 4th at 124 (actual malice requires allegations "identifying the precise individual who spoke the defamatory statements, and therefore whose 'state of mind' is at issue").

Nor can Mittal establish actual malice as to Defendants' purported knowledge of her role at OI before the investigation began. She alleges that "at all times since 2008, Unilever has known

that Ms. Mittal's full-time, paid position is Executive Director of the Oakland Institute." FAC ¶ 88. The FAC does not allege, however, that Mittal disclosed to Unilever, TMICC, or Senf the extent of her OI role, or the amount of money she earned from it, or when she made that purported disclosure. *See* Ex. C at 3 ("Foundation funds have been directed or funneled to the Oakland Institute, without appropriate conflict-of-interest disclosures or considerations."); *id*. ("Ms. Mittal's presence on both sides of numerous transactions gives an appearance of a conflict of interest that is harmful to the B&J brand, particularly where she failed to disclose her conflict as required under the Avoiding Conflicts of Interest policy."). The FAC assumes that her work with OI "resulted in an invitation to join" the Ben & Jerry's Board in 2008, FAC ¶ 13, but that has no legal significance because it occurred years before the Foundation began funding OI.

The FAC cites, but fails to attach, a 2017 e-mail Mittal purportedly sent to a Unilever employee named "Jostein" wherein Mittal offered to return one of the Foundation's donations to OI. *Id*. ¶ 89. The FAC's summary of the email shows that Mittal failed to disclose her executive director role or the total amount of direct and indirect funding the Foundation had given to OI.

The FAC also alleges that, in August 2025, "Defendants were informed" that the "trustees disclose[d] any relationship with a non-profit they select for funding." *Id*. ¶ 91. But that passively voiced ("were informed") allegation does not aver what *Mittal* actually disclosed about her relationships with the many organizations that were receiving Foundation money or to which of the thousands of Unilever and TMICC employees she supposedly said this, such that it would be reasonable to infer that it reached the speakers of the allegedly defamatory statements at issue.

Similarly insufficient to allege that Defendants knew or suspected that the statements about Mittal were false is the allegation that she had no obligation to disclose her conflicts because *the Foundation* lacked "a formal conflict of interest policy until October 27, 2025." *Id*. ¶ 91. Mittal's relationship with Unilever was not limited to her service as a Foundation trustee. Like every other employee or director of the company and its subsidiaries and affiliates, she was subject to Unilever's Conflicts of Interest policies, which obligated her to disclose any "actual, perceived, or potential conflict of interest to Business Integrity," which she failed to do. Ex. C at 2-3.

Mittal's other malice allegations fail as a matter of law for the reasons noted above. Her claim that "Unilever never criticized or objected" to her prior "discretionary" donations to prohibited organizations (FAC ¶ 101) does not establish actual malice; it is a concession that Defendants' statements about those donations are true.

The allegation that Defendants published the toxic workplace charge with actual malice because they did not "identify a single instance or example supporting that accusation" (FAC ¶ 102) is a non sequitur. The presence or absence of supporting examples in a statement is no basis on which to conclude that the speaker believed the statement to be true or false. If actual malice could be inferred from a speaker's failure to give examples sufficient to support an assertion, speakers would have to annotate everything they said. No court has so held. It would offend the First Amendment. And in cases involving speech about a corporate investigation, it would violate the employee's privacy rights to require that such details be included. *See Galanski v. Wal-Mart Assocs., Inc.*, 2024 WL 2701084, at *3 (E.D. Cal. May 24, 2024) ("information relating to employees' complaints of sexual harassment and discrimination implicates a legally protected privacy interest" because disclosure "could result in embarrassment and the engenderment of animus," so an employer "should provide its employees some assurance that information volunteered by victims and witnesses will remain confidential and be protected").

Defendant Senf's alleged republication of the gist of the October 23 Letter at a later meeting of company executives (FAC ¶ 51) is the only statement the FAC attributes to him. If the Court holds that these statements are not actionable, it should dismiss him from the case.

### C. <u>The Statements in the SEC Form 20-F and Prospectus Are Not Actionable.</u>

TMICC's November 2025 SEC Form 20-F filing and December 2025 Prospectus each state that "following investigations commissioned by the Group and conducted by external advisors, in the opinion of the Group the current chair of the Ben & Jerry's Board no longer meets the criteria to serve as a member of the Ben & Jerry's Board." FAC ¶¶ 62-66; Exs. E-F. Neither statement can support liability.

