**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Steven G. Madison (SBN: 101006)
stevemadison@quinnemanuel.com
Robert M. Schwartz (SBN: 117166)
robertschwartz@quinnemanuel.com
Marie M. Hayrapetian (SBN: 315797)
mariehayrapetian@quinnemanuel.com
Julian T. Schoen (SBN: 344202)
julianschoen@quinnemanuel.com
Arian J. Koochesfahani (*pro hac vice forthcoming*)
ariankoochesfahani@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

*Attorneys for Defendants Unilever PLC, The Magnum Ice Cream Company N.V., and Jochanan Senf*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ANURADHA MITTAL,<br><br>Plaintiff,<br><br>vs.<br><br>UNILEVER PLC, THE MAGNUM ICE CREAM COMPANY N.V., and JOCHANAN SENF,<br><br>Defendants. | Case No. 26-cv-02660-WHO<br><br>**DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**<br><br>Judge: Hon. William H. Orrick<br>Hearing Date: September 30, 2026<br>Hearing Time: 2:00 p.m.<br>Courtroom: 2, 17th Floor<br><br>**[*Supporting Declarations of Ted Stotzer, Natalia Cavaliere, and Jochanan Senf Filed Concurrently*]** |

# TABLE OF CONTENTS

Page


STATEMENT OF ISSUES TO BE DECIDED ....... 1

PRELIMINARY STATEMENT ....... 1

FACTUAL AND PROCEDURAL BACKGROUND ....... 2

A. The Parties ....... 2

B. The Ongoing Corporate Governance Dispute ....... 4

C. The SDNY Case ....... 7

ARGUMENT ....... 9

I. THE CASE SHOULD BE DISMISSED IN ITS ENTIRETY FOR LACK OF PERSONAL JURISDICTION OVER ANY DEFENDANT IN CALIFORNIA ....... 9

A. Plaintiff Mittal Has The Burden of Establishing Either General Or Specific Personal Jurisdiction Over Each Defendant ....... 9

B. No General Personal Jurisdiction Exists In California As To Any Defendant ....... 10

C. Specific Jurisdiction Is Absent ....... 11

1. Defendants Did Not Purposefully Direct The Statements Into California ....... 11

2. Plaintiff Mittal's Claims Do Not Relate To Defendants' Forum Contacts ....... 16

3. The Exercise Of Personal Jurisdiction Would Be Unreasonable ....... 17

CONCLUSION ....... 18

# TABLE OF AUTHORITIES

Page

## Cases

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*,
874 F.3d 1064 (9th Cir. 2017) .......... 12, 14, 15

*In re Boon Glob. Ltd.*,
923 F.3d 643 (9th Cir. 2019) .......... 9

*Calder v. Jones*,
465 U.S. 783 (1984) .......... 12, 13, 16

*Daimler AG v. Bauman*,
571 U.S. 117 (2014) .......... 10

*Davis v. Cranfield Aerospace Sols., Ltd.*,
71 F.4th 1154 (9th Cir. 2023) .......... 11

*Dole Food Co. v. Watts*,
303 F.3d 1104 (9th Cir. 2002) .......... 9

*Freestream Aircraft (Bermuda) Ltd. v. Aero L. Grp.*,
905 F.3d 597 (9th Cir. 2018) .......... 16

*Fuld v. Palestine Liberation Org.*,
606 U.S. 1 (2025) .......... 2

*Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*,
284 F.3d 1114 (9th Cir. 2002) .......... 17, 18

*Handsome Music, LLC v. Etoro USA LLC*,
2020 WL 8455111 (C.D. Cal. Dec. 17, 2020) .......... 15

*Johnson v. UBS AG*,
860 F. App'x 531 (9th Cir. 2021) .......... 10

*Lew v. Moss*,
797 F.2d 747 (9th Cir. 1986) .......... 10

*MGA Ent., Inc. v. Innovation First, Inc.*,
2010 WL 11601032 (C.D. Cal. Sept. 14, 2010) .......... 15

*MLS Nat. Med. Evaluation Servs., Inc. v. Templin*,
812 F. Supp. 2d 788 (E.D. Mich. 2011) .......... 15

*Newpoint Fin. Corp. v. Bermuda Monetary Auth.*,
680 F. Supp. 3d 1151 (C.D. Cal. 2023) .......... 12

*Power Integrations, Inc. v. Penbrothers Int'l Inc.*,
2019 WL 6117479 (N.D. Cal. Nov. 18, 2019) ........ 2

*Ranza v. Nike, Inc.*,
793 F.3d 1059 (9th Cir. 2015) ........ 9, 10

*Remick v. Manfredy*,
238 F.3d 248 (3d Cir. 2001) ........ 16

*Schwarzenegger v. Fred Martin Motor Co.*,
374 F.3d 797 (9th Cir. 2004) ........ 12

*W. States Hockey League Inc. v. Doungchak*,
2016 WL 5886901 (C.D. Cal. Mar. 7, 2016) ........ 13

*Walden v. Fiore*,
571 U.S. 277 (2014) ........ 12

*Williams v. Kula*,
2020 WL 7770915 (S.D. Cal. Dec. 29, 2020) ........ 14, 16

*Yamashita v. LG Chem, Ltd.*,
62 F.4th 496 (9th Cir. 2023) ........ 12, 16

*Young v. New Haven Advocate*,
315 F.3d 256 (4th Cir. 2002) ........ 14, 15

**Rules**

Fed. R. Civ. P. 12(b)(2) ........ 1

**NOTICE IS HEREBY GIVEN THAT** on September 30, 2026 at 2 p.m., or as soon thereafter as the matter may be heard, Defendants Unilever PLC ("Unilever"), The Magnum Ice Cream Company N.V. ("TMICC"), and Jochanan Senf will move the Court for an order dismissing this case without leave to amend for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2).

## STATEMENT OF ISSUES TO BE DECIDED

Whether the Court should dismiss Plaintiff Anuradha Mittal's first amended complaint ("FAC") for lack of personal jurisdiction in California as to each Defendant given that none is a resident of California and no allegedly defamatory statements were directed toward California.

## PRELIMINARY STATEMENT

The Court lacks personal jurisdiction over each Defendant under both the general and specific prongs of the personal-jurisdiction analysis. By the instant motion, Defendants Unilever, TMICC and Mr. Senf move to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).[1] Plaintiff Mittal cannot satisfy the requirements of general personal jurisdiction because no defendant is domiciled in California or has other contacts sufficient to be "at home" here, under controlling Ninth Circuit case law. Similarly, Plaintiff Mittal cannot sustain her burden of establishing specific personal jurisdiction in this defamation lawsuit where no evidence exists that any defendant purposefully directed any of the alleged defamatory statements toward California. To the contrary, Plaintiff Mittal's own pleadings—judicial admissions that now estop Plaintiff Mittal from claiming otherwise to avoid dismissal—demonstrate that the alleged statements at issue do not focus on California, have no California-related purpose, and have no California-specific audience. Instead, they all concern Plaintiff Mittal's conduct as an independent director and chair of the board of directors of Ben & Jerry's Homemade, Inc. ("Ben & Jerry's"), a Vermont corporation headquartered in Vermont, and her conduct as a trustee of the Ben & Jerry's Foundation

[1] Unilever, TMICC and Mr. Senf are filing contemporaneously herewith motions to dismiss the FAC for failure to state a claim under Fed. R. Civ. P. 12(b)(6) and California's Anti-SLAPP statute, and also a motion to transfer venue. Counsel for the parties met and conferred on August 4, 2026 regarding all these motions. Plaintiff Mittal's counsel did not agree to dismiss any claims or Defendant herein.

(a Vermont non-profit corporation domiciled there). Plaintiff Mittal's own residence or other contacts in California cannot establish personal jurisdiction over foreign defendants, as a matter of law.

Should the Court grant the motion for lack of personal jurisdiction, the concurrently filed motions to dismiss and the alternative request to transfer venue will be moot. *See Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 11 (2025) ("We have long held that a 'court must have ... power over the parties before it (personal jurisdiction) before it can resolve a case.'" (citation omitted)); *see also, e.g.*, *Power Integrations, Inc. v. Penbrothers Int'l Inc.*, 2019 WL 6117479, at *5 (N.D. Cal. Nov. 18, 2019) ("Because the Court concludes that it does not have personal jurisdiction over Penbrothers, it does not reach Penbrothers' venue challenge and its argument that PI has failed to state a claim."). The Court should grant this motion to dismiss for lack of personal jurisdiction and dismiss the case without leave to amend as to all three Defendants.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Parties

***Unilever.*** Unilever is a UK public limited company headquartered in London, England. Declaration of Ted Stotzer ("Stotzer Decl.") at ¶ 3. Unilever conducts no business in California, is not registered to do business in California, has no offices, property or employees here, is not a California taxpayer and has not brought litigation in California. *Id.* at ¶¶ 4-14.

Unilever is the parent company of the "Unilever Group," a global network of subsidiaries, affiliates, and joint ventures engaged in the consumer goods business across four core areas: beauty & well being, personal care, home care, and food. *Id.* at ¶ 13. Unilever itself does not manufacture, distribute, market, or sell any products. *Id.* at ¶¶ 14-15. Where those activities are conducted by the Unilever Group, they are conducted by separately incorporated subsidiaries or corporate partners organized under the laws of the jurisdiction(s) in which each operates. *Id*. Each Unilever subsidiary or affiliate, including those conducting business in the U.S. maintains its own officers, employees, books and records, and bank accounts, and observes its own corporate formalities separate from Unilever. *Id.* at ¶ 16. Unilever does not control the day-to-day operations, personnel decisions, or

business activities of its affiliates or subsidiaries, each of which has its own officers and management teams. *Id.* at ¶ 17.

***TMICC.*** TMICC, referred to in the FAC as "Magnum," similarly conducts no business in California, is not registered to do business in California, has no offices, property or employees here, is not a California taxpayer, and has not brought litigation in California. Declaration of Natalia Cavaliere ("Cavaliere Decl.") at ¶¶ 3-12. TMICC is the parent company of The Magnum Ice Cream Group, a group of affiliated ice cream companies representing over 20 ice cream brands in the Unilever Group. *Id.* at ¶ 13. TMICC does not itself make, distribute, market, or sell ice cream anywhere, including the U.S.; those activities are conducted by subsidiaries organized under the laws of the jurisdiction(s) in which they operate. *Id.* at ¶ 15.

TMICC's U.S. subsidiaries include the American ice cream company Ben & Jerry's, a Vermont corporation headquartered in South Burlington, Vermont, which, as discussed below, Unilever acquired in 2000. *Id.* at ¶ 16. Each U.S. subsidiary, including Ben & Jerry's, maintains its own officers, employees, books and records, and bank accounts, and observes its own corporate formalities separate from TMICC. *Id.* at ¶¶ 17-18.

***Jochanan Senf.*** Mr. Senf has been Ben & Jerry's CEO since July 2025. Declaration of Jochanan Senf ("Senf Decl.") at ¶ 1. Mr. Senf is a citizen and resident of the Netherlands, where he lives with his wife and three school-age children. *Id.* at ¶¶ 3-4. He began working at Unilever in 2003 and, from 2009-2017, he was the Managing Director of Ben & Jerry's Europe. *Id.* at ¶ 1. Since Unilever demerged its ice cream businesses and TMICC became a standalone company in December 2025, Mr. Senf has been an employee of TMICC's subsidiary, Ben & Jerry's. Mr. Senf uses a residence provided by Ben & Jerry's in Burlington while there working as Ben & Jerry's CEO. *Id.* at ¶ 7. He is not registered to vote in California, has no U.S. bank accounts, and owns no property in the U.S. *Id.* at ¶¶ 5, 8.

***Anuradha Mittal.*** Plaintiff Mittal is a public figure known for her outspoken views mainly on issues salient to the Middle East, her opposition to Israel, and her support for Palestinian causes. First Amended Complaint ("FAC") at pp. 3-4, 6 (¶¶ 10-12, 19). She lives in Oakland, California. *Id.* at p. 2 (¶ 1). In 2004, she founded the Oakland Institute ("OI"), a California non-profit that

describes itself as an "independent policy think tank." *Id.* at p. 3 (¶ 10). Plaintiff Mittal serves as Executive Director, *id.*, and her husband is also employed by OI. OI conducts business from Plaintiff Mittal's Oakland home, paying Plaintiff Mittal rent sufficient to pay the entire mortgage on her home even though OI only uses a portion of the home. *See Id.* (Ex. C at 3); Exs. 1-13 to Defendants' Request For Judicial Notice filed concurrently herewith ("RJN").

**B. The Ongoing Corporate Governance Dispute**

In 2000, Unilever acquired Ben & Jerry's. FAC at p. 5 (¶¶ 16-17). As part of the acquisition, Unilever agreed to establish a special purpose board of directors, comprised of a majority of "Class I" "independent directors" (persons not employed at Ben & Jerry's or Unilever) plus the CEO and a Class "U" Director, both appointed by Unilever (the "Board"). Importantly, the Board is not a traditional company board that has oversight for everything the business does. Here, the Board's remit is limited to primary responsibility for Ben & Jerry's "social mission and brand integrity." *Id.* at p. 5 (¶ 17).

As part of its acquisition, Unilever also agreed to fund the Foundation, an entity separate from Ben & Jerry's run by its own board of trustees. *Id*. at p. 4 (¶ 14). Unilever was the Foundation's sole source of funding. Unilever agreed to annually donate a percentage of Ben & Jerry's profits, and a minimum of $5 million for the first 10 years. *Id.*

Plaintiff Mittal became a Class I director in 2008. *Id.* at p. 4 (¶ 13). In 2012, she became a trustee of the Foundation. *Id.* at p. 4 (¶ 14). And she became the Ben & Jerry's Board chair in 2018. *Id.* at p. 5 (¶ 18).

In March 2024, Unilever announced plans to reorganize its numerous ice cream companies (including Ben & Jerry's) as subsidiaries of TMICC. FAC at p. 7 (¶ 24). In preparation for the reorganization, TMICC conducted audits "across the entirety of the Magnum organizations" so that TMICC could report to its shareholders (and the SEC) about its business, risk factors and governance practices. *Id.* at p. 10 (¶ 32). With the Foundation's approval, TMICC hired "big four" firm EY (formerly Ernst & Young) to audit the Foundation. *Id.* at p. 10 (¶ 33).

During the period at issue, several Foundation trustees, including Plaintiff Mittal, directed donations to organizations with which they were affiliated, including to Plaintiff Mittal's OI.

Plaintiff Mittal also issued trustee-directed grants to controversial organizations that Unilever had rejected, as Unilever had the right to do under the governing agreements. Plaintiff Mittal did so even after she and the other independent directors on the Ben & Jerry's board had lost an arbitration that challenged Unilever's discretionary right to veto grants to at least two of those organizations.

Plaintiff Mittal refused to cooperate with the audit. The auditors gave her multiple opportunities to participate in interviews related to the discretionary grant-making process and respond to questions surrounding discretionary grants made at her request. But Plaintiff Mittal said that she would answer questions only if put to her in writing. *Id.* at pp. 29-30 (¶¶ 95-96). By then she had retained an attorney—the same attorney who was representing her and the other former Class I directors in the pending lawsuit against Unilever in SDNY. The auditors wanted her unprompted answers, not answers written by her litigators.

In September 2025, the Skadden law firm informed Plaintiff Mittal that Skadden had been retained to conduct a Business Integrity ("BI") investigation "into certain matters relating to [her] role as director" on the Board. *Id.* at pp. 11-12 (¶ 40). Skadden asked Plaintiff Mittal to sit for an interview. Again, she refused. *See id.* at pp. 29-30 (¶¶ 95-96). Even worse, she prevented others from complying: "Mittal, through her counsel, made clear that neither she nor any Class I Directors or Foundation Trustees would agree to be interviewed for the investigation." *Id.* (Ex. C at 5).

Under the Ben & Jerry's governing agreements, Class I board members sit in judgment of, and may remove, one another. At the conclusion of the BI investigation, TMICC attempted to share the findings with those other Class I directors at an October 23, 2025 meeting. But they "refused to engage without their outside litigation counsel present," and their lawyer "insisted on recording the meeting where confidential and sensitive information was to be shared." *Id.* (Ex. C at 6). On October 23, 2025, TMICC sent a letter to those Class I directors that summarized the investigation's findings and asked them to advise TMICC how they planned to address the issues raised. *See id.* at 13-16 (¶ 47 & Ex. C (the "October 23 Letter")). Neither the October 23 Letter nor the BI investigation's details were shared with the public or with anyone outside of Unilever or TMICC (or even within Unilever or TMICC who lacked a need to know), by Unilever, TMICC or Mr. Senf. Instead, it was Plaintiff Mittal who first made the October 23 Letter's contents public when she cut

and pasted portions of the letter into her original complaint (*see* Dkt. 1 at pp. 13-15 (¶ 44)), and later attached it as an exhibit, (*see* FAC (Ex. C)). The October 23, 2025 letter provided seven independent categories of misconduct by Plaintiff Mittal:

1. "Ms. Mittal improperly benefits from B&J Foundation funds." This finding concerned the direct and indirect payments from the Foundation to her organization. FAC (Ex. C at 2).

2. "Ms. Mittal circumvented Unilever's refusal to donate to certain organizations." This finding concerned donations she caused the Foundation to make to controversial organizations after Unilever rejected them, which it had the right to do, and after Plaintiff Mittal lost a legal challenge to Unilever's decisions. The donations "placed Unilever and B&J at legal risk of state anti-boycott laws," which breached Plaintiff Mittal's fiduciary duties. *Id*. at 3-4. Plaintiff Mittal's failure to disclose Unilever's prior objections and the arbitrator's ratification of those objections to the Foundation prior to such grants having been made put the Foundation's ongoing funding from Unilever and TMICC at risk, in further breach of her fiduciary duties to both Ben & Jerry's and the Foundation.

3. "Ms. Mittal's behavior towards employees and fellow Board members created a toxic working environment." This finding concerned Plaintiff Mittal's offensive and inappropriate workplace behavior to both employees and Board members in violation of the company's Respect, Dignity and Fair Treatment policy. *Id.* at 4.

4. "Ms. Mittal's actions have substantially interfered with both Unilever and B&J businesses." This finding concerned Plaintiff Mittal's breach of the 2000 acquisition agreements by refusing to stay within the specific areas of responsibility delegated to the Board. She inserted herself in business decisions that were the responsibility of the CEO including product development, overruled justified decisions, and wasted company resources. *Id.* at 4-5.

5. "Ms. Mittal allowed the disclosure of confidential business information." This finding concerned Plaintiff Mittal's improper public disclosure of a confidential

performance review of the former Ben & Jerry's CEO, without his or the company's consent and in breach of the company's privacy policy. *Id.* at 5.

6. "Ms. Mittal failed to cooperate in the Investigation and the Foundation Audit." This finding concerned her refusal to be interviewed and her demand that she be given any questions in writing so that she could draft her responses with the aid of her lawyer.

7. "Ms. Mittal initiated a Business Integrity complaint to further her own personal interests at the expense of the Foundation, Unilever, and B&J." This finding concerned her retaliation against members of the legal department involved in the governance audit and BI investigation by commencing a baseless and bad-faith BI investigation against them. *Id.* at 6.

The FAC alleges that, on October 28 or 29, 2025, during the board's meeting in Burlington, Vermont, Ben & Jerry's CEO Jochanan Senf allegedly read a "summary" of the October 23 letter to the Board, including Plaintiff Mittal—no press or non-employees were present. *Id.* at p. 16 (¶¶ 50-51).[2] The FAC also alleges that statements related to the findings in the EY audit and the Skadden BI investigation that were made in the press and in SEC filings defamed her and caused her emotional distress. *Id.* at pp. 25-26, 32-33 (¶¶ 81, 106).

Plaintiff Mittal filed the instant lawsuit on March 26, 2026 (Dkt. 1) and filed the FAC on May 8, 2026 (Dkt. 24), at which time she added Mr. Senf as a defendant.

**C. The SDNY Case**

As noted above, the case at bar is not the only pending lawsuit that Plaintiff Mittal has filed in this long-running Ben & Jerry's corporate governance dispute. In 2024, Plaintiff Mittal and other now-former Class I board members filed suit against Unilever (and later also against TMICC through an amended complaint) in SDNY in[3] *Ben & Jerry's Homemade, Inc. v. Unilever PLC*, No.

[2] Mr. Senf denies these allegations. When he sought to speak to the Board at this meeting, Plaintiff Mittal, as chair, refused to allow him to be heard. That factual dispute is immaterial to this motion.

[3] The SDNY Case was filed in November 2024. FAC at p. 7 (¶ 23). As then-Board Chair, Plaintiff Mittal and the other individual SDNY plaintiffs sued in the name of Ben & Jerry's, but when a

1:24-cv-08641-PKC (S.D.N.Y. Apr. 4, 2025), Dkt. No. 110 (Fourth Amended Complaint ("SDNY Complaint")) ("the SDNY Case"), attached as Exhibit 28 to the RJN. Plaintiff Mittal alleges there that Unilever and TMICC breached two agreements: the 2000 Merger Agreement whereby Unilever acquired Ben & Jerry's and a 2022 Settlement Agreement that resolved a prior dispute between the former Class I Directors and Unilever regarding Ben & Jerry's social mission and Palestine. SDNY Complaint at pp. 8, 23, 46 (¶¶ 24, 63, 124). Both agreements contain forum-selection clauses that specify New York as the sole forum for litigating disputes "relating to" the agreements. *See* Ex. 29 to RJN (2022 Settlement Agreement at p. 5, § 14); Ex. 30 to RJN (2000 Merger Agreement at p. 65, § 9.10).

According to Plaintiff Mittal's allegations in the SDNY Case, Unilever and TMICC breached these agreements when they engaged in the same conduct at issue here—namely, "[l]aunching and continuing [a] removal scheme, including a pretextual audit of the Foundation and sham Business Integrity Investigation of Chair Mittal." SDNY Complaint at pp. 48, 55 (¶¶ 132, 163). In support of that allegation, Plaintiff Mittal tells much the same story that she tells here. She recounts her role on the Board, her disagreements with Unilever, and the supposed plan to oust her (*id.* at pp. 9-11, 24-32 (¶¶ 26-30, 66-98)); impugns EY's audit and Skadden's Business Integrity investigation (*id.* at pp. 28-37 (¶¶ 83-109)); claims the October 23, 2025 letter, the subsequent SEC filing, and the December 3, 2025 prospectus contain false and defamatory statements about her (*id.* at pp. 34-37 (¶¶ 103, 106, 108)); complains about being relieved of her board seat as a result of the audit and investigation, and seeks reinstatement as a remedy (*id.* at 39-40, 63 (¶¶ 117, 118, 198)).

---

motion to dismiss was filed raising the former Class I Directors' lack of standing to sue in the name of the company, Plaintiff Mittal and the other directors filed a First Amended Complaint on behalf of "The Independent Directors of Ben & Jerry's." *Ben & Jerry's Homemade, Inc. v. Unilever PLC*, No. 1:24-cv-08641-PKC (S.D.N.Y. Apr. 4, 2025), Dkt. No. 32.

# ARGUMENT

## I. THE CASE SHOULD BE DISMISSED IN ITS ENTIRETY FOR LACK OF PERSONAL JURISDICTION OVER ANY DEFENDANT IN CALIFORNIA

### A. Plaintiff Mittal Has The Burden of Establishing Either General Or Specific Personal Jurisdiction Over Each Defendant

As "[t]he party asserting jurisdiction," Plaintiff Mittal "bears the burden to establish jurisdictional facts." *In re Boon Glob. Ltd.*, 923 F.3d 643, 650 (9th Cir. 2019) (citation omitted). On a motion to dismiss for lack of personal jurisdiction, district courts should consider "whether the pleadings and affidavits establish a *prima facie* showing of jurisdictional facts." *Id.* (citation and quotation omitted). "The party asserting jurisdiction cannot simply rest on the bare allegations of its complaint." *Id.* (citation and quotation omitted).

Substantively, "[w]here, as here, there is no applicable federal statute governing personal jurisdiction, the district court applies the law of the state in which the district court sits." *Dole Food Co. v. Watts*, 303 F.3d 1104, 1110 (9th Cir. 2002) (citation omitted). "Because California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same." *Id.* (citation omitted).

For the exercise of personal jurisdiction over a defendant, "due process requires that the defendant have certain minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015) (citation and quotation omitted). "The strength of contacts required depends on which of the two categories of personal jurisdiction a litigant invokes: specific jurisdiction or general jurisdiction." *Id.* (citations omitted). "Specific jurisdiction exists when a case arises out of or relates to the defendant's contacts with the forum. … Hence, it is 'specific' to the case before the court." *Id.* (citation modified). "General jurisdiction, in contrast, permits a court to hear any and all claims against a defendant, whether or not the conduct at issue has any connection to the forum." *Id.* (citation and quotation omitted). Accordingly, "general jurisdiction requires affiliations so continuous and systematic as to render the [defendant] essentially at home in the forum State." *Id.* (citation modified).

**B. No General Personal Jurisdiction Exists In California As To Any Defendant**

It cannot be seriously disputed that Unilever, TMICC, and Mr. Senf are not subject to general personal jurisdiction in California. "The paradigmatic locations where general jurisdiction is appropriate over a corporation are its place of incorporation and its principal place of business." *Id.* (citation omitted). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile[.]" *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (citation omitted). "A person is 'domiciled' in a location where he or she has established a fixed habitation or abode in a particular place, and intends to remain there permanently or indefinitely." *Lew v. Moss*, 797 F.2d 747, 749-50 (9th Cir. 1986) (citation modified) (citations and quotations omitted). "Only in an exceptional case will general jurisdiction be available anywhere else." *Ranza*, 793 F.3d at 1068 (citation and quotation omitted).

Here, Plaintiff Mittal alleges no facts to support the existence of general jurisdiction over any Defendant. To the contrary, her allegations refute general personal jurisdiction, as they acknowledge that none of the defendants are domiciled in California. Specifically, Plaintiff Mittal alleges that Unilever PLC is a UK public limited company headquartered in London, England; that TMICC is a Dutch public limited company headquartered in the Netherlands; and that Mr. Senf is a citizen of the Netherlands who works and has a residence in Burlington, Vermont, not California. FAC at p. 3 (¶¶ 2-4). As Defendants' declarations confirm, these allegations are correct and refute the existence of general jurisdiction in California. Stotzer Decl. at ¶ 3; Senf Decl. at ¶¶ 3-4, 7; Cavaliere Decl. at ¶ 3.

Although Plaintiff Mittal alleges that Unilever has contacts with California through offices in Los Angeles and San Francisco (FAC, ¶¶ 2, 5) those allegations are demonstrably untrue: those offices belong to Unilever *USA*, not Defendant Unilever PLC. Stotzer Decl. at ¶ 18. Moreover, having offices in the forum state is insufficient to establish general jurisdiction regardless. *E.g.*, *Johnson v. UBS AG*, 860 F. App'x 531, 532 (9th Cir. 2021) (rejecting general jurisdiction based on "branch offices" generating "a significant amount of revenue"). Plaintiff Mittal does not and cannot allege that TMICC has offices in California or that Mr. Senf works or has significant contacts in California.

**C. Specific Jurisdiction Is Absent**

The Court also lacks specific jurisdiction over Defendants because they did not target California in any relevant way and it would be unreasonable to exercise specific jurisdiction regardless. To determine specific jurisdiction, the Ninth Circuit uses a three-part test:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Davis v. Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154, 1161-62 (9th Cir. 2023) (citation omitted).

"The plaintiff bears the burden of meeting the first two prongs while the defendant shoulders the burden on the final prong." *Id.* at 1162 (citation omitted). "All three prongs must be met to exercise personal jurisdiction over the defendant." *Id.* (citation omitted). But none is met here.

**1. Defendants Did Not Purposefully Direct The Statements Into California**

The first prong of specific jurisdiction "incorporates two distinct concepts—'purposeful direction' and 'purposeful availment.'" *Id.* at 1162 (citation omitted). "The 'purposeful direction' test typically applies to tort claims while the 'purposeful availment' test typically applies to contract cases." *Id.* (citation modified).

**a.** The applicable test here is "purposeful direction," as Plaintiff Mittal alleges only intentional torts. FAC at pp. 33-35 (¶¶ 107-121). But even if the "purposeful availment" test were applied, it would not be satisfied. Purposeful availment exists "when a defendant's dealings with a state establishes a quid pro quo—where the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws[.]" *Davis*, 71 F.4th at 1163 (citation modified). For example, purposeful availment may exist where a defendant reaches into the State by "exploiting a market in the forum State[.]" *Id.* (citation omitted). But purposeful availment does not exist if a defendant merely enters the stream of commerce with knowledge that its products will reach the forum state. *Yamashita v. LG Chem, Ltd.*,

62 F.4th 496, 503 (9th Cir. 2023). Nor does it exist if a defendant's subsidiaries or affiliates do business in the forum state while the defendant does not. *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1071 (9th Cir. 2017) (upholding corporate separateness).

Defendants' declarations establish the absence of any purposeful availment of California. Unilever and TMICC themselves do no business in California. Stotzer Decl. at ¶¶ 4-17; Cavaliere Decl. at ¶¶ 4-18. Rather, any California business is conducted by third parties. *Id.* Those contacts cannot be imputed to Unilever and TMICC. *See Calder v. Jones*, 465 U.S. 783, 790 (1984) ("Each defendant's contacts with the forum State must be assessed individually."); *Axiom*, 874 F.3d at 1071 & n.5. Likewise, Mr. Senf's contacts with California are virtually non-existent. Senf Decl. at ¶¶ 1-8.

**b.** Turning to "purposeful direction," this test asks whether each Defendant "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Id.* at 1162-63 (citation and quotation omitted). Neither the second element nor the third element is satisfied here.[4]

***No Express Aiming.*** In the context of tortious statements, courts examine the statements' focus, purpose, and circulation. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 807 (9th Cir. 2004). The fact that the plaintiff resides in the forum state—and the plaintiff's forum contacts generally—cannot drive the analysis. *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1070 (9th Cir. 2017) (citing *Walden v. Fiore*, 571 U.S. 277 (2014)); *see Newpoint Fin. Corp. v. Bermuda Monetary Auth.*, 680 F. Supp. 3d 1151, 1167 (C.D. Cal. 2023) (specific jurisdiction cannot arise "just [as] a coincidence of the plaintiffs' residence").

*Calder v. Jones*, 465 U.S. 783 (1984) provides the paradigmatic example of an allegedly defamatory statement expressly aimed at California. In *Calder*, a Florida paper published an article that "impugned the professionalism of an entertainer whose television career was centered in

[4] Although Unilever, TMICC and Mr. Senf dispute whether certain alleged statements were made at all, the "intentional act" element is assumed *arguendo* for purposes of the present motion. That said, Plaintiff Mittal herself excludes Mr. Senf from many of the allegedly tortious publications. *See* FAC at pp. 19, 20, 22, 24 (¶¶ 63, 66, 73, 80 (Form 20-F Statement, Prospectus, and news articles)).

California" by claiming she "drank so heavily as to prevent her from fulfilling her professional obligations." *Id.* at 788 & n9. The article focused on the plaintiff's "California activities," "was drawn from California sources," and had its "largest circulation" in California. *Id.* at 788, 790. California was thus "the focal point both of the story and of the harm suffered." *Id.* at 789.

Not so here. From the beginning, the statements at issue focused not on California but on Unilever's "probing [of] the finances of Ben & Jerry's charitable foundation" and Unilever's corresponding "plan[] to audit" that foundation. FAC at p. 9 (¶ 31 (April 22, 2025 *Semafor* article)). The October 23, 2025 letter—which is substantively identical to the December 15, 2025 letter detailing Plaintiff Mittal's ineligibility—discloses the investigation's findings: Plaintiff Mittal engaged in seven forms of misconduct, from violating confidentiality obligations to improperly steering Foundation funds to benefit herself and OI, including through donations to organizations rejected by Unilever which put the Foundation at risk. *Id.* (Ex. C). The statements made in TMICC's Form 20-F statement—repeated by Reuters and in TMICC's year-end Prospectus—state that "following investigations commissioned by the Group and conducted by external advisers, in the opinion of the Group the current chair of the Ben & Jerry's Board [*i.e.*, Plaintiff Mittal] no longer meets the criteria to serve as a member of the Ben & Jerry's Board." FAC (Exs. E-G). The statements circulated by international media state that Plaintiff Mittal was terminated as a result. FAC (Exs. I, J, L).

All these statements focus on Plaintiff Mittal's improper conduct in her capacity as a Board member and Trustee of entities domiciled in Vermont—not in California. Further, none of the statements aim at a California audience. If they aim at anyone, they aim at a globally dispersed audience of international investors, institutional media, and corporate governance stakeholders concentrated in financial centers such as London and New York. *See* FAC at p. 24 (¶ 79 (characterizing the media reports as "worldwide articles published in multiple languages")). As for the statements made internally, they aim at the Board and at Ben & Jerry's leadership, which also have no California focus. Finally, Defendants' alleged purpose of rendering Plaintiff Mittal ineligible to serve on the Board also lacks any California connection. For all these reasons, there is no express aiming at California here. *See, e.g.*, *W. States Hockey League Inc. v. Doungchak*, 2016

WL 5886901, at *4 (C.D. Cal. Mar. 7, 2016) ("the FAC includes no factual allegations that Defendants specifically targeted the California hockey base or Plaintiffs California interests via the article.").

The only conceivable connection between any of the statements at issue and California is that some statements mention OI. *See, e.g.*, FAC at p. 9 (¶ 31 (April 22, 2025 *Semafor* article)); *id.* at p. 13 (¶ 47 (October 23, 2025 letter)). But for at least two reasons, that is legally insufficient to establish express aiming.

***First***, the location of OI is incidental to the statements' alleged defamatory content and the findings of the audit and investigation—namely, that Plaintiff Mittal improperly steered Foundation funds, derived from corporate assets, to an entity she controlled and from which she benefitted. The Fourth Circuit's decision in *Young v. New Haven Advocate*, 315 F.3d 256 (4th Cir. 2002) is instructive on this point. In *Young*, the court addressed "news articles that, in the context of discussing the State of Connecticut's policy of housing its prisoners in Virginia institutions, allegedly defamed the warden of a Virginia prison." *Id.* at 258. The articles "discussed the allegedly harsh conditions at the Virginia prison" and "question[ed] the practice of relocating Connecticut inmates to Virginia prisons." *Id.* at 259. Although the articles referred to Virginia, the court held that this did not establish specific jurisdiction in Virginia. *Id.* at 263-64. "The focus of the articles … was the Connecticut prisoner transfer policy and its impact on the transferred prisoners and their families back home in Connecticut." *Id.* at 263. Virginia was not "the focal point." *Id.* at 264.

The same reasoning applies here. The statements that mention OI do so only because OI is part of the factual background to one of Plaintiff Mittal's misdeeds. OI's location—and thus any jurisdictionally relevant connection to California—is not the focal point. To the contrary, to the extent that the statements at issue have a geographical focus, that focus is diffuse and international. *Cf. Williams v. Kula*, 2020 WL 7770915, at *5 (S.D. Cal. Dec. 29, 2020) ("Ultimately, the allegedly defamatory statements had a 'Belize focus' rather than a 'California focus.'"). To find express aiming based on the fact that one of Plaintiff Mittal's misdeeds happened to involve a California entity that Plaintiff Mittal herself created would wrongly permit Plaintiff Mittal's own contacts with

California to drive the jurisdictional analysis. *See Axiom Foods*, 874 F.3d at 1070. It also would improperly rest personal jurisdiction on a "fortuitous" contact. *Id.* at 1068.

***Second***, regardless of OI's location, OI has only an attenuated connection to the statements at issue. It appears in only four of the twelve statements and, where it does appear, it plays a minor role. *See, e.g.*, *MLS Nat. Med. Evaluation Servs., Inc. v. Templin*, 812 F. Supp. 2d 788, 800 (E.D. Mich. 2011) (rejecting specific jurisdiction in part because "Dr. Templin's statements comprise only a very small part of a lengthy Daily Journal article[.]"). In the *Semafor* article, OI is mentioned twice in the context of a larger discussion about Unilever's planned audit and the broader dispute between Unilever and the Ben & Jerry's Board. *See* FAC (Ex. A). In the October 23, 2025 letter—which was substantively repeated at the Board and leadership meetings and again in Plaintiff Mittal's termination letter—OI is mentioned in two paragraphs as just one of ***seven*** examples of Plaintiff Mittal's misconduct. *See* FAC (Ex. C). Accordingly, neither OI's location nor OI itself is the focus of the statements at issue. Like the State of Virginia was in *Young*, 315 F.3d at 264, OI here is merely part of the context and cannot anchor a finding of "express aiming" into California.

***No Knowledge Of Harm Likely To Be Suffered In California.*** To establish this element, Plaintiff Mittal must show that Defendants knew that harm would likely occur in California. *E.g.*, *Handsome Music, LLC v. Etoro USA LLC*, 2020 WL 8455111, at *10 (C.D. Cal. Dec. 17, 2020) (Plaintiff presents no evidence to show Defendant caused harm it knew to be likely suffered in California."). Mere "knowledge of the plaintiffs' strong forum connections, plus the foreseeable harm the plaintiffs suffered in the forum," does not suffice. *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1069-70 (9th Cir. 2017) (citation modified).

But Plaintiff Mittal fails to allege any facts to show that any Defendant knew that Plaintiff Mittal would suffer reputational or related harms in California. *See, e.g.*, *MGA Ent., Inc. v. Innovation First, Inc.*, 2010 WL 11601032, at *5 (C.D. Cal. Sept. 14, 2010) ("Plaintiff does not specifically allege that Defendants knew Plaintiff was located in California or that the harm to Plaintiff caused by its acts would primarily occur in California."). To the contrary, Plaintiff Mittal alleges that her reputation is international in scope. For example, she gives interviews on *CNN* and *BBC World*. FAC at 3 (¶ 11). She testifies before Congress and the United Nations. *Id.* at p. 4

(¶ 12). She is a fellow at the American University, Cairo. *Id.* And her work is "internationally renowned." *Id.* at p. 4 (¶ 13).

Thus, this case closely resembles *Remick v. Manfredy*, 238 F.3d 248 (3d Cir. 2001), where the court addressed "allegedly defamatory letters … published throughout the boxing community[.]" *Id.* at 259. The court explained that specific jurisdiction in Pennsylvania was lacking because "Remick has not asserted that Pennsylvania has a unique relationship with the boxing industry, as distinguished from the relationship in *Calder* between California and the motion picture industry, with which the *Calder* plaintiff was associated." *Id.* Like reasoning applies here. Plaintiff Mittal's professional status in the world of social activism, and Plaintiff Mittal's related role on the Board, have no particular connection to California. Accordingly, Plaintiff Mittal's alleged reputational harms also have no particular connection to California, and Defendants cannot be charged with knowledge that Plaintiff Mittal would suffer those harms in California.

**2. Plaintiff Mittal's Claims Do Not Relate To Defendants' Forum Contacts**

"'[A]rise out of' and 'relate to' are alternatives: for a claim to arise out of a defendant's forum contacts requires causation, while a claim can relate to those contacts, even absent causation[.]" *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 504-05 (9th Cir. 2023) (citation omitted). Relatedness "does not mean anything goes." *Id.* at 506 (citation omitted). It "requires a close connection between contacts and injury." *Id.* at 506 (citations omitted).

Although a showing of purposeful direction would automatically satisfy the "arising out of or relating to" prong in this case, a showing of only purposeful availment would refute it. Specifically, to the extent that a given publication and a given Defendant satisfy the "purposeful direction" test, the relatedness prong is necessarily satisfied because the publications themselves provide the basis for Plaintiff Mittal's claims. *See, e.g.*, *Freestream Aircraft (Bermuda) Ltd. v. Aero L. Grp.*, 905 F.3d 597, 603 (9th Cir. 2018). But to the extent that a given Defendant satisfies only the "purposeful availment" test, the relatedness prong is not satisfied. *See, e.g.*, *Williams v. Kula*, 2020 WL 7770915, at *3 (S.D. Cal. Dec. 29, 2020) ("Even if the Court were to consider Plaintiffs' underlying business relationship with Defendant Kahn, those contacts would fail the second prong of the Ninth Circuit's test for specific jurisdiction[.]"). The underlying contacts relevant to

purposeful availment—*e.g.*, directing business into California—would not relate to Plaintiff Mittal's claims, which concern Plaintiff Mittal's position on the Board and the specific statements at issue here. *See Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1123-24 (9th Cir. 2002) (rejecting specific jurisdiction because "[t]he contracts giving rise to this dispute were negotiated abroad, involved foreign companies, and required performance (*i.e.,* delivery of rice) in India.").

**3. The Exercise Of Personal Jurisdiction Would Be Unreasonable**

Even if Plaintiff Mittal could establish the first two prongs of specific jurisdiction, the exercise of jurisdiction would still be unreasonable under the third. The reasonableness prong considers seven factors:

> (1) the extent of a defendant's purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's home state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interests in convenient and effective relief; and (7) the existence of an alternative forum.

*Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1125 (9th Cir. 2002) (citation omitted).

Each of these factors favors Defendants, all of whom are based in foreign countries. *See id.* ("The reasonableness calculus clearly compels the conclusion that the exercise of personal jurisdiction over Shivnath Rai [a foreign party] would be unreasonable.").

**(1)** For the reasons explained above, Defendants have not interjected themselves into California's affairs. *See supra* at pp. 2-3, 12-13.

**(2)** Defendants would be burdened by defending in California. Many of their potential witnesses reside elsewhere, including in foreign countries. *Supra* at pp. 2-3; *see Glencore*, 284 F.3d at 1126 (defendant's "potential witnesses and evidence are likely half a world away").

**(3)** The Ninth Circuit has held that "[w]here, as here, the defendant is from a foreign nation rather than another state, the sovereignty barrier is high and undermines the reasonableness of personal jurisdiction." *Glencore*, 284 F.3d at 1126 (citation omitted). That holding applies here, where Defendants are domiciled in the UK and the Netherlands.

**(4)** California's interest here is slight because it flows solely from Plaintiff Mittal's residence.

**(5)** This dispute would be most efficiently resolved in New York because there is ongoing litigation there between all but one of the parties, based on the same ultimate facts.

**(6)** New York courts are equally capable of granting effective relief as California courts. And New York would be the more convenient forum due to the related litigation already proceeding there.

**(7)** For the reasons explained in Defendants' contemporaneously filed motion to transfer, *see also supra* at pp. 7-8, New York is available as an alternative forum due to the forum-selection clauses that bind Plaintiff Mittal.

Accordingly, the balance of the factors weighs against exercising personal jurisdiction.

## CONCLUSION

Defendants respectfully request that the Court dismiss for lack of personal jurisdiction.

DATED: August 12, 2026

Respectfully submitted,

By: */s/_Steven G. Madison_*

Steven G. Madison
Robert M. Schwartz
Marie M. Hayrapetian
Julian T. Schoen
Arian J. Koochesfahani
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Fax: (213) 443-3096
robertschwartz@quinnemanuel.com
stevemadison@quinnemanuel.com
mariehayrapetian@quinnemanuel.com
julianschoen@quinnemanuel.com
ariankoochesfahani@quinnemanuel.com

*Attorneys for Defendants*

# CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served on all counsel of record electronically or by another manner authorized under Fed. R. Civ. P. 5(b) on this the 12th day of August 2026.

Dated: August 12, 2026

By: */s/ Steven G. Madison*
Steven G. Madison
*Attorney for Defendants*