THOMAS B. HARVEY (CA Bar #287198)
**LAW OFFICES OF THOMAS B. HARVEY**
365 E. Avenida De Los Arboles, #226
Thousand Oaks, CA 91360
Telephone: (805) 768-4440
tbhlegal@proton.me

PAUL K. VICKREY (*Pro Hac Vice*)
PATRICK F. SOLON (*Pro Hac Vice*)
DYLAN M. BROWN (*Pro Hac Vice*)
**VITALE, VICKREY, NIRO, SOLON & GASEY LLP**
311 S. Wacker Drive, Suite 2200
Chicago, IL 60606
(312) 236-0733
vickrey@vvnlaw.com
solon@vvnlaw.com
dbrown@vvnlaw.com

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

ANURADHA MITTAL,

Plaintiff,

v.

UNILEVER PLC, THE MAGNUM ICE CREAM COMPANY N.V., and JOCHANAN SENF,

Defendants.

Case No. 26-cv-02660-WHO

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

| | |
|---|---|
| Judge: | Hon. William H. Orrick |
| Hearing Date: | October 7, 2026 |
| Hearing Time: | 2:00 p.m. |
| Courtroom: | 2 |

# TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. RELEVANT FACTS .......... 1

A. Defendants' California Directed Activity .......... 1

B. The SDNY Case .......... 4

III. ARGUMENT .......... 4

A. The Standard .......... 4

B. Defendants Expressly Aimed Their Campaign at California .......... 5

1. Defendants' Focal-Point Cases Apply a Superseded or Out-of-Circuit Rule .......... 6

2. The Accusations Targeted a California Institution and California Property .......... 6

3. Each Defendant's Own Forum-Directed Conduct Satisfies Express Aiming .......... 7

C. Plaintiff Relies on Each Parent's Own Conduct, Not Imputation .......... 8

D. An Officer Is Assessed on His Own Acts, and Senf's Declaration Disputes Only Where He Lives .......... 8

E. Defendants Knew the Harm Would Be Felt in California .......... 9

F. Jurisdiction Is Reasonable .......... 10

1. Burden and Sovereignty Cannot Defeat Jurisdiction Where a Defendant Directed Its Conduct at the Forum .......... 10

2. California's Interest Is Strong and the New York Action Is Not an Adequate Alternative for These Claims .......... 11

G. The Claims Arise Out of and Relate to Defendants' California Conduct .......... 12

IV. CONCLUSION .......... 12

# TABLE OF AUTHORITIES


**Page(s)**

**Cases**

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064 (9th Cir. 2017) .......... 8, 9

*Ben & Jerry's Homemade, Inc. v. Unilever PLC*, 2026 U.S. Dist. LEXIS 188978 (S.D.N.Y. Aug. 21, 2026) .......... 4, 11

*Briskin v. Shopify, Inc.*, 135 F.4th 739 (9th Cir. 2025) .......... 1, 5, 6, 7, 2

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) .......... 10

*Calder v. Jones*, 465 U.S. 783 (1984) .......... 1, 5, 6, 7, 8, 10

*Davis v. Metro Prods., Inc.*, 885 F.2d 515 (9th Cir. 1989) .......... 9

*Dole Food Co. v. Watts*, 303 F.3d 1104 (9th Cir. 2002) .......... 11, 12

*Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016) .......... 9

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351 (2021) .......... 12

*Gates Learjet Corp. v. Jensen*, 743 F.2d 1325 (9th Cir. 1984) .......... 11

*Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114 (9th Cir. 2002) .......... 10, 11

*Gordy v. Daily News, L.P.*, 95 F.3d 829 (9th Cir. 1996) .......... 11

*Handsome Music, LLC v. Etoro USA LLC*, 2020 WL 8455111 (C.D. Cal. Dec. 17, 2020) .......... 9, 10

*In re JUUL Labs, Inc.*, 497 F. Supp. 3d 552 (N.D. Cal. 2020) .......... 9

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984) .......... 6

*Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218 (9th Cir. 2011) ....................4

*MGA Entertainment, Inc. v. Innovation First, Inc.*, 2010 WL 11601032 (C.D. Cal. Sept. 14, 2010) ....................9, 10

*People Center, Inc. v. Deel, Inc.*, 2026 WL 497491 (N.D. Cal. 2026) ....................7

*Roth v. Garcia Marquez*, 942 F.2d 617 (9th Cir. 1991) ....................11

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797 (9th Cir. 2004) ....................4, 5, 8, 9

*Walden v. Fiore*, 571 U.S. 277 (2014) .................... 7

*Williams v. Kula*, 2020 WL 7770915 (S.D. Cal. Dec. 29, 2020)....................5, 6

*W. States Hockey League, Inc. v. Doungchak*, 2016 WL 5886901 (C.D. Cal. Mar. 7, 2016) ....................5, 6

*Yamashita v. LG Chem, Ltd.*, 62 F.4th 496 (9th Cir. 2023) ....................12

*Young v. New Haven Advocate*, 315 F.3d 256 (4th Cir. 2002) ....................5, 6

**Statutes**

Cal. Civ. Proc. Code § 410.10 ....................4

## I. INTRODUCTION

Defendants Unilever PLC ("Unilever"), The Magnum Ice Cream Company ("MAGNUM") and Jochanan Senf ("Senf"), contend that they are foreign entities and an individual with no California ties, that the challenged statements focus on a Vermont company rather than California, and that their corporate structure and the reasonableness factors defeat jurisdiction. (Doc. #52 at 1-3). The motion fails. The claims sound in intentional tort, so the first prong of specific jurisdiction is governed by the *Calder* effects test, and the only contested element is express aiming. On record, taken in Plaintiff's favor, each Defendant expressly aimed the same coordinated defamation campaign at California -- at Ms. Mittal's California-based reputation and at the California institution the accusations targeted -- and drove it into the State through a San Francisco meeting, letters to California-resident directors, SEC filings, and a press campaign. Defendants' contrary framing depends on a "focal-point" or "targeting" requirement the *en banc* Ninth Circuit discarded in *Briskin v. Shopify, Inc.*, 135 F.4th 739 (9th Cir. 2025), a case which Defendants do not cite. Their remaining arguments -- corporate separateness, lack of knowledge of California harm, and unreasonableness -- fail for the reasons below. One of those arguments -- "California's intent here is slight because it flows solely from Plaintiff Mittal's residence." (Doc. #52 at 22) -- ignores broad swaths of Ms. Mittal's FAC.

## II. RELEVANT FACTS

### A. Defendants' California Directed Activity

The FAC alleges: "Defendants crafted and implemented a plan to smear and discredit Ms. Mittal through sham "investigations" and statements about their findings. Defendants engaged in that strategy to (1) coerce Ms. Mittal into "voluntarily" leaving the Board, and if she refused, (2) inform the public that she would be ousted for financial misconduct due to 'investigations.'" (FAC ¶2).

That campaign began with an audit of Ben & Jerry's Foundation, Inc. ("BNJF") "focusing on Ms. Mittal and contributions to the Oakland Institute." (FAC ¶29). Ms. Mittal is a resident of Oakland,

California. The Oakland Institute also is located in Oakland, California. (FAC ¶1; Doc. #24-3 at 3 of 6). In April of 2025, Unilever leaked the letter announcing the audit to Semafor, and "Unilever executives privately" indicated that a target of the audit was Ms. Mittal "and a series of grants to the Oakland Institute." (FAC ¶31).

Unilever, through its counsel, directed the auditors to focus on grants to the Oakland Institute. (FAC ¶¶34, 35) ("Background overview of the situation, Unilever to our meeting notes with Skadden and Weil but have more depth on the grants in question."). Thereafter, Unilever instituted an "investigation" into Ms. Mittal (FAC ¶40).

The FAC details a key meeting in San Francisco arranged by Unilever's CEO:

> 43. Less than a month later, on October 10, 2025, Ms. Mittal attended a meeting in San Francisco with then Unilever's General Counsel, Maria Varsellona, and others to discuss the possible settlement of the Board litigation, a meeting which Unilever CEO Fernando Fernandez arranged and choreographed. In the course of those discussions, Ms. Varsellona made a startling threat: if Ms. Mittal did not resign from the Board, Unilever would publish damaging claims about her in the upcoming Magnum prospectus.
>
> 44. Ms. Varsellona also said that if Ms. Mittal resigned, the statements about Ms. Mittal would not be made. Instead, the investigation would result in a finding of no wrongdoing, and Ms. Mittal could head a new multi-million-dollar charitable organization that Unilever would fund. Ms. Varsellona's statements provided blunt confirmation that the investigation was fraudulently conceived. The threat and proposal conveyed by Ms. Varsellona were carefully scripted in advance by Defendants Unilever and Magnum. Ms. Mittal was so shocked and upset by them that she immediately left the meeting.

Ms. Mittal's rejection of that proposal in that San Francisco meeting led to all of Defendants' ensuing statements and conduct:

> 45. After Ms. Mittal refused to leave the Board, all Defendants crafted their strategy to force the Independent Board to remove her by telling the Board (all Directors except Ms. Mittal) of their "findings" and threatening that a failure to act would "breach [the Directors'] fiduciary duties." In the interim, Defendants would signal to potential investors that Ms. Mittal would be removed due to misconduct.
>
> 46. After Ms. Mittal rejected Unilever's coercive proposal, all Defendants escalated their efforts to isolate, humiliate and denigrate her. On October 14, 2025, Ms. Mittal sent an email to Unilever CEO Fernandez stating, among other things, "I

> was informed last week that should I not resign as a Chair of the Independent Board. Unilever's next prospectus would include allegations against me…. I would also note that in the same conversation that this threat was made, Unilever offered to allow me to head a multi-million-dollar non-profit should I capitulate." On October 16, 2025, Fernandez instructed Ms. Mittal that Defendant Senf was to be her "point of contact" with Unilever and Magnum. Unilever had just appointed Senf, a long time Unilever executive, as Ben & Jerry's new CEO.

On October 23, 2025, Magnum sent a letter to Ben & Jerry's Independent Board members (except for Ms. Mittal), two of whom reside in California, a letter signed by Magnum's Chief Legal Officer Vanessa Vilar (who previously held the title of General Counsel of Unilever Ice Cream), but which all Defendants took a responsible part in preparing and publishing. (FAC ¶47).

That letter contains numerous charges against Ms. Mittal, many of which also involve the Oakland Institute, which the letter expressly referenced nine times. It addresses grants made to the Oakland Institute, salary paid to Ms. Mittal by the Oakland Institute, "the use of an Oakland CA home," and "a residential home in a California wine region…" (Doc. #24-3 at 3 of 6).

The FAC also recites communications with Defendants about the Oakland Institute (FAC ¶¶85, 89, 90 and Doc. #24-4), and the fact that "Unilever had planned to provide Ms. Mittal security at her actual home after she received threats." (FAC ¶57).

Defendant Senf repeated those charges to the assembled Independent Board during the meeting in Vermont on October 28 and 29. (FAC ¶50). He also took a responsible part in the recitation of those charges to the entire Ben & Jerry's leadership team on November 11, 2025. (FAC ¶¶59-60).

On December 15, 2025, Defendants Unilever and Magnum sent Ms. Mittal, in California, a letter at 6:38 a.m. PST reciting the same charges and removing her from the Independent Board; they also immediately spread the news about Ms. Mittal to their media contacts, one of whom contacted her that day at 6:43 a.m. PST. (FAC ¶¶72-73). Senf participated in scripting Defendants' statements to the press (FAC ¶77).

**B. The SDNY Case**

On August 21, 2026, the court in *Ben & Jerry's Homemade, Inc. v. Unilever PLC*, 2026 U.S. Dist. LEXIS 188978 *4 (S.D.N.Y. Aug. 21, 2026) (attached as Ex. 1 to Plaintiff's Request for Judicial Notice), entered an order granting a motion to dismiss on seven of the claims, and substituting Magnum for Unilever as a defendant. The court denied the motion to dismiss as to (1) the Class 1 Directors' claim that "they were wrongly deemed ineligible and thus removed, or not appointed in violation of section 6.14(a) [of the Merger Agreement]" *Id*. at **30-31, and (2) the Class 1 Directors' claim for breach of section 2(b), (g) and (j) of the Settlement Agreement by "censoring Ben & Jerry's social mission," replacing Ben & Jerry's CEO, implementing retroactive term limits, and issuing statements about Ben & Jerry's Social Mission not approved by the Independent Board (*Id*. at **31-33). Defendant Senf is not a party in that case, and Unilever is no longer a party in that case. *Id*. at caption and *40. Fact Discovery in that case is scheduled to close on October 16, 2026. (Ex. 2 to Plaintiff's Request for Judicial Notice).

**III. ARGUMENT**

**A. The Standard**

On a Rule 12(b)(2) motion decided without an evidentiary hearing, Plaintiff need only make a "prima facie showing of jurisdictional facts"; the Court takes her uncontroverted allegations as true and resolves conflicts in the parties' declarations in her favor. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004); *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011). Because California's long-arm statute reaches the full extent of due process, the statutory and constitutional inquiries merge. Cal. Civ. Proc. Code § 410.10; *Schwarzenegger,* 374 F.3d at 800-01.

Plaintiff relies solely on specific jurisdiction, which the Ninth Circuit analyzes under a three-prong test: the defendant must (1) purposefully direct its activities at the forum, (2) the claim must

arise out of or relate to those activities, and (3) jurisdiction must be reasonable. *Id*. at 802; *Briskin,* 135 F.4th at 750-51. Plaintiff bears the burden on the first two prongs; if met, the defendant must present a "compelling case" that jurisdiction is unreasonable. *Briskin*, 135 F.4th at 751. Because the claims sound in intentional tort, the first prong is governed by purposeful direction under the "*Calder* effects" test, which requires that the defendant (1) committed an intentional act, (2) expressly aimed at the forum, and (3) caused harm it knew was likely to be suffered there. *Id*.; *Calder v. Jones*, 465 U.S. 783, 788-89 (1984).

**B. Defendants Expressly Aimed Their Campaign at California**

Defendants contend that the challenged statements are not aimed at California because they "focus on" Ms. Mittal's conduct as a director and trustee of Vermont-domiciled entities -- Ben & Jerry's and its Foundation -- and reached "a globally dispersed audience," not a California-specific one. (Doc. #52 at 12-16). They characterize the Oakland Institute as "incidental," appearing in only a handful of statements and as one of several misconduct examples, and argue that resting jurisdiction on it would let Plaintiff's own California residence drive the analysis. (Doc. #52 at 14-15). Their lead authority is *Young v. New Haven Advocate*, 315 F.3d 256 (4th Cir. 2002), and they rely on *Schwarzenegger's* "focus, purpose, and circulation" formulation and unpublished decisions applying it. (Doc. #52 at 13-14) (citing *Williams v. Kula*, 2020 WL 7770915 (S.D. Cal. Dec. 29, 2020); *W. States Hockey League, Inc. v. Doungchak*, 2016 WL 5886901 (C.D. Cal. Mar. 7, 2016)).

However, Defendants' argument rests on a rule the *en banc* Ninth Circuit has discarded. *Briskin* overruled any requirement that a defendant "differentially target" or maintain a "forum-specific focus," holding that a defendant expressly aims at a forum when its conduct there is its own deliberate choice -- "not random, isolated, or fortuitous" -- "even if [it] cultivate[s] a nationwide audience." 135 F.4th at 757-58.

The controlling question is therefore not whether California was Defendants' exclusive or primary target, but whether they deliberately drove their conduct into California. They did. That the same accusations also reached readers in London or New York is no defense; a defendant who publishes into the forum answers there regardless of where else its conduct lands. *Id.*; *accord Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 779-81 (1984). Defendants' silence on *Briskin* -- the controlling, *en banc*, on-point authority -- is telling.

**1. Defendants' Focal-Point Cases Apply a Superseded or Out-of-Circuit Rule**

*Young* cannot bear the weight Defendants place on it. It is Fourth Circuit authority applying that circuit's "manifest intent of targeting readers in [the forum]" test, 315 F.3d at 263 -- the very "differential targeting" requirement the Ninth Circuit rejected in *Briskin*. It also involved a genuinely incidental forum connection: Connecticut newspapers wrote about Connecticut prison policy for Connecticut readers, and Virginia entered the story only because that is where Connecticut happened to send prisoners. *Id.* at 258-59. Here, by contrast, the accusations were built on Mittal's own California institution and directed into California by, personal meeting, letters, filings, and articles.

*Young* itself distinguishes *Calder* on exactly this ground -- that in *Calder* the defendants "expressly aimed" at the forum and knew the brunt of the harm would be felt there, 315 F.3d at 262 -- and it is *Calder*, not *Young*, that Defendants' actions track. Defendants' remaining cases add nothing: *Williams* and *Western States* apply the same superseded "targeted the forum via the article" logic.

**2. The Accusations Targeted a California Institution and California Property**

The Oakland Institute was not incidental to Defendants' accusations; it was the vehicle of the alleged wrongdoing. Defendants accused Mittal of self-dealing by steering Ben & Jerry's Foundation ("BNJF") grants to the Oakland Institute -- a California organization that she founded and at which she is employed -- and of improperly benefiting from California real property, including roughly

$249,000 in "rent" on an Oakland home and a residence in a "California wine region." (FAC ¶¶31, 47, 56-57). The "improper benefit" charge cannot be stated without its California subject.

As in *Calder*, the accusations concerned "the California activities of a California resident," and the "brunt of the harm" to her professional reputation was suffered in California, "the State in which she lives and works." 465 U.S. at 788-90. California is thus a focal point of both the defamation and the harm -- which is all express aiming requires.

### 3. Each Defendant's Own Forum-Directed Conduct Satisfies Express Aiming

***Unilever*** entered the forum and published into it: its General Counsel delivered the resign-or-be-defamed ultimatum at a San Francisco meeting Unilever arranged (FAC ¶¶43-44), and Unilever drove the accusations into California through its statements to the press, the October 23 letter to California-resident directors, its SEC filings, and the December 15 letter. Physical entry "in person or through an agent, goods, mail, or some other means" is itself a forum contact. *Briskin*, 135 F.4th at 756 (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014)).

***Magnum*** aimed its own conduct at California through its own officers. Magnum participated in planning the San Francisco confrontation and ultimatum. (FAC ¶44). Its Chief Legal Officer signed the October 23 and December 15 letters accusing Mittal of self-dealing through the California institution she founded and is employed at, its statements to the press, and its SEC filings. (FAC ¶¶47, 63, 66, 72, 75-78). Plaintiff does not impute any subsidiary's contacts to Magnum; she relies on Magnum's own acts. See *People Center, Inc. v. Deel, Inc.*, 2026 WL 497491 (N.D. Cal. 2026).

***Senf***, designated by Unilever's CEO as Mittal's point of contact, took a responsible part in preparing and publishing the October 23 letter. Senf read the accusations aloud and convened the leadership assembly at which they were repeated. He also participated in scripting Magnum's statements to the press. (FAC ¶¶46-47, 50-51, 59, 75-77). That he acted from outside California is immaterial -- the *Calder* defendants acted entirely in Florida and never entered California, yet were

subject to suit there. 465 U.S. at 785-86, 789. Senf's declaration disputes only where he lives; it does not deny any of this conduct, which stands uncontroverted. *Schwarzenegger*, 374 F.3d at 800.

### C. Plaintiff Relies on Each Parent's Own Conduct, Not Imputation

Defendants argue that Unilever and Magnum are holding companies that conduct no business in California, and that the California offices, operations, and personnel Plaintiff points to belong to separate subsidiaries -- Unilever United States, Inc., Conopco, and Ben & Jerry's -- whose contacts cannot be imputed to the parents. (Doc. #52 at 8-10, 16-17).

Separateness is beside the point, because Ms. Mittal does not impute any subsidiary's contacts to either parent. She agrees that "each defendant's contacts with the forum State must be assessed individually," *Calder*, 465 U.S. at 790 -- and assessed individually, each parent's own conduct establishes express aiming. Unilever's own General Counsel (working with Magnum) delivered the ultimatum in San Francisco at a meeting its CEO arranged, and Defendants drove the October 23 and December 15 letters and its SEC filings into California. (FAC ¶¶ 43-44, 47, 63, 66, 72-73). Magnum's own Chief Legal Officer signed the letters.

None of this depends on Unilever United States, Conopco, or Ben & Jerry's; it is the parents' own tortious conduct, directed at California. *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064 (9th Cir. 2017), confirms the point rather than defeating it: it holds only that a subsidiary's forum contacts are not attributed to a parent absent an agency or alter-ego showing -- a theory Ms. Mittal does not press and does not need. *Id.* at 1071 & n.5. The offices allegation Defendants' declarations dispute is immaterial, because Ms. Mittal does not rely on the parents' physical presence in California; she relies on what the parents did.

### D. An Officer Is Assessed on His Own Acts, and Senf's Declaration Disputes Only Where He Lives

Senf's status as an officer of Ben & Jerry's neither insulates him from jurisdiction nor converts his personal conduct into the company's. Because California's long-arm reaches the constitutional

limit, the fiduciary-shield doctrine does not apply, and an officer's tortious acts are his own for jurisdictional purposes even when performed in a corporate role. *Davis v. Metro Prods., Inc.*, 885 F.2d 515, 522 (9th Cir. 1989). An officer who personally participates in the wrongful conduct -- the "guiding spirit" or "central figure" -- is individually subject to jurisdiction for those acts. *Id*. at 524-25; *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1069 (9th Cir. 2016); *In re JUUL Labs, Inc.*, 497 F. Supp. 3d 552, 675, 678 (N.D. Cal. 2020). Senf's declaration establishes only that he is a Netherlands citizen and resident who owns no California property and has never lived or worked here. (Senf Decl. ¶¶3-8). It does not deny that he was designated Mittal's point of contact, read the accusations aloud, or convened the leadership assembly at which they were repeated. (FAC ¶¶46, 50-51, 59). Those conduct allegations are therefore uncontroverted and taken as true, *Schwarzenegger*, 374 F.3d at 800, and they -- not his domicile -- establish that he expressly aimed his own conduct at California.

**E. Defendants Knew the Harm Would Be Felt in California**

Defendants dispute the third element of the effects test, arguing that Plaintiff has not shown any Defendant knew the reputational harm would be suffered in California, and that knowledge of a plaintiff's forum residence plus foreseeable harm does not suffice. (Doc. #52 at 15-16) (citing *Axiom*, 874 F.3d at 1069-70; *Handsome Music, LLC v. Etoro USA LLC*, 2020 WL 8455111 (C.D. Cal. Dec. 17, 2020); *MGA Entertainment, Inc. v. Innovation First, Inc.*, 2010 WL 11601032 (C.D. Cal. Sept. 14, 2010)).

The record establishes exactly the knowledge Defendants claim is missing. Defendants knew Mittal resided and worked in California: they corresponded with her here throughout and designated Senf as the single point of contact for their communications with her. They arranged for the pivotal ultimatum meeting to be held in San Francisco not randomly, but because they knew she resides in Oakland. And they knew her professional reputation was centered at the Oakland Institute -- the very

California organization their accusations targeted. Accusing a known California resident of self-dealing through a California institution, which she founded and is employed at, is conduct that Defendants knew would injure her where she lives and works. That is precisely the knowledge *Calder* requires. 465 U.S. at 789-90.

Defendants' authorities are pleading-failure cases that prove the point by contrast: in *MGA*, the plaintiff "d[id] not specifically allege that Defendants knew Plaintiff was located in California or that the harm… would primarily occur in California," 2010 WL 11601032, at *5, and *Handsome Music* involved no evidence of any California-specific focus. Here, Plaintiff alleges the very facts those plaintiffs lacked.

**F. Jurisdiction Is Reasonable**

Defendants argue that even if Plaintiff satisfies the first two prongs, jurisdiction is unreasonable because they are foreign entities and an individual for whom litigating in California is burdensome, because their home nations' sovereignty is implicated, and because a parallel action is already pending in the Southern District of New York that provides an adequate alternative forum. (Doc. #52 at 17-20) (citing *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1124-26 (9th Cir. 2002)). Defendants made no argument as to why jurisdiction over Defendant Senf exists in New York but not in California.

**1. Burden and Sovereignty Cannot Defeat Jurisdiction Where a Defendant Directed Its Conduct at the Forum**

Because Plaintiff satisfies the first two prongs, Defendants bear the burden of presenting a "compelling case" that jurisdiction is unreasonable -- a burden foreign defendants rarely carry. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476-77 (1985). Defendants cannot carry it here.

Their argument rests almost entirely on the two reasonableness factors that always favor a foreign defendant: the burden of defending from abroad and the sovereignty of the home nation. But "[b]y their very nature, these two factors are likely to favor foreign defendants every time personal

jurisdiction in the United States is considered," and for that reason cannot be given controlling weight. *Dole Food Co. v. Watts,* 303 F.3d 1104, 1117 (9th Cir. 2002); *accord Gates Learjet Corp. v. Jensen,* 743 F.2d 1325, 1333 (9th Cir. 1984) (if sovereignty controlled, it "would always prevent suit against a foreign national in a United States court").

The Ninth Circuit has accordingly sustained jurisdiction over foreign defendants -- including foreign individuals -- even where those factors, and others, favored them. *Dole Food*, 303 F.3d at 1117; *Roth v. Garcia Marquez,* 942 F.2d 617, 624-25 (9th Cir. 1991). *Glencore* is not to the contrary: jurisdiction there was unreasonable because the defendant had directed no conduct at California -- the claim "d[id] not arise out of conduct directed at or related to California," and the contracts "were negotiated abroad, involved foreign companies, and required performance... in India." 284 F.3d at 1124. Here, Defendants directed their tortious conduct into California, so reasonableness follows the contacts.

### 2. California's Interest Is Strong and the New York Action Is Not an Adequate Alternative for These Claims

The factors that matter tilt decisively toward jurisdiction in California. California "maintains a strong interest in providing an effective means of redress for its residents tortiously injured," *Gordy v. Daily News, L.P.,* 95 F.3d 829, 836 (9th Cir. 1996), and Mittal, the Oakland Institute, the witnesses, and the reputational harm are all in California -- making it both the efficient forum and the one that matters to Plaintiff's relief. The pending New York action does not change this. That action is a contract dispute governed by New York law solely because of forum-selection provisions in the Merger and Settlement Agreements, and following the court's August 21, 2026 order, plaintiff's claims have been winnowed down to narrow contract claims. *See Ben & Jerry's Homemade, Inc. v. Unilever PLC,* No. 24-cv-08641 (S.D.N.Y. Aug. 21, 2026). Mittal's California tort claims -- defamation, false light, and IIED -- are not claims under those agreements and could not be brought

in New York on the same theory. Senf is not a party to the New York case, and Defendants have made no effort to explain how personal jurisdiction over Senf exists in New York but not California.

No Defendant is located in New York, and Defendants have identified no witnesses in New York. The burden of showing an adequate alternative forum rests on Defendants, *see Dole Food,* 303 F.3d at 1117, and they have not carried it.

**G. The Claims Arise Out of and Relate to Defendants' California Conduct**

Defendants do not seriously contest the second prong, conceding that a showing of purposeful direction satisfies relatedness in this case. (Doc. #52 at 17). That concession is correct: Plaintiff's claims arise directly out of the very acts that constitute the forum contacts -- the San Francisco ultimatum, the letters into California, the securities filings, and the articles -- so there is no gap between the contacts and the claims. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021); *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 504 (9th Cir. 2023). The second prong is satisfied.

## IV. CONCLUSION

The motion should be denied as to all three Defendants. Each Defendant expressly aimed the same coordinated defamation campaign at California -- at Mittal's California reputation and the California institution the accusations targeted -- and the claims arise directly from that forum-directed conduct.

Defendants' contrary arguments fail: their "Vermont focus / global audience" theory depends on a targeting requirement *Briskin* overruled; corporate separateness is beside the point because Plaintiff relies on each parent's own conduct, not any subsidiary's contacts; the record establishes the knowledge of California harm they claim is missing; and burden and sovereignty cannot defeat jurisdiction where Defendants directed their conduct into the forum. Jurisdiction is proper and reasonable, and the motion should be denied.

DATE: September 9, 2026

Respectfully submitted

By: /s/ Paul K. Vickrey
Paul K. Vickrey

THOMAS B. HARVEY (CA Bar #287198)
**LAW OFFICES OF THOMAS B. HARVEY**
365 E. Avenida De Los Arboles, #226
Thousand Oaks, CA 91360
Telephone: (805) 768-4440
tbhlegal@proton.me

PAUL K. VICKREY (*Pro Hac Vice*)
PATRICK F. SOLON (*Pro Hac Vice*)
DYLAN M. BROWN (*Pro Hac Vice*)
**VITALE, VICKREY, NIRO, SOLON & GASEY LLP**
311 S. Wacker Drive, Suite 2200
Chicago, IL 60606
(312) 236-0733
vickrey@vvnlaw.com
solon@vvnlaw.com
dbrown@vvnlaw.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served on all counsel of record electronically or by another manner authorized under Fed. R. Civ. P. 5(b) on this the 9th day of September 2026.

Dated: September 9, 2026

By: */s/ Paul K. Vickrey*
Paul K. Vickrey
*Attorney for Plaintiff*