THOMAS B. HARVEY (CA Bar #287198)
**LAW OFFICES OF THOMAS B. HARVEY**
365 E. Avenida De Los Arboles, #226
Thousand Oaks, CA 91360
Telephone: (805) 768-4440
tbhlegal@proton.me

PAUL K. VICKREY (*Pro Hac Vice*)
PATRICK F. SOLON (*Pro Hac Vice*)
DYLAN M. BROWN (*Pro Hac Vice*)
**VITALE, VICKREY, NIRO, SOLON & GASEY LLP**
311 S. Wacker Drive, Suite 2200
Chicago, IL 60606
(312) 236-0733
vickrey@vvnlaw.com
solon@vvnlaw.com
dbrown@vvnlaw.com

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

ANURADHA MITTAL,

Plaintiff,

v.

UNILEVER PLC, THE MAGNUM ICE CREAM COMPANY N.V., and JOCHANAN SENF,

Defendants.

Case No. 26-cv-02660-WHO

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE AND MOTION TO DISMISS**

| | |
|---|---|
| Judge: | Hon. William H. Orrick |
| Hearing Date: | October 7, 2026 |
| Hearing Time: | 2:00 p.m. |
| Courtroom: | 2 |

# TABLE OF CONTENTS


**I. INTRODUCTION** .......... 1

**II. DEFENDANTS' FACT NARRATIVE DEVIATES FROM THE RECORD** .......... 2

**III. ARGUMENT** .......... 5

- **A. Defendants Chose to Challenge the Legal Sufficiency of the Complaint, Confining the Inquiry to 12(b)(6)'s Plausibility Standard** .......... 6
- **B. Defendants' Motion Fails at Step One** .......... 7
  - **1. The Internal Communications Are Not Protected Activity** .......... 8
  - **2. Defendants' Conduct Regarding Semafor and the December News Statements Are Not Protected Activity** .......... 8
  - **3. The December 2025 Prospectus and SEC Form 20-F Are Not Protected Activity** .......... 9
  - **4. Defendants' Sweeping Arguments Do Not Satisfy Their Step One Burden** .......... 9
- **C. All of Mittal's Defamation Claims in Her Cause of Action Have More Than Minimal Merit** .......... 10
  - **1. The Statements Assert Actionable Fact, Not Protected Opinion** .......... 10
  - **2. The Statements Were Made with Actual Malice** .......... 20
- **D. The False Light Count States a Claim** .......... 23
- **E. The IIED Count States a Claim** .......... 23

**IV. CONCLUSION** .......... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Antonovich v. Superior Court*,
234 Cal. App. 3d 1041 (1991) ....................22, 23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................7

*Balla v. Hall*,
59 Cal. App. 5th 652 (2021) ....................16

*Bently Reserve LP v. Papaliolios*,
218 Cal. App. 4th 418 (2013) ....................1, 11, 15

*Berk v. Choy*,
146 S. Ct. 546 (2026)....................6, 25

*Bonni v. St. Joseph Health System*,
11 Cal. 5th 995 (2021) ....................9, 10

*Charney v. Standard General, L.P.*,
10 Cal. App. 5th 149 (2017) ....................11, 14, 15

*CoreCivic, Inc. v. Candide Grp., LLC*,
46 F.4th 1136 (9th Cir. 2022) ....................6, 11

*Doe v. Gangland Prods.*,
730 F. 3d 946 (9th Cir. 2013) ....................24

*Duronslet v. Cnty. of Los Angeles*,
266 F. Supp. 3d 1213 (C.D. Cal. 2017) ....................24

*Dyer v. Childress*,
147 Cal. App. 4th 1273 (2007) ....................7

*Edwards v. Ellis*,
72 Cal. App. 5th 780 (2021) ....................12, 17, 21

*FilmOn.com Inc. v. DoubleVerify Inc.*,
7 Cal. 5th 133 (2019) ....................1, 7, 8, 9

*Freeman v. Wells Fargo & Co.*,
2023 U.S. Dist. LEXIS 129543 (N.D. Cal. July 26, 2023)....................18

*Glob. Plasma Sols., Inc. v. Iee Indoor Env't Eng'g*,
600 F. Supp. 3d 1082 (N.D. Cal. 2021) ....................19

*Gregory v. McDonnell Douglas Corp.*,
17 Cal. 3d 596 (1976) ....................................................................................................11

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
491 U.S. ......................................................................................................................21, 22

*Hawran v. Hixson*,
209 Cal. App. 4th 256 (2012) ...................................................................12, 13, 14, 15, 17, 19

*Hughes v. Hughes*,
122 Cal. App. 931 (2004) ................................................................................................19

*Hughes v. Pair*,
46 Cal. 4th 1035 (2009) ...................................................................................................24

*Implicit Conversions, Inc. v. Stine*,
2025 WL 360744 (N.D. Cal. Jan. 30, 2025) ............................................................................1

*Koch v. Goldway*,
817 F. 2d 507 (9th Cir. 1987) ..........................................................................................24

*McGarry v. Univ. of San Diego*,
154 Cal. App. 4th 97 (2007) .......................................................................................10, 11

*Milkovich v. Lorain Journal*,
497 U.S. 1 (1990)..............................................................................................................11

*Mitchell v. Twin Galaxies LLC*,
70 Cal. App. 5th 207 (2021) .......................................................................................20, 22

*Moser v. Encore Capital Group*,
2006 U.S. Dist. LEXIS 109142 (S.D. Cal. May 2, 2006)...........................................13, 14, 24

*Oasis West Realty, LLC v. Goldman*,
51 Cal. 4th 811 (2011) ..................................................................................................1, 10

*Ojjeh v. Brown*,
43 Cal. App. 5th 1027 (2019) ..............................................................................................9

*Okun v. Superior Ct.*,
29 Cal. 3d 442 (1981) ......................................................................................................11

*Overstock.com v. Gradient Analytics, Inc.*,
151 Cal. App. 4th 688 (2007) ............................................................................................20

*Park v. Nazari*,
93 Cal. App. 5th 1099 (2023) ............................................................................................10

*Pechkis v. Trustees of California State University*,
119 Cal. App. 5th 497 (2026) ............................................................................................10

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
890 F.3d 828 (9th Cir. 2018) ....................6, 7

*Reader's Digest Assn. v. Superior Court*,
37 Cal. 3d 244 (1984) ....................20

*Rodriguez v. Panayiotou*,
314 F. 3d 979 (9th Cir. 2002) ....................11, 20

*Sanders v. Walsh*,
219 Cal. App. 4th 855 (2013) ....................11

*Savage v. Pacific Gas & Electric Co.*,
21 Cal. App. 434 (1993) ....................16

*Soo Park v. Thompson*,
851 F.3d 910 (9th Cir. 2017) ....................6

*Van Buskirk v. Cable News Network, Inc.*,
284 F.3d 977 (9th Cir. 2002) ....................25

*Wallace v. McCubbin*,
196 Cal. App. 4th 1169 (2011) ....................10

*Wilson v. Cable News Network, Inc.*,
7 Cal. 5th 871 (2019) ....................5

**Statutes**

Cal. Civ. Proc. 425.16 ....................1, 5, 8, 25

# I. INTRODUCTION

Defendants make the blanket argument that all claims against all Defendants are protected activity under the anti-SLAPP statute, Section 425.16. Defendants argue that the claims all involve issues of public interest because Defendants Unilever PLC ("Unilever") and The Magnum Ice Cream Company ("Magnum") are publicly traded, Ms. Mittal has been outspoken about issues in the Middle East, and certain statements are directed to existing or potential shareholders. This approach does not comport with the two-part inquiry required in *FilmOn.com Inc. v. DoubleVerify Inc.*, 7 Cal. 5th 133, 149-50 (2019). The second step of that inquiry is dispositive here: "it is not enough that the statement refers to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate." *Id.* at 150. Defendants have made no effort to meet their burden to establish such a showing here; indeed, they do not even cite *FilmOn*.

The motion fails at step two regardless of how step one is resolved. "Anti-SLAPP Motions challenge particular causes of action, rather than individual allegations or theories supporting a cause of action." *Implicit Conversions, Inc. v. Stine*, 2025 WL 360744 at *2 (N.D. Cal. Jan. 30, 2025) (citing Cal. Civ. Proc. Code § 425.16(b)(1)). Ms. Mittal's defamation claim survives step two as long as she shows a probability of prevailing on at least one of the asserted bases for that cause of action. *Oasis West Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011) ("The complaint identifies a number of acts of alleged misconduct and theories of recovery, but for purposes of reviewing the anti-SLAPP motion it is sufficient to focus on just one."); *Bently Reserve LP v. Papaliolios*, 218 Cal. App. 4th 418, 426 (2013) ("When a cause of action states multiple grounds for relief, 'the plaintiff may satisfy its obligation in the second prong by simply showing a probability of prevailing on any' one of the grounds.") (quoting *Wallace v. McCubbin*, 196 Cal. App. 4th 1169, 1212 (2011)). Ms. Mittal has established a probability of prevailing on all of the asserted bases, but needs only one. Read in context, Defendants' statements are not protected opinion: each asserts, or necessarily implies, that Ms. Mittal

committed specific misconduct -- a historical fact that is provably false and that the FAC alleges to be false. Because actual malice is adequately pleaded, the motion should be denied.

## II. DEFENDANTS' FACT NARRATIVE DEVIATES FROM THE RECORD

Defendants' motion doubles down on their pre-suit messaging that Ms. Mittal is a belligerent fraudster seeking to wrongfully enrich herself and her family. In so doing, Defendants make several statements of "fact" which are untethered to the record. Examples include a claim that Ms. Mittal "belligerently refused to be interviewed" in the "business integrity investigation" (Mot. at 2). Actually, Ms. Mittal offered to provide relevant information as long as the proceeding occurred in an "independent and impartial forum." (Doc. #24-4 at 22 of 27). Addressing the request for an interview of Ms. Mittal, Independent Board counsel asked the investigating law firm: "to evaluate your request… could you please clearly state whether Skadden played any role in advising on the Foundation's audit? The response to this straight-forward question will inform our position on your request. Also, please specify the allegation you are asking us to respond to? This is our second request for same." Skadden refused to answer the questions. (FAC ¶¶98-99).

Defendants also state (Mot. at 4):

> Mittal used her position to enrich herself and her family. During her tenure, the Foundation issued grants in excess of $200,000 to OI. An additional $400,000 flowed to OI from other organizations that received Foundation grants -- circuitous funding akin to "donation laundering." This enabled her to draw over $1 million in salary from OI plus $249,000 in "rent" for the use of her house as OI's "headquarters." Between 2018 and 2023, 23-27% of OI's budget went to Mittal in one form or another. That percentage is a donor "red flag" for any charity. The Foundation was not her only victim. Every dollar Mittal lavished on herself was one dollar less that the Foundation could give to deserving causes.

Defendants' forensic audit team which analyzed all of the Foundation's contributions drew no such conclusions (FAC ¶38); nor are such conclusions supported by the 975 pages of Form 990 tax filings with which Defendants seek to supplement the record.

Defendants thereafter state (Mot. at 6):

> Mittal refused to cooperate with the audit. The auditors gave her multiple opportunities to participate in interviews related to the discretionary grant making process and respond to questions about discretionary grants made at her request. But Mittal sought special treatment as a condition to her involvement. Unlike other Trustees who cooperated in the audit, she said that she would answer questions only if put to her in writing. FAC ¶¶95-96. But by then she had retained an attorney -- the same attorney who was representing her and the other former Class I directors in the pending governance lawsuit against Unilever and Magnum in the Southern District of New York. *Id*. The auditors wanted her unprompted answers, not answers written by her litigators.

As alleged in the Amended Complaint, Ms. Mittal did not "refuse[ ] to cooperate with the audit"; she offered to answer written questions, which was the same protocol which the auditors used for the stated, ostensible target of the audit: the Ben & Jerry's Foundation ("BNJF"). Moreover, participation in the interview was voluntary, and other trustees also declined to be interviewed. (Doc. #24-4 at 10 of 27). The auditors did not seek the interview of trustee Jerry Greenfield, who has repeatedly donated to Oakland Institute ("OI"). (*Id*.). Contrary to Defendants' statement, Ms. Mittal did not "retain[ ] an attorney" (see FAC ¶96). And the notion that "[t]he auditors wanted her unprompted answers" is not in the record; instead, the auditors refused to explain why the written question protocol used for BNJF was inappropriate for Ms. Mittal. (FAC ¶96). Finally, it was Defendants' investigation and litigation counsel who were directing the auditors, and the auditors shielded their communications with such counsel as "attorney work product." (FAC ¶¶34-36). To this day, Unilever has refused to release the audit, claiming that it is "privileged." (FAC ¶38).

Defendants have also requested to supplement the record with over 975 pages of Form 990 tax filings, which they have summarized in a manner inconsistent with the documents themselves. To begin with, BNJF's 990s indicate that the "in excess of $200,000" figures include $144,300 expressly sent to OI for distribution to other beneficiaries. (Exhibit A, which is a subset numbered 1-42 of the BNJF 990 filings attached to Doc. #51-1). BNJF did make contributions to OI, principally through the "U-Fund", an independent source of funds that did not come from Unilever or Ben & Jerry's. Ms. Mittal informed the then Ben & Jerry's CEO of OI's receipt of funds from BNJF in writing. (FAC

¶89). Moreover, Ms. Mittal never requested or decided that BNJF funds be directed to the benefit of OI, and Defendants knew that she lacked the authority to do so. (FAC at ¶84). Defendants also knew that BNJF funds were not used to fund Ms. Mittal's purportedly "lavish" lifestyle but "were used to support human rights/land rights [of] Indigenous defenders and their struggles." (*Id*. at ¶85). Further, the forensic audit of all such grants found no evidence that Ms. Mittal had engaged in "wrongdoing, ethical malpractice, or violations." (*Id*. at ¶38).

As for the accusation of "donation laundering," the largest "other organization" implicated in that accusation is the Tides Foundation ("Tides"); indeed, Tides has been the recipient of far more funding from BNJF than any other BNJF grantee. (Ex. A). OI had received significant funding from Tides well before any BNJF grants to Tides. For example, Tides' Form 990 tax filings show that in 2012 OI received $99,000 from Tides (Plaintiff's Request for Judicial Notice ("RJN") at Ex. 3). BNJF's first significant contribution to Tides was in 2016, when it gave $200,000 to Tides' "Grants Fund" (Ex. A at 16). In 2017, BNJF gave Tides $220,000 earmarked for "Refugee Initiatives", (Ex. A at 20), and in 2018, BNJF gave Tides $250,000 earmarked to the "UK Fund", and another $1,000 directed to the "Chispa Education Fund" (Ex. A at 24). In 2019, BNJF gave Tides 250,000 for the "UK Fund" and $15,000 for the "Nobody Leaves Mid-Hudson Education Fund", not OI (Ex. A at 27); in 2020 BNJF gave $250,000 to the Tides "UK Fund" (Ex. A at 30). In 2021, BNJF gave Tides $23,000 for "Repeal California's Three Strikes Law", and another $275,000 to Tides "UK Fund" (Ex. A at 33). In the years 2022-24, BNJF gave Tides $845,000, none of which was directed for OI (Ex. A at 36, 39, 42); Meanwhile, Tides gave OI $15,000 in 2018, $32,000 in 2019, zero in 2020, zero in 2021, zero in 2022, $23,000 in 2023, and $33,000 in 2024. (RFN at Exs. 4-10). Even a cursory review of public filings reveals the falsity of Defendants' claim that BNJF "laundered" donations to OI through Tides -- ***none*** of BNJF's grants to Tides were directed to OI.

Over the 13 years at issue, Ms. Mittal -- a prominent Bay Area Executive Director -- drew an

average salary of less than $100,000. The rent was not for "her house"; it was below market rent, approved by OI's Board for OI's offices, which went entirely to mortgage payments. (FAC ¶57). Ms. Mittal's compensation over those 13 years was 13.75% of OI's revenue. (Doc. #51-1, Exs. 1-13). OI is not the March of Dimes; it is a lauded "think tank" devoted to the rights of small holder farmers and Indigenous communities. (FAC ¶10). The narrative that Ms. Mittal used BNJF funds and "donation laundering" to "enrich herself and her family" is not based on the record, and Defendants knew that.

Finally, Defendants also ignore the most important allegations in the FAC, including those surrounding the pivotal October 10, 2025 San Francisco meeting, when Defendants threatened Mittal with the publication of damaging claims if she did not resign. (FAC ¶43). Defendants accompanied that threat with an offer: if Mittal resigned, the investigation would result in a finding of no wrongdoing, and Mittal could head a new multimillion-dollar charitable organization which Unilever would fund. (FAC ¶44). That episode is a critical backdrop for all of the conduct which would follow, as it demonstrates: (1) Defendants knew the defamatory import of the claims they were threatening to publish; (2) that the "investigation" was contrived; and (3) the "findings" were suspect and manipulable. Moreover, a prudent fiduciary would not create a multi-million-dollar charitable organization to be run by someone it believed to be a "belligerent," "toxic," "donation laundering," self-dealer, seeking to fund a "lavish" lifestyle with ill-gotten gains. Defendants' motion nowhere mentions that meeting.

## III. ARGUMENT

An anti-SLAPP motion proceeds in two steps: the defendant must first make a threshold showing that the challenged claim arises from activity protected under § 425.16(e), and only then does the burden shift to the plaintiff to demonstrate minimal merit. *Wilson v. Cable News Network, Inc.*, 7 Cal. 5th 871, 884 (2019). In federal court, an anti-SLAPP motion that challenges the legal sufficiency

of a claim is evaluated under the Rule 12(b)(6) standard, so the FAC's well-pleaded allegations are accepted as true. *CoreCivic, Inc. v. Candide Grp., LLC,* 46 F.4th 1136, 1143 (9th Cir. 2022).

**A. Defendants Chose to Challenge the Legal Sufficiency of the Complaint, Confining the Inquiry to 12(b)(6)'s Plausibility Standard**

Defendants state: "[a]n anti-SLAPP challenge[] to the legal sufficiency of a defamation claim is analyzed under the Rule 12(b)(6) standard." (Mot. at 10) They also invoke *CoreCivic*, *supra*, for the proposition that "anti-SLAPP legal challenges are identical to Rule 12(b)(6) challenges," and rest their alternative Rule 12(b)(6) motion on "the same legal defects with the FAC." *Id.* at 25. In other words, Defendants have deliberately framed this as a legal sufficiency challenge. *See Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 833-34 (9th Cir. 2018) (distinguishing a "facial" anti-SLAPP challenge to legal sufficiency, tested under Rule 12(b)(6), from a "factual" challenge requiring an evidentiary showing and, ordinarily, discovery).

Despite committing to a legal sufficiency framework, Defendants ask the Court to resolve, disputed characterizations of extrinsic tax filings in their favor: that Ms. Mittal engaged in "donation laundering", that her rent and salary reflect self-enrichment rather than lawful compensation, and that she "refused" rather than conditioned her cooperation with the audit. That is a factual sufficiency argument smuggled into a motion Defendants themselves defined, from the outset, as a legal sufficiency challenge; they do not get the benefit of both frameworks at once.

Federal pleading rules "set[] a ceiling on the information that plaintiffs can be required to provide about the merits of their claims," and a state procedural device cannot be read to demand more. *Berk v. Choy*, 146 S. Ct. 546, 554-55 (2026). Where, as here, "there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, [the] complaint survives." *Soo Park v. Thompson*, 851 F.3d 910, 918 (9th Cir. 2017). Having made that election at the threshold, Defendants are bound by it throughout: the Court accepts Ms. Mittal's well-pleaded allegations as true and draws all reasonable inferences in her favor.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). Under that analysis, Ms. Mittal's account of the audit, "investigation" and her refutation of the charges stands, foreclosing the central maneuver of Defendants' motion. If Defendants wished to make a factual sufficiency showing instead, contrary to what they appear to be doing here, discovery would first be required. *Planned Parenthood*, 890 F.3d at 833.

**B. Defendants' Motion Fails at Step One**

Defendants contend that every challenged statement clears anti-SLAPP step one because it is speech "in connection with a public issue." (Mot. at 10-11). The controlling authority on this issue, *FilmOn*, requires a two-part inquiry: the court asks first what public issue the speech implicates, and second "what functional relationship exists between the speech and the public conversation about some matter of public interest." 7 Cal. 5th 133 at 149-50. The second step is dispositive here: "it is not enough that the statement refers to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate." *Id.* at 150 (quotation omitted); *see also Dyer v. Childress,* 147 Cal. App. 4th 1273, 1280 (2007) ("[t]he fact that 'a broad and amorphous public interest' can be connected to a specific dispute" is not enough). Two distinctions Defendants blur must be kept separate: whether a statement concerns a public *issue* (step one) is not the same question as whether the plaintiff is a public *figure* (a merits question), *FilmOn,* 7 Cal. 5th at 145-52.

In *FilmOn*, the defendant offered evidence that FilmOn "has been subject to media requests and litigation over its streaming model." 7 Cal. 5th at 150. It further argued: "FilmOn is notorious for its long history violating copyright laws, and 'FilmOn's CEO and billionaire owner, Mr. David, regularly injects himself in the public spotlight to discuss himself, his companies, and the purported legality of FilmOn's services.'" *Id*. at 152. The court held that the report at issue concerned an issue of public interest because it involved, adult content on the internet, which was the "subject of numerous press reports regulatory actions and lawsuits…. [and also related to] the public debate over

legislation to curb children's exposure to… sexually explicit media content." *Id*. The Supreme Court reversed, holding:

> It is true enough that the various actions of a prominent CEO, or the issue of children's exposure to sexually explicit media content -- in the abstract -- seem to qualify as issues of public interest under section 425.16, subdivision (e)(4). But even assuming so, the focus of our inquiry must be on "the specific nature of the speech," rather than on any generalities that might be abstracted from it."
>
> * * *
>
> We can answer that question only by looking at the broader context in which DoubleVerify issued its reports, ***discerning through that context whether the company's conduct qualifies for statutory protection by furthering the public conversation on an issue of public interest.***

*Id*. at 152-53; emphasis added. Defendants have made no attempt to satisfy this requirement.

### 1. The Internal Communications Are Not Protected Activity

The internal communications (the October 23 letter, the October 28 meeting, and the November 11 video conference) are not protected. All such communications were confidential and internal. (FAC ¶¶46-47, 50-51, 59). The *FilmOn* court made clear that the private nature of a communication is important context in determining whether to extend protection. 7 Cal. 5th at 154. Moreover, those internal communications contributed nothing to any public conversation, so they fail *FilmOn*'s functional-relationship step. *Id*. at 149-50. Defendants have made no effort to explain how communications kept secret furthered public debate about any issue.

### 2. Defendants' Conduct Regarding Semafor and the December News Statements Are Not Protected Activity

The Semafor article included no public statement by Defendants at all. (FAC ¶31). As to Defendants' statements to the media, the inquiry is whether the challenged statement itself contributed to the public debate -- not whether the statements to news media generated media coverage. *FilmOn,* 7 Cal. 5th at 150 ("we agree with the court in *Wilbanks* that 'it is not enough that the statement refer to a subject of widespread interest; the statement must in some manner itself contribute to the public debate.'").

**3. The December 2025 Prospectus and SEC Form 20-F Are Not Protected Activity**

While these statements were certainly made in a public forum, Defendants have made no effort to explain how any of their statements contributed the public debate on any issue. The "investigations" referenced the audit which Unilever claimed to be privileged, and the investigation of Ms. Mittal, which she was told was highly confidential. (FAC ¶31). Under *FilmOn*, context is key, and here the context was Defendants Unilever and Magnum's execution of their threat to punish Ms. Mittal for not resigning by publishing a statement which did not have to be made. In that regard, *FilmOn* rejected the categorical line-drawing argued by Defendants, and substituted a contextual approach: "[C]ontext matters. It allows courts to liberally extend the protection of the anti-SLAPP statute where doing so would 'encourage continued participation in matters of public significance,' but withhold that protection otherwise. And here, it allows us to discern what content alone conveys less clearly…." 7 Cal. 5th at 154.

While Defendants read FAC ¶29 as conceding public interest, the paragraph alleges a pretextual scheme to manufacture "findings of misconduct" and to "coerce" Ms. Mittal's resignation and "maximize [her] humiliation." (FAC ¶29). An allegation that Defendants planned to weaponize publicity is not an admission that the subject is a bona fide public issue. Nor does *Ojjeh v. Brown*, 43 Cal. App. 5th 1027 (2019), help. That the Gaza conflict is a public issue says nothing about whether *these statements* contribute to any public conversation about that conflict. *FilmOn* asks about the challenged speech, not the plaintiff's separate advocacy, 7 Cal. 5th at 149-52, and the "public issue" inquiry is not a back door to the distinct "public figure" question, *Id*. at 145.

**4. Defendants' Sweeping Arguments Do Not Satisfy Their Step One Burden**

Defendants' broad-brush treatment of the parties and the claims is another reason why they have not met their step one burden. At step one, Defendants bear the burden to show that each allegation supporting Ms. Mittal's claim of recovery rests on protected activity. *Bonni v. St. Joseph*

*Health System*, 11 Cal. 5th 995, 1012 (2021) ("The hospitals bear the burden of showing that each allegation supporting Bonni's claim of recovery is one that rests on protected activity."). They have not even attempted to do so. For example (and contrary to Defendants' arguments at Mot., p.21), Defendant Senf was primarily involved in the internal statements at issue (FAC ¶¶50-51, 59-60), yet Defendants made no effort to parse individual conduct for purposes of step one. Moreover, internal communications comprise the entirety of several of Ms. Mittal's defamation claims and the centerpiece of her IIED claim, but Defendants ignore that such claims are founded on clearly unprotected conduct. In that regard, Defendants' motion is like the motion rejected at the step one stage in *Park v. Nazari*, 93 Cal. App. 5th 1099, 1108 (2023), where the defendant moved to strike the entire complaint but "fail[ed] to link specific claims for relief to protected activity." *Accord¸ Pechkis v. Trustees of California State University*, 119 Cal. App. 5th 497, 508 (2026) (court affirmed denial of motion to strike where the defendant did not carry its step one burden; "we will not independently perform surgery on plaintiff's causes of action when defendant has wholly failed to 'propose where to make the incisions.'" (quoting *Nazari*, 93 Cal. App. 5th at 1102.)).

### C. All of Mittal's Defamation Claims in Her Cause of Action Have More Than Minimal Merit

Again, under *Oasis*, *supra*, 51 Cal. 4th at 21, Ms. Mittal need only establish a probability of prevailing on one of her defamation claims to survive step two. To quote the court in *Wallace v. McCubbin*, *supra*, 196 Cal. App. 4th at 1212:

> In essence, *Oasis* embraces the view in *Mann* that, if there is any probability of prevailing on any act alleged under the heading of a "cause of action," then the cause of action is not meritless and should not be struck. In effect, *section 425.16* was not intended to relieve a defendant from the burden of defending against meritless allegations of liability based on protected activity; instead, it was intended to remove a meritless cause of action from a complaint if the plaintiff happened to include in that cause of action an allegation of liability based on protected activity.

#### 1. The Statements Assert Actionable Fact, Not Protected Opinion

A statement is actionable if it "declares or implies a provably false assertion of fact." *McGarry*

*v. Univ. of San Diego*, 154 Cal. App. 4th 97, 112-13 (2007); *accord Milkovich v. Lorain Journal*, 497 U.S. 1, 19-20 (1990). Couching an accusation as opinion does not immunize it, because a speaker "may still imply 'a knowledge of facts which lead to the [defamatory] conclusion.'" *Milkovich*, 497 U.S. at 18-19. Specifically, "an opinion based on implied, undisclosed facts is actionable" where the speaker signals possession of facts justifying the conclusion. *Bently Reserve LP,* 218 Cal. App. 4th at 427. The court applies a totality-of-the-circumstances test, examining language and context, *Sanders v. Walsh,* 219 Cal. App. 4th 855, 863 (2013), and decides the question as a matter of law, taking the FAC's allegations as true, *CoreCivic*, 46 F.4th at 1143.

Defendants repeatedly rely on *Charney v. Standard General, L.P.,* 10 Cal. App. 5th 149 (2017), in arguing that their various charges are non-actionable opinion. However, the *Charney* court's analysis of opinion versus fact relied on *Gregory v. McDonnell Douglas Corp.*, 17 Cal. 3d 596, 604 (1976), which it cited as support for the statement: "Even if the press release could be interpreted as somehow stating Charney was terminated for unidentified improper conduct, the fact that there may be some dispute over whether there was 'improper' conduct that justified termination is a matter of opinion." 10 Cal. App. 5th at 158 fn. 10. In *Rodriguez v. Panayiotou*, 314 F. 3d 979, 987 (9th Cir. 2002), the Ninth Circuit cautioned that *Gregory* was "based on the categorical 'opinion rule' that was rejected in *Milkovich*…." Nonetheless, Defendants rely on that same footnote 10 in *Charney* several times (Mot. at 17, 18, 19, 23), even citing it as support for their dramatic declaration: "*Charney* forecloses Mittal's claims." (Mot. at 18). Defendants also rely on another pre-*Milkovich* case, *Okun v. Superior Ct.*, 29 Cal. 3d 442, 450 (1981), for the proposition that "'mere opinion' is 'not libelous.'" (Mot. at 17). The court in *Rodriguez* pointed out that *Okun* "applied the rule from *Gregory*" (314 F. 3d at 985), and explained: "In response to *Milkovich*, California courts have begun to… recognize that 'if a statement of opinion implies facts which may lead to a defamatory conclusion, the implied facts must themselves be true.'" *Id.* at 986 (citations omitted).

On this issue, *Hawran v. Hixson* is apposite. *Hawran* involved a public company's SEC-tied press release announcing the completion of an internal investigation and an officer's departure. The Court of Appeal rejected the argument that the statements were "merely inactionable opinion": they were "not phrased as mere impressions," and were "not invectives or loose figurative terms, but statements of matters that can be proven or disproven." *Hawran v. Hixson,* 209 Cal. App. 4th 256, 291-92 (2012). Read in "the entire context" of the release as a whole, the statements' "defamatory meaning is plain on the face of the document," *Id.* at 291, and the court emphasized that "such formalized statements in press releases are usually intended to be factual," *Id.* at 292.

**a. The SEC Form 20-F and Prospectus**

The statement "in the opinion of the Group" Ms. Mittal "no longer meets the criteria" cannot be read in a vacuum. The factual representation beside it states that the opinion follows "investigations... conducted by external advisers" and that "[t]he Group has informed the Ben & Jerry's Board about the results of the internal investigations." (FAC ¶¶62-63, 66). That is an assertion that the investigations produced adverse results about Ms. Mittal -- a historical fact, provably false under *Hawran*, and pleaded as false at. (FAC ¶¶ 83-84, 86). The Reuters article republishes the same factual message that Ms. Mittal was "not fit to serve," tracing directly to Defendants' filing and intended message. (FAC ¶¶64-65).

The inquiry "is not on the literal truth or falsity of each word in a statement, but whether the 'gist or sting' of the statement is true or false, benign or defamatory in substance." *Edwards v. Ellis*, 72 Cal. App. 5th 780, 790 (2021) (citations omitted). The court also considers "whether the reasonable or 'average' reader would interpret the material." *Id.* (citation omitted). Moreover, if, to an average reader, the statements "are susceptible of both an innocent and libelous meaning, it is for the jury, not [the court] to decide how they are in fact understood." *Id.* at 791.

*Hawran v. Hixon* involved a defamation claim premised upon a press release which mirrored

the defendants' SEC Form 8-K, reporting:

> …The company has obtained the resignation of its chief financial officer, Paul Hawran, and one other officer. While each of these officers and employees has denied wrongdoing, the special committee's investigation has raised serious concerns, resulting in a loss of confidence by the independent members of the company's board of directors in the personal involved.

209 Cal. App. 4th at 264. The court pointed out that formalized statements in press releases and SEC filings "are usually intended to be factual as opposed to rhetorical, persuasive, or evaluative." 209 Cal. App. 4th at 292. The court held that the plaintiff demonstrated a *prima facie* showing of defamation:

> ***To an average person reading the entirety of the press release, the damaging implication is apparent***: Sequenom sought and obtained Hawran's resignation because Hawran was among the group of officers and employees somehow involved or responsible for the identified failures and deficiencies of the T21 program and failed company procedures. ***The statements suggest that Sequenom possessed undisclosed, and provably false, facts concerning what Hawran actually did or did not do at Sequenom to implicate him in the wrongdoing.***

209 Cal. App. 4th at 293 (emphasis added; citations omitted). Here too, the statements suggested that Defendants possessed undisclosed, provably false facts showing misconduct by Ms. Mittal.

Similarly, in *Moser v. Encore Capital Group*, 2006 U.S. Dist. LEXIS 109142 (S.D. Cal. May 2, 2006), the plaintiff claimed that statements made in a Form S-1 SEC filing were defamatory. In that document, under the heading "Settlement with Former Officer": "Defendants stated Moser raised questions regarding the accuracy of certain accounting reporting and financial disclosures and that an internal investigation determined his questions were unfounded. (*Id.*) The statement continued: 'On April 9, 2001, the former officer was placed on administrative leave and his employment was terminated as of July 31, 2001.' (*Id.*)" *Id*. at *12. The court held:

> When the "Settlement with Former Officer" section is read in its entirety in the context of Moser's factual allegations, it is reasonably susceptible to an interpretation that Moser wrongly or incompetently accused Encore of accounting and other improprieties, and was terminated for this reason. The Court finds this interpretation has a tendency to injure Moser in his occupation as an attorney whose practice focuses on securities and finance laws.

* * *

> The statements that Moser was placed on administrative leave and then terminated are libelous *per se*. A statement someone was placed on administrative leave and subsequently terminated conveys to the average reader the person was suspected of some wrongdoing, and was subsequently terminated because of that wrongdoing.

*Id*. at **30-31.

Here, the statement conveys to the "average reader" that Ms. Mittal was found by two outside investigations to have committed wrongdoing so serious that it required her removal. At a minimum, as in *Hawran*, "[t]he statements suggest that [Unilever] possessed undisclosed, and provably false facts concerning" Ms. Mittal and her purported wrongdoing. Defendants admittedly viewed the statement that way, as they used the prepublication statement as a cudgel in the October 10, 2025 San Francisco meeting: if Ms. Mittal didn't resign, Unilever would publish what they called damaging claims about her in the prospectus. If she resigned, the claims would not be made in the prospectus, and the investigation would result in a finding of no wrongdoing. (FAC ¶¶43, 44).

*Charney*, on which Defendants' motion principally relies, is not to the contrary. The court in *Charney* confronted a quite different scenario, and considered declaration evidence supporting the *bona fides* of an Audit Committee's investigation of Dov Charney, including five documented reasons for his suspension. 10 Cal. App. 5th at 155. After a six-month investigation, a second committee, the Suitability Committee "unanimously concluded that Charney was not suitable to return…." *Id*. The press release at issue stated: "We supported the independent, third-party and very thorough investigation into the allegations against Mr. Charney, and respect the Board of Directors' decision to terminate him based on the results of that investigation." 10 Cal. App. 5th at 152. The court held "The statement cannot be proven false as it does not state that Charney engaged in criminal conduct or that his conduct violated certain standards, or even that there existed any particular conduct that caused his termination." *Id*. at 158. Here, the statement ***does*** state that Ms. Mittal violated standards, namely "the criteria to serve as a member on Ben & Jerry's Board." (FAC ¶63). Moreover, *Charney*

did not involve a scenario where the prepublication statement and the investigation were employed by the defendant as a threat to coerce the plaintiff's ouster. And the *Charney* court specifically rejected the argument that the investigation in that case was not independent as opinion. *Id*. at 158.

Here, in contrast, the pretextual investigations were "conducted for the purpose of ousting Ms. Mittal and defaming her." (FAC ¶97). Additionally, this SEC statement also included the statement "in the opinion of the Group…." "The Group" (Defendants Unilever and Magnum) held no such opinions: indeed, they were prepared to install Ms. Mittal as the head of a new, multi-million-dollar charity if she resigned. (FAC ¶44).

**b. The October 23 Letter, The October 28-29 Meeting, the November 11 Teleconference and the December 15 Letter**

All of these events involved the publication of a litany of charges against Ms. Mittal, including charges that she had: (1) engaged in self-dealing; (2) received improper benefits; (3) improperly "divert[ed] Foundation funds"; (4) "violated fiduciary duties"; (5) created a "toxic work environment"; (6) "allowed the disclosure of confidential information"; and (7) "failed to cooperate" in the audit and the investigation. The letter is the polar opposite of *Charney*. It does not withhold reasons; it enumerates them. (FAC ¶¶46-47). *Bently*, 218 Cal. App. 4th at 427, is directly on point: as in the review there, each charge can be juxtaposed against contrary facts the plaintiff pleads -- here, that the audit found no wrongdoing, and the "investigation" was a sham procedure, the findings of which Defendants admitted could be manipulated from guilty to innocent on demand. (FAC ¶¶43-44, 83-84, 86). While Defendants claim "Mittal fails to deny the October 23 Letters's statements" (Mot. at 14), she expressly did so (FAC ¶48, 81), and explained why (FAC ¶83-105). Defendants also argue that certain of the statements are true; however, "even if a statement is literally accurate, defamation may be proven if it has a false implication." *Hawran*, 209 Cal. App. 4th at 293.

Even in this motion, Defendants summarized their financial misconduct findings as "Mittal used her position to enrich herself and her family" with funds from BNJF, and "donation laundering", which

money she "lavished on herself." (Mot. at 3). They also signaled that the findings showed that "The Foundation was not her only victim." *Id*. At a minimum, Defendants' financial misconduct charges have a "false implication." See discussion *infra* at 3-5.

While Defendants claim that Ms. Mittal did not sufficiently deny the creation of a toxic work environment and related statements (FAC ¶47), she pointed out that the Ben & Jerry's employees who interacted with her rejected Defendants' narrative with a group email forcefully supporting her. (FAC ¶103: "that's why we're so deeply concerned about what appears to be a narrative framing Anuradha Mittal and the board as sources of conflict…."). Moreover, the rest of the Independent Board vehemently rejected that accusation in writing. (FAC ¶93; Doc. #24-4 at 18 of 27).

Nor are the statements non-actionable opinion. Each is a specific, verifiable charge about past conduct, not a "loose, figurative" epithet, and each carries the implication that Defendants' audit and investigation substantiated it. Defendants' accusations of misconduct are similar to statements found to be defamatory in *Balla v. Hall*, 59 Cal. App. 5th 652, 680 (2021):

> Here, Hall's publications asserted or implied that Heebner and Nichols used their positions to give Balla the train station project in exchange for favors, and he offered those favors to get the project, including making a donation from the Foundation he directed. Put simply, Hall claimed that all three plaintiffs misused their positions to their benefit, in a manner that did not and could not have happened.

In so holding, the *Balla* court rejected (*Id*. at 681) the defendant's reliance on *Savage v. Pacific Gas & Electric Co.*, 21 Cal. App. 434 (1993), a case in which an executive's opinion of a conflict of interest was held to be non-actionable. Here, as in *Balla*, the essence of the charges was that Ms. Mittal "misused [her] position to [her] benefit in a manner that did not and could not have happened." These statements were not simply a person's opinion of a conflict of interest, but a formal determination by a "business integrity" investigation that Ms. Mittal had, among other things, "failed to disclose her conflict as required under the Conflict of Interest policy," had received a "personal benefit of Foundation funds," "improperly benefits from [BNJF] funds," and had engaged in "serious

violations of the Code and the attendant policies." (FAC at p. 14) Under *Hawran,* that these charges appear in a formal Board communication reinforces, rather than dispels, their factual character. 209 Cal. App. 4th at 291.

**c. The Semafor Article**

Defendant Unilever's statements published in the April 22, 2025 *Semafor* article (italicized in ¶31), indicate that Unilever executives approached a reporter, leaked an internal letter, and stated that Unilever had launched a probe targeting grants involving Ms. Mittal and made to OI. The article states that those Unilever executives "identified a series of grants to the Oakland Institute…. Anuradha Mittal is a salaried employee and founder…." At a minimum, Defendants intended to convey the defamatory impression that Unilever had discovered improper funding of the Oakland Institute by BNJF when Ms. Mittal was on both sides of the transactions, justifying a "probe" so serious that it was being leaked to the press, and merited at least two "Unilever executives" to call or meet with a reporter. The relevant question is not whether the individual facts recited (that a probe existed, that OI received Foundation-linked funds or the wording of the leaked letter) are independently true, but whether the "gist or sting" of the coordinated disclosure, sourced from an internal Unilever letter and "off the record" statements by Unilever executives to a financial reporter, FAC ¶¶30-31, conveys or implies to the average reader that Unilever had uncovered financial wrongdoing specifically implicating Ms. Mittal. *Edwards v. Ellis*, 72 Cal. App. 5th 780, 790 (2021).

The FAC alleges that this is precisely the message Defendants intended to convey, and that it is false: the payments described were lawful, disclosed, and unconnected to any impropriety. (FAC ¶31, 38, 85). An average reader would understand the Unilever input into that article to convey that Unilever had just discovered evidence of financial wrongdoing on Ms. Mittal's part. However, the purported self-dealing charges were a rehash of what the *Washington Beacon* published four years earlier in 2021 and forcefully rejected by Unilever as "personal slander." (FAC ¶85). Moreover,

BNJF's financial support of OI was disclosed in writing, and Unilever executives were well aware of that fact. (FAC ¶¶88-90).

**d. The December 2025 Statements**

Defendants Unilever and Magnum's statements published to the *Financial Times* on December 15, 2025 (italicized in FAC ¶75) indicated that Ms. Mittal was ousted "after an external investigation and an audit of the brand's charitable arm, of which she is a trustee, uncovered conflicts of interest." This statement is false in several respects. To begin with, the notion that Ms. Mittal was ousted because of alleged conflicts of interest is false, and both the "audit" and the "external investigation" were pretextual "uncovered" no "wrongdoing, ethical malpractice, or violations," and the FAC so alleges. Moreover, Ms. Mittal engaged in no conflict of interest, and the fact that BNJF had made contributions to OI was well known to Unilever.

Each of the four December statements attributes Ms. Mittal's abrupt removal to the results of "an external investigation and audit," (FAC ¶75), "internal investigations," (FAC ¶77), or an audit that "identified… material… conflicts of interest," (FAC ¶78). Those statements are provably false as to the actual reason for Ms. Mittal's removal. The statement also implies omitted facts, which may lead to a defamatory conclusion. Whether these statements are true depends on the same disputed characterization of the audit and investigation, and cannot be resolved on the pleadings.

Defendants Unilever and Magnum stated to the *BBC* that Ms. Mittal was immediately removed, while two other members remained until the end of the year, in a "move to… safeguard [the brand's] essential integrity" (italicized in FAC ¶76). By messaging the urgency of Ms. Mittal's removal in a move to safeguard "integrity," Defendants intended to convey the defamatory impression that her urgent removal was due to misconduct. See *Freeman v. Wells Fargo & Co.*, 2023 U.S. Dist. LEXIS 129543 at **25-26 (N.D. Cal. July 26, 2023) (Press release stating that terminated executives would not receive bonuses, equity and restated stock options conveyed a defamatory meaning).

Defendants Unilever and Magnum's statement published to *CNBC* (italicized in FAC ¶77) announced that the removal Ms. Mittal was to "safeguard [Ben & Jerry's] essential integrity" and came after "internal investigations." This statement is false in several respects: the "investigations" were not the reason why Defendants removed Ms. Mittal; they were pretextual and they found no evidence of misconduct or dishonesty by Ms. Mittal, much less conduct warranting her removal from the Board. Defendants Unilever and Magnum intended to convey the defamatory impression that two objective investigations discovered misconduct by Ms. Mittal justifying her immediate removal from the Board for cause, because she lacked the "essential integrity" which Defendants were seeking to safeguard. Contrary to Defendants' argument (Mot. at 23), "such formalized statements in press releases are usually intended to be factual," *Hawran*, 209 Cal. App. 4th at 292.

Defendants Unilever and Magnum's statement published to the *BBC* on December 19, 2025 (italicized in FAC ¶78) announced the removal of Ms. Mittal and that an audit had "identified… material deficiencies in financial controls, governance…, including conflicts of interest." This statement is false in several respects; the removal of Ms. Mittal was not because of the audit. Moreover, if not asserted directly, the statement implies that Ms. Mittal had engaged in financial misconduct.

In summary, the falsity element is squarely pleaded: Defendants did not remove Ms. Mittal due to the audit and investigation, and the representation or implication that they yielded disqualifying "results" is likewise provably false. (FAC ¶¶83-84, 86). Defendants' "deny the substance" argument (Mot. at 23-24 citing *Vogel v. Felice,* 127 Cal. App. 4th at 1021-22 (2005)), fails on its own terms because the FAC denies the substance -- that the investigations found the charged misconduct at all -- and substantial truth is generally considered a fact question not resolvable on the pleadings. *Glob. Plasma Sols., Inc. v. Iee Indoor Env't Eng'g*, 600 F. Supp. 3d 1082, 1097 (N.D. Cal. 2021); *Hughes v. Hughes*, 122 Cal. App. 931, 937 (2004).

Because each challenged statement asserts or implies that Defendants' investigations found Ms. Mittal to have committed misconduct -- a provably false factual assertion the FAC alleges to be false -- the statements are actionable. Put another way, all of the statements are actionable unless "no 'reasonable fact finder could conclude that [they] imply a provably false factual assertion.'" *Rodriguez*, 314 F. 3d at 987 (citations omitted).

**2. The Statements Were Made with Actual Malice**

In *Reader's Digest Assn. v. Superior Court*, 37 Cal. 3d 244, 257-58 (1984), the court identified the kinds of circumstantial evidence pointing to inferences of actual malice:

> '[E]vidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity.' A failure to investigate, anger and hostility toward the plaintiff, reliance upon sources known to be unreliable, or known to be biased against the plaintiff -- such factors may, in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication.

(citations and fn. omitted). Here, all of these indica are present.

In *Mitchell v. Twin Galaxies LLC*, 70 Cal. App. 5th 207, 223-24 (2021), the court found an inference of actual malice where the defendant relied on "biased sources," including a third party investigator who "publicly expressed [his] conclusion that Mitchell was guilty before the investigation began." *Accord*, *Overstock.com v. Gradient Analytics*, *Inc.*, 151 Cal. App. 4th 688, 713 (2007) (circumstantial evidence of actual malice found where defendants "had direct knowledge that, contrary to Gradient's public assertion that their reports were independent and objective, in reality the reports were subject to manipulation by interested parties."). Here, the FAC alleges that Unilever's "third party investigator", Skadden, was biased (FAC ¶¶34-36, 41), and the investigation itself was intended to generate charges of misconduct against Ms. Mittal. The FAC also alleges several examples of Defendants' "anger and hostility toward the plaintiff," another actual malice inference identified in *Reader's Digest*. (FAC ¶¶21, 28, 50, 51).

The FAC also alleges that Defendants commissioned an audit of the Ben & Jerry's Foundation

by EY, and that the audit "did not find 'wrongdoing, ethical malpractice, or violations'" by Ms. Mittal. (FAC ¶¶83, 86). It further alleges that the Skadden "investigation" "failed to discover any instance in which Ms. Mittal requested or decided that Foundation funds be directed to the benefit of the Oakland Institute," and that Defendants were "presented with evidence affirmatively showing that she had no authority" to fund the Institute and "never attempted to do so." (*Id.* ¶84). Defendants thus "knew that the 'audit' found no evidence that Ms. Mittal personally benefited from any Foundation funding." (*Id.* ¶86). Unilever also "rejected the very same allegations of self-dealing" when they were raised in 2021 by the *Washington Beacon*, which a Unilever executive denounced. (FAC ¶85). Having received no evidence of "wrongdoing, ethical malpractice, or violations", Defendants still proceeded to publish, repeatedly, expressly and through implication that Ms. Mittal had engaged in "self-dealing," "improperly benefited" from Foundation funds, "diverted" funds, and breached her fiduciary duties. (*Id.* ¶¶47, 83).

In *Edward v. Ellis*, 72 Cal. App. 5th 780, 794 (2021), the court found a probability of actual malice where the defendant admitted he had read material establishing the truth before publishing the opposite. His "prepublication" knowledge of the contradictory facts was "critical," "demonstrat[ing] beyond any point of dispute that [he] knew… yet he went ahead with the publication… that insinuated the very opposite," so that he "arguably acted 'with "actual malice" -- that is, with knowledge that [the statements were] false.'" *Id.*

Unlike a mere failure to investigate, "the purposeful avoidance of the truth" also supports a finding of actual malice where the defendant's "inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of [the] charges." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. at 692. In *Harte-Hanks*, the Court found purposeful avoidance where the newspaper "failed to make any effort to interview" the key witness and "no one at the newspaper took the time to listen to" tape recordings the source had made available -- omissions

the jury could find "a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity" of the charges. 491 U.S. at 691–92. The FAC alleges the same avoidance in sharper form: Defendants "purposefully instructed EY to not send Ms. Mittal written questions" about the items underlying the accusations, "though EY had sent the Foundation hundreds of written questions relating to the audit," and when Ms. Mittal "offered to respond to written questions sent by EY," that offer "was rejected… at Defendants' behest." (FAC ¶¶87, 96).

Immediately after receiving the October 23, 2025 letter, Directors of the Independent Board wrote a letter to Unilever's CEO and Board Chair stating that many of the charges "were actually recycled, slanderous claims which previous Unilever executives had rejected", and requested that Unilever respond to their questions about the charges by October 26, 2025. That didn't happen. (Doc. 24-4 at 12 of 27). The FAC alleges that Skadden's Junck "ignored several written requests for information about the purported charges," and that when Independent Board counsel asked Skadden to "specify the allegation" Ms. Mittal was to answer, "Skadden refused to provide the requested information." (FAC ¶¶98–99). Concealing the accusation itself, so the accused cannot rebut it, is a paradigm "deliberate decision not to acquire knowledge of facts that might confirm the probable falsity" of the charge. *Mitchell*, *supra*, 70 Cal. App. 5th at 221 (*prima facie* malice found where the record showed a "decision to avoid facts that might confirm the probable falsity of the challenged statement").

The FAC also alleges that on December 3, 2025 the Independent Board "sent a detailed response refuting all of the statements made in the October 23, 2025 letter," and that Defendants "[n]onetheless… restated the exact same allegations in their December 15, 2025 letter" and accompanying press messaging. (FAC ¶93). *Antonovich v. Superior Court*, 234 Cal. App. 3d 1041, 1053 (1991) is instructive on this point. There, the court held a trier of fact could find actual malice because the defendant, after his opponent "offered to submit his proof for [the defendant's]

inspection," "submitted no evidence… to show what, if any, steps he took to inquire into the truth" and "instead[] made similar statements thereafter." That, the court held, permitted the inference that the defendant's "inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of [the] charges," amounting to a "purposeful avoidance of the truth." *Id*. (quoting *Harte-Hanks*, 491 U.S. at 692). Defendants likewise received a point-by-point refutation, made no effort to engage it, and restated the identical charges.

Finally, the FAC alleges that Defendants proposed "to install Ms. Mittal as head of a new multi-million-dollar charitable organization with funding coming from Unilever," and pleads the common-sense inference directly: "[h]ad Defendants actually believed their accusations of serious misconduct, their implementation of such an arrangement would have breached their own fiduciary duties." (FAC ¶92.) One does not just entrust millions in charitable funds to a person one believes has just been found to have engaged in financial self-dealing easily. The offer is probative in two ways because it was coupled with an assurance that, if Ms. Mittal resigned, "the investigation would result in a finding of no wrongdoing," (*Id.* ¶44) -- a representation that the investigation's outcome was available on demand, further confirming that its accusatory "findings" were not the product of good faith belief, but instead, manipulation.

**D. The False Light Count States a Claim**

Defendants argue "[w]hen a false light claim is coupled with a defamation claim, the false light claim is essentially superfluous, and stands or falls on whether it meets the same requirements as the defamation cause of action," and assert it "fails for the same reasons." (Mot. at 24 (quoting *Jackson v. Mayweather,* 10 Cal. App. 5th 1240, 1264-65 (2017)). A false-light claim that "meets the same requirements as the defamation cause of action" survives when the defamation claim does. *Id.*

**E. The IIED Count States a Claim**

This is not a case of "mere insults, indignities, threats, annoyances, petty oppressions, or other

trivialities." *Hughes v. Pair,* 46 Cal. 4th 1035, 1051 (2009). The FAC alleges a deliberate, orchestrated campaign: Defendants manufactured "findings of misconduct" their own investigators had refuted, then published them to investors and the global press knowing them to be false, for the purpose of coercing Ms. Mittal's resignation and "maximiz[ing]" her "humiliation." (FAC ¶¶29, 83-84, 86). Defendants' cases are the opposite -- *Koch v. Goldway*, 817 F. 2d 507, 510 (9th Cir. 1987), involved a single off-hand political insult and *Duronslet v. Cnty. of Los Angeles*, 266 F. Supp. 3d 1213, 1219 (C.D. Cal. 2017), mere "trivialities."

A calculated scheme to destroy a person's professional reputation with accusations known to be false is a different order of conduct -- one that can "exceed all bounds of that usually tolerated in a civilized community." *Hughes*, 46 Cal. 4th at 1050-51. Although the court decides outrageousness in the first instance, the conduct pleaded here clears that threshold. In *Moser*, *supra*, the court deemed the alleged conduct (threats and defamation) was sufficient to survive a motion to dismiss: "where reasonable persons may differ, it is for the jury to determine whether the conduct was sufficiently outrageous." *Moser*, 2006 U.S. Dist. LEXIS 109142 at *34 (citing *Alcorn v. Anbro Eng'g Inc.*, 2 Cal. 3d 493, 499 (1970)).

In *Moser*, the court held that the plaintiff adequately pled severe emotional distress based on his allegations that "he suffered humiliation, mental anguish, and emotional and physical distress, and has been injured in his mind and body including, without limitation: inability to sleep, inability to concentrate, physical and mental exhaustion, restlessness, distractions, anxiety and public embarrassment." *Moser*, *supra*, 2006 U.S. Dist. LEXIS 109142 at *35. See also *Doe v. Gangland Prods.*, 730 F. 3d 946 (9th Cir. 2013) (plaintiff established a reasonable probability of prevailing on IIED claim where he alleged that he suffered emotional distress because he lost his job and apartment, and gang members threatened him). The FAC details the symptoms of Ms. Mittal's severe emotional distress, including emotional swings, intense anxiety, insomnia, an inability to meet social and family

obligations, depression and other problems. (FAC ¶106).

### F. Even If Plaintiff is Partially Successful, a Fee Award is Inappropriate

Finally, the sequencing of Defendants' two motions cannot produce two different results. Defendants elected the legal sufficiency framework and, as shown above, every challenged statement survives that shared standard, but even if one survives, both motions fail together. If the Court were to find otherwise as to some subset of statements, the dismissal of particular statements while others survive does not support an anti-SLAPP fee award as to the surviving claims. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 985 (9th Cir. 2002) (affirming partial dismissal of defamation claims where some statements failed and others survived). Fees under § 425.16(c)(1) attach only to what is actually stricken; they are not a windfall for a partially unsuccessful motion. Any dismissal that does occur should proceed under Rule 12(b)(6), with leave to amend, rather than under the anti-SLAPP statute's fee-shifting, no-amendment framework, particularly given the unresolved question whether § 425.16 even displaces the Federal Rules in this posture. *Berk*, 146 S. Ct. at 552-55.

## IV. CONCLUSION

For the reasons stated above, Ms. Mittal respectfully requests that Defendants' motions be denied in their entirety.

DATE: September 9, 2026

Respectfully submitted

By: /s/ Paul K. Vickrey

PAUL K. VICKREY (*Pro Hac Vice*)
PATRICK F. SOLON (*Pro Hac Vice*)
DYLAN M. BROWN (*Pro Hac Vice*)
**Vitale, Vickrey, Niro, Solon & Gasey LLP**
311 S. Wacker Drive, Suite 2200
Chicago, IL 60606
(312) 236-0733
vickrey@vvnlaw.com
solon@vvnlaw.com
dbrown@vvnlaw.com

THOMAS B. HARVEY (CA Bar #287198)
**LAW OFFICES OF THOMAS B. HARVEY**
365 E. Avenida De Los Arboles, #226
Thousand Oaks, CA 91360
Telephone: (805) 768-4440
tbhlegal@proton.me

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served on all counsel of record electronically or by another manner authorized under Fed. R. Civ. P. 5(b) on this the 9th day of September 2026.

Dated: September 9, 2026

By: */s/ Paul K. Vickrey*
Paul K. Vickrey
*Attorney for Plaintiff*