***First***, TMICC's statements do not contain a provably false fact and thus constitute non-actionable opinion. *Charney* controls. The statement there was in a press release stating that the

defendant "supported the independent, third-party and very thorough investigation into the allegations against Charney, and respect the Board of Directors' decision to terminate him based on the results of that investigation." *Charney*, 10 Cal. App. 5th at 152. The Court rejected the defamation claim because "the press release does not state the underlying reasons for terminating Charney" and thus "cannot be proven false as it does not state that Charney engaged in criminal conduct or that his conduct violated certain standards, or even that there existed any particular conduct that caused his termination." *Id*. at 158. Assuming there was a dispute over "whether there was 'improper' conduct that justified termination," that determination would constitute "a matter of opinion." *Id*. at n.10. "Because the press release does not articulate *why* Charney was terminated, Charney's allegation that it falsely states he was terminated for 'cause' does not constitute an actionable defamation." *Id*. at 158 (emphasis in original).

The facts here are indistinguishable. TMICC's SEC filing and Prospectus do not state the underlying reasons why TMICC believed that Mittal no longer met the criteria to serve on the Board. TMICC said no more about Mittal—and arguably less—than the defendant in *Charney* had said about the ex-CEO, which the court held were non-actionable statements of opinion.

***Second***, Mittal failed to allege that TMICC made these statements with actual malice. The FAC is bereft of any allegation that TMICC "realized that [its] statement was false or that [it] subjectively entertained serious doubt as to the truth of [the] statement." *Newton*, 930 F.2d at 668. Nor could she cure this with an amendment. The statement that "in the opinion of the Group the current chair of the Ben & Jerry's Board no longer meets the criteria to serve as a member of the Ben & Jerry's Board" is a matter of opinion, and opinions are not actionable no matter how much alleged malice is behind them. *Campanelli*, 44 Cal. App. 4th at 578 (even if "made in bad faith … statements of opinion rather than fact cannot form the basis for a libel action.").

**D. <u>The Statements in the *Financial Times*, *BBC*, and *CNBC* Are Not Actionable.</u>**

The December 2025 news articles discussing Mittal's exit from the Board (FAC ¶¶ 75-78; Exs. I-L) fail as a matter of law for the same reason discussed above.

***First***, the FAC does not deny the substance of statements in the December 2025 news articles. *See CoreCivic, Inc.*, 46 F.4th at 1144; *Vogel*, 127 Cal. App. 4th at 1021-22.

***Second***, TMICC's media statements are non-actionable opinions. The company's view that Mittal engaged in "conflicts of interest" and "no longer meets the criteria to serve as a member of the board following 'internal investigations'" (FAC ¶¶ 75, 77), are quintessential opinions that cannot be proven true or false. *See Charney*, 10 Cal. App. 5th at 158, n.10; *Savage*, 21 Cal. App. 4th at 445 ("[T]he expressed belief in the existence of a conflict of interest does not imply an objective fact that can be proved to be true or false."); *McGarry*, 154 Cal. App. 4th at 117 ("[C]oncepts [of morality] are infinitely debatable, and … better left to philosophers.").

None of TMICC's statements discloses the investigation's factual findings or why Defendants reached their conclusion. *See Charney*, 10 Cal. App. 5th at 158 ("Because the press release does not articulate *why* Charney was terminated, Charney's allegation that it falsely states he was terminated for 'cause' does not constitute an actionable defamation."). In fact, TMICC "declined to outline the alleged conflicts" or "to give further details." FAC ¶¶ 75, 77. That TMICC identified "a series of material deficiencies in financial controls, governance, and other compliance policies, including conflicts of interest" (FAC ¶ 78) raises only a "matter of opinion" "over whether there was 'improper' conduct that justified" Mittal's ineligibility. *Id*. at n.10.

Further, the statements related to TMICC's desire to "safeguard," "preserve and enhance" its "social mission" and "essential integrity" are "too vague to be taken as fact by a reasonable reader." *ComputerXpress, Inc.*, 93 Cal. App. 4th at 1013. Those generalities fail as a matter of law. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) (statements of "mere corporate puffery," and vague statements "like 'good,' 'well-regarded,' or other feel good monikers," are not actionable.).

***Third***, Mittal cannot allege that TMICC made the statements with actual malice. The FAC fails to identify the person who made the statements. *McGarry*, 154 Cal. App. 4th at 124; *see Resolute Forest Prods., Inc.*, 302 F. Supp. 3d at 1018. It cites only unidentified "people familiar with the matter" or "briefed" on it, "spokesperson[s]," and other nameless company officials. FAC ¶¶ 75-78; Exs. I-L. Even if Mittal could identify these individuals, she cannot show actual malice because the statements are non-actionable opinions. *Campanelli*, 44 Cal. App. 4th at 578.

**E. Mittal's False Light And IIED Claims Fail As A Matter Of Law.**

"When a false light claim is coupled with a defamation claim, the false light claim is essentially superfluous, and stands or falls on whether it meets the same requirements as the defamation cause of action." *Jackson*, 10 Cal. App. 5th at 1264-65 (affirming dismissal of false light claim on same grounds as defamation claim). Mittal's false light claim fails for the same reasons as her defamation claim, as discussed above.

Mittal's IIED claim requires a showing of falsity and actual malice, plus "extreme and outrageous conduct" that causes "severe or extreme emotional distress[.]" *Corales v. Bennett*, 567 F.3d 554, 571 (9th Cir. 2009); *Koch v. Goldway*, 817 F.2d 507, 510 (9th Cir. 1987) (public official's comment comparing plaintiff to Nazi arch-criminal "was reprehensible," but failed to reach level of conduct necessary to state IIED claim because "rudeness and bad taste, regrettably, are not so uncommon in American politics"). As explained above in connection with the same elements required for her defamation claim, she has failed to allege falsity and actual malice.

Nor has Mittal alleged "extreme or outrageous" conduct. *See Duronslet v. Cnty. of Los Angeles*, 266 F. Supp. 3d 1213, 1219 (C.D. Cal. 2017) ("[O]utrageous conduct does not include 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'") (citing *Hughes v. Pair*, 46 Cal. 4th 1035, 1051 (2009)).

**F. Defendants Are Entitled to An Award of Attorneys' Fees and Costs.**

The anti-SLAPP statute provides that "a prevailing defendant on a special motion to strike shall be entitled to recover that defendant's attorney's fees and costs." Cal. Civ. Proc. Code § 425.16(c)(1). The California Supreme Court has held that the award is mandatory, not discretionary. *Ketchum v. Moses*, 24 Cal. 4th 1122, 1131 (2001). Defendants are entitled to an award of reasonable attorneys' fees and costs, according to proof upon a noticed motion.

## III. ALTERNATIVELY, THE COURT SHOULD GRANT THE MOTION TO DISMISS

As an alternative to the anti-SLAPP Motion, Defendants move to dismiss the Amended Complaint pursuant to Rule 12(b)(6) on the basis that Mittal's claims fail as a matter of law. As explained in Defendants' anti-SLAPP arguments, Mittal cannot demonstrate that any Defendant made a false, defamatory statement of fact with actual malice. Her defamation, false light, and

IIED claims accordingly must fall. If for any reason the Court were to find that the statements were not subject to the anti-SLAPP statute, the same legal defects with the FAC establish grounds to dismiss the pleading under Rule 12(b)(6). *CoreCivic, Inc.*, 46 F.4th at 1143 (anti-SLAPP legal challenges are identical to Rule 12(b)(6) challenges). Because Mittal cannot cure the Amended Complaint's flaws with further amendment, the dismissal should be with prejudice.

**CONCLUSION**

For the foregoing reasons, the Court should grant Defendants' anti-SLAPP motion, and award Defendants reasonable attorneys' fees in an amount to be determined though a separate motion, or in the alternative, grant Defendants' motion to dismiss without leave to amend.

Dated: August 12, 2026

Respectfully submitted,

QUINN EMANUEL URQUHART
& SULLIVAN, LLP
Steven G. Madison
Robert M. Schwartz
Marie M. Hayrapetian
Julian T. Schoen

By: ______________________
Robert M. Schwartz
*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served on all counsel of record electronically or by another manner authorized under FRCP 5(b) on this the 12th day of August 2026.

Dated: August 12, 2026

By: */s/ Julian Schoen*
Julian Schoen
*Attorneys for Defendants